UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

MASON CLASSICAL ACADEMY, INC.,
a Florida non-profit corporation,
KELLY LICHTER, individually, and
DAVID BOLDUC, individually,

                                        Case No. 2:22-cv-513-JLB-NPM

       Plaintiffs,

v.

LARRY ARNN, individually,
HILLSDALE COLLEGE, INC.,
a Michigan non-profit corporation,
JONATHAN D. FISHBANE, individually,
ERIKA DONALDS, individually,
THE OPTIMA FOUNDATION, INC.,
a Florida non-profit corporation,
MATTHEW MATHIAS, individually,
PHOENIX EDUCATION NETWORK, INC.,
a Florida non-profit corporation,
CHRISTOPHER DURST, individually, and
CHRISTINE LEWIS, individually,
PAMELA VICKARYOUS, individually,
BENJAMIN H. YORMAK, individually,
BYRON DONALDS, individually,
and OPTIMAED, LLC, a Florida limited
liability company,

       Defendants.

_____/

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

      Plaintiffs, Mason Classical Academy, Inc., Kelly Lichter, and David Bolduc,

sue Defendants, Larry Arnn, Hillsdale College, Inc., Jonathan D. Fishbane, Erika

Donalds, The Optima Foundation, Inc., Matthew Mathias, Phoenix Education

Network, Inc., Christopher Durst, Christine Lewis, Pamela Vickaryous, Benjamin H.

Yormak, Byron Donalds, and OptimaEd, LLC, and allege as follows:

## I.    <u>NATURE OF THE ACTION</u>

1.     Mason Classical Academy, Inc. is a private non-profit corporation that

operates "Mason Classical Academy," *the highest performing public school* in Collier

County, Florida, and Kelly Lichter and David Bolduc are *unpaid volunteers* who serve

on the school's Governing Board.

2.     Despite Mason Classical Academy's stellar academic and financial

performance, Plaintiffs have been the targets of a relentless, ongoing conspiracy carried

out by individuals, officials, and entities with considerable political and economic

power on the local, state, and national level.

3.     This cast of conspirators and their accomplices and enablers includes

current and former elected officials, attorneys, their spouses and affiliated companies,

and others with political aspirations or grudges against Plaintiffs, who covertly

planned and carried out a continuing series of criminal and tortious acts that violated

Plaintiffs Constitutional rights, liberties, and freedoms.

4.     Regardless of whether they were motivated by the money, power, and/or

political benefits associated with controlling Mason Classical Academy or driven by

greed, political alliances, ill-will, hatred, or spite, each Defendant shared a common

goal of harming Plaintiffs so they could advance their own social, political, or

economic interests.

5.      In furtherance of that goal, Defendants each engaged in overt, unlawful, and tortious acts that substantially contributed to their conspiracy's objective and caused Plaintiffs considerable harm that cannot be allowed to continue.

6.      Plaintiffs bring this action primarily to stop the ongoing retaliation and harassment they and their school continue to endure simply because they are unwilling to be bullied and forced to give control of their school to people with more influence and power.  Plaintiffs also seek compensation for the significant harm caused by Defendants' acts and conspiracy to seize control of Mason Classical Academy and oust its Board.

## II.    <u>PARTIES, JURISDICTION & VENUE</u>

7.      Plaintiff, Mason Classical Academy, Inc. ("MCA") is a Florida non-profit corporation with its principal place of business located in Collier County, Florida.

8.      Plaintiff, Kelly Lichter ("Lichter"), is an individual residing in Collier County, Florida.

9.      Plaintiff, David Bolduc ("Bolduc"), is an individual residing in Collier County, Florida.

10.     Defendant, Larry Arnn ("Arnn"), is an individual residing in Hillsdale, Michigan.

11.     Defendant, Hillsdale College, Inc. ("Hillsdale"), is a Michigan non-profit corporation that is registered to conduct and conducting business in Florida, including in Collier County, with its registered agent located in Volusia County.

12.    Defendant, Jonathan D. Fishbane ("Fishbane"), is an individual residing in Collier County, Florida.

13.    Defendant, Byron Donalds ("Rep. Donalds"), is an individual residing in Collier County, Florida.

14.    Defendant, Erika Donalds ("E. Donalds"), is an individual residing in Collier County, Florida.

15.    Defendant, The Optima Foundation, Inc. ("Optima Foundation"), is a Florida non-profit corporation with its principal place of business located in Collier County, Florida.

16.    Defendant, OptimaEd, LLC ("OptimaEd"), is a Florida limited liability company with its principal place of business located in Collier County, Florida.

17.    Defendant, Matthew Mathias ("Mathias"), is an individual residing in Collier County, Florida.

18.    Defendant, Phoenix Education Network, Inc. ("Phoenix"), is a Florida non-profit corporation with its principal place of business located in Collier County, Florida

19.    Defendant, Christopher Durst ("Durst"), is an individual residing in Orange County, Florida.

20.    Defendant, Christine Lewis ("Lewis"), is an individual residing in Hillsborough County, Florida.

21.    Defendant, Pamela Vickaryous ("Vickaryous"), is an individual residing in Collier County, Florida.

4

22.     Defendant, Benjamin H. Yormak ("Yormak"), is an individual residing in Lee County, Florida.

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §1332 because it involves claims arising under the U.S. Constitution and laws of the United States, as well as claims between citizens of different states with an amount in controversy that exceeds the sum of $75,000.00, exclusive of interest and costs.  This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367 because they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same cause or controversy under Article III of the U.S. Constitution, and do not raise novel or complex issues of state law or substantially predominate over the claims over which this Court has original jurisdiction.

24.     Pursuant to 28 U.S.C. §1391, venue is proper in this District because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District and multiple Defendants reside in this District.

25.     Defendants, directly and/or through employees, agents, authorized representatives, co-conspirators, subsidiaries, affiliates, and/or other persons, entities, and/or representatives acting under their management, direction, supervision, and/or control, engaged in numerous contacts in, with, and/or directed at the state of Florida upon which this action is based.

26.     Defendants knowingly and intentionally entered into one or more contracts or agreements, pursuant to which they, directly and/or through employees,

agents, authorized representatives, co-conspirators, subsidiaries, affiliates, and/or other persons, entities, and/or representatives acting under their management, direction, supervision, and/or control, committed and engaged in tortious and overt acts within and directed at the state of Florida.

27.     Based on the facts alleged throughout this Complaint, this Court has personal jurisdiction over each Defendant under Section 48.193, *Florida Statutes*, because they each personally, directly, in concert with one another, and/or through an employee, agent, co-conspirator, subsidiary, affiliate, and/or other person or entity acting under their management, supervision, direction, and/or control, engaged in one or more of the following acts:

    a.    committing tortious acts within the state of Florida;

    b.    committing intentional torts expressly aimed at Florida, effects of which were suffered in Florida;

    c.    operating, conducting, engaging in, or carrying on a business or business venture within the state of Florida, or having an office in Florida;

    d.    engaging in substantial and not isolated activity within the state of Florida; and/or

    e.    engaging in a conspiracy to commit tortious acts against Plaintiffs within the state of Florida and engaging in overt acts in furtherance of that conspiracy within the state of Florida.

28.     Based on the facts alleged throughout this Complaint, sufficient minimum contacts exist between each Defendant and the state of Florida to satisfy Due Process under the United States Constitution because Defendants:  (1) engaged in substantial and not isolated activity within and directed at the state of Florida;

(2) reside, maintain an office, and/or conducted business through employees, agents,

co-conspirators, and/or authorized representatives located in the state of Florida;

and/or (3) committed and conspired to commit intentional torts expressly aimed at

Florida, the effects and harms of which were calculated to and did cause injury within

the state of Florida.   Accordingly, each of the Defendants could and should have

reasonably anticipated being sued for the claims alleged herein in the state of Florida.

29.     At all times material to this action, Defendants were the agents, licensees,

employees, partners, joint-venturers, co-conspirators, masters, and/or employers of

one another, and each of them acted within the course and scope of an agency, license,

partnership, employment, conspiracy, ownership, joint venture, or contractual

relationship with one another.  At all times material to this action, each Defendant's

acts, omissions, and misconduct alleged herein were known to, authorized, approved,

and/or ratified by the other Defendants; and/or Defendants engaged in such acts,

omissions, and misconduct in concert or active participation with one another or to

aid or abet one another.

30.     Defendants conspired and agreed with each other and others to engage

in unlawful and tortious conduct intended to violate Plaintiffs' Constitutional rights,

harm Plaintiffs, prevent Plaintiffs from holding office and discharging the duties of

their offices, injure Plaintiffs on account of their lawful discharge of the duties of their

offices, and disrupt and/or interfere with the lawful administration and functions of

their offices and MCA's operations.  In furtherance of this conspiracy, Defendants and

other co-conspirators engaged in overt acts within and directed at the state of Florida

and could and should have reasonably anticipated that their and their co-conspirators' acts and omissions alleged herein connected them to Florida in a meaningful way.

31.     Defendants' actions, failures to act, and misconduct alleged herein produced and/or substantially contributed to producing the damages, injuries, and harms Plaintiffs suffered, and for which they seek recovery and redress through this action; which injuries and harms occurred in the state of Florida and the greatest effects of which were suffered within the state of Florida.

32.     All conditions precedent to the filing and maintenance of this action have occurred, have been performed, and/or have been waived.

33.     Plaintiffs have retained the undersigned attorneys to represent them in this action and are obligated to pay them a reasonable fee for their services.

## III.    OVERVIEW OF THE PARTIES & KEY PLAYERS

34.     MCA operates a charter school for grades K-12 in Collier County, Florida pursuant to a Charter Agreement with the School Board of Collier County ("CCSB") dated June 13, 2017 (attached as **Exhibit A**), as amended by the First Amendment to the Charter Agreement dated December 1, 2017 (attached as **Exhibit B**).  MCA's charter runs through November 30, 2032.

35.     MCA is Collier County's highest performing K-12 public school.  The Florida Department of Education ("FDOE") ranked MCA No. 8 out of 3,392 schools in the state in 2021.  *US News and World Report* recently ranked MCA the No. 351 public school nationally out of 17,843 schools.

36.    MCA is a prototype charter school—one started by parents who wanted to take a more active role in their children's and community's children's public education.

37.    Lichter is a mom, MCA parent, and former teacher who helped found MCA and has served as its President since its inception over a decade ago.

38.    Lichter *volunteers* her time at MCA and is not compensated for her services.  Her hard work and dedication in the educational field has been recognized by the FDOE, *US News and World Report*, *Eagle Forum*, and the Florida Consortium of Charter Schools.

39.    Lichter served as a Collier County School Board ("CCSB") Member from 2014-2018, often clashing with CCSB counsel, Fishbane, and other CCSB Board Members due to philosophical differences and because Lichter is a staunch advocate for school choice and charter schools.

40.    Bolduc is a dad and parent of a former MCA student who works in the financial services industry and has *volunteered* his time without compensation as an MCA Board Member and its Treasurer since January 2019.

41.    **Lichter and Bolduc do _not_ personally profit or derive any personal financial benefit from the time and energy they donate to MCA**.

42.    Durst is a former MCA parent and an accountant with "operational and financial management experience from a variety of industries."

9

43.    Lewis is a former MCA parent and former administrative assistant for MCA.

44.    Joseph Baird ("Baird") is a former MCA parent who briefly served on the MCA Board and as its Treasurer from August 2016 to October 2016.

45.    Mathias was an MCA Board Member from September 2014 until his resignation in December 2015 due to a conflict of interest associated with loans he procured for the school.

46.    Mathias is a founder and Chair of the Governing Board of Defendant, Phoenix, a Florida non-profit corporation he formed with E. Donalds amidst the conspiracy to take over MCA and oust its Governing Board.

47.    Phoenix operates Naples Classical Academy, a Hillsdale College "Member" charter school E. Donalds manages through the Optima Foundation and OptimaEd.  Naples Classical Academy opened in the fall of 2021.

48.    Mathias serves on Phoenix's Governing Board alongside its Vice Chair, Derrick Ayers[1] ("Ayers"), Tim Hall (a consultant for Florida Gulf Coast University and Ambassador for the Greater Naples Chamber of Commerce), Bill Truog (a Hillsdale College graduate),. Holly Miller, and Mark Russo.

---

[1] Ayers was a board member of the Greater Naples Chamber of Commerce alongside Bill Barker, President/Publisher of the *Naples Daily News* from 2016-2021.  Ayers and Bill Barker also served together on the Collier County Chamber of Commerce and The Partnership for Collier's Future Economy.

49.     Rep. Donalds is a member of the U.S. House of Representatives on behalf of Florida's 19th District.  He served as a member of the Florida House of Representatives from 2016-2020, where he was on the Education Committee and Appropriations Committee, Vice Chair of the PreK-12 Appropriations Subcommittee, and centrally involved in the passage of Florida House Bill 7069 in 2017 ("HB 7069"), including its "Schools of Hope" and "Hope Scholarship" initiatives.

50.     E. Donalds and Rep. Donalds are married and actively involved in federal, state, and local politics:





51.     E. Donalds was an MCA Advisory Board Member from 2012-2014 and Collier County School Board Member from 2014-2018.

52.     In 2015, E. Donalds co-founded the Florida Coalition of School Board Members ("FCSBM") with Shawn Frost (Rep. Donald's 2020 campaign manager), Bridget Ziegler, and Jeff Bergosh.  FCSBM was created as an alternative to the Florida State School Board Association and it advocated for school choice as one of its top priorities.

53.     E. Donalds currently serves as the President and CEO of Defendants, Optima Foundation and OptimaEd.

54.     Optima Foundation was incorporated in 2017 and until recently operated as a charter school management company providing financial and compliance

management services to charter school governing boards in exchange for a management fee, typically in the range of 10% to 12% of the school's gross revenue.

55.    In the fall of 2022, Optima Foundation shifted its focus to fundraising[2] and OptimaEd assumed the role of managing several Hillsdale affiliated charter schools in Florida and Optima's virtual charter school ("Optima Classical Academy")[3]—which recently became Step Up for Students' first ever virtual reality provider.  Step Up for Students runs Florida scholarship programs, such as the Florida Tax Credit Scholarship, Hope Scholarship, Reading Scholarship, and the Family Empowerment Scholarship.

56.    OptimaEd is described as an Optima Foundation "sister organization" and "Education Experience Company" that offers a "selection of private, public, and virtual reality-based educational environments" and provides various "management, curriculum, counseling, and training" resources associated with charter schools, including charter school management and assistance with charter applications and renewals:

---

[2] According to its website, Optima Foundation now operates "to connect [its] schools with donors who want to make a difference by providing private, philanthropic support" and "supports the establishment and continuing development of superior quality schools of choice and the education delivery systems they use."  *See* https://optima.foundation/about/.

[3] In September 2020, E. Donalds incorporated Optima Domi, LLC (now OptimaEd), in connection with the development of a virtual instruction provider of a classical education curriculum.  This virtual learning environment is now marketed as "Optima Classical Academy."



57.    OptimaEd markets the "brick and mortar" charter schools it manages to the public as "Optima Academies":



**In-person Learning**

Optima Academies are traditional, brick-and-mortar public charter schools delivering a scholarly environment, a classical education model, and a time-tested liberal arts and sciences curriculum for grades K to 12. They are tuition-free and privately managed under contract with their local school districts and are open to all children regardless of income or zip code.

Each academy's faculty delivers a content-rich rigorous curriculum using traditional classroom instruction and teaching methods. Uniforms are worn in a scholarly environment, ensuring that training students' hearts and minds remain the focus of each school day.

**Our OptimaEd Brick & Mortar Schools Provide:**



**HILLSDALE COLLEGE**
*K-12 Education*
**MEMBER SCHOOL**
**BARNEY CHARTER SCHOOL INITIATIVE**

58.    The "Optima Academies" currently include Treasure Coast Classical Academy, Jacksonville Classical Academy, Naples Classical Academy, Jacksonville Classical Academy East, and Estero Classical Academy, and provide Hillsdale's K-12 Curriculum.

59.    The stated goal of Optima Foundation and OptimaEd is to launch Hillsdale schools throughout the state of Florida:





---

[4] *See* https://www.linkedin.com/company/optimafoundation

60.    Optima Foundation and OptimaEd employ several individuals with close ties to Hillsdale and Arnn, such as Domine Clemons ("Clemons")[5] and Bob Harden ("Harden").[6] Optima Foundation's Director of Charter School Management.

61.    Chuck Marshall ("Marshall") was also affiliated with MCA for several years until he left MCA to help start Hillsdale charter schools for the Optima Foundation in 2019.

62.    In December 2021, E. Donalds incorporated The Classical Education Network, Inc. In 2022, with the assistance of the OptimaEd, The Classical Education Network, Inc. submitted applications to open several new charter schools in Florida, including Estero Classical Academy,[7] Palms Classical Academy, and Wildlight Classical Academy—each of which will also be Hillsdale schools.

---

[5] Clemons is Optima Foundation's Government Relations Manager and OptimaEd's Manager of Strategic Partnerships. She is a 2020 graduate of Hillsdale College and a member of the Emerging Leaders Council at the Steamboat Institute who also previously worked as the Director of Operations of Florida Citizens Alliance and interned at the U.S. Department of Education under Betsy DeVos.

[6] Harden is an Optima Foundation Board Member and also serves on the Board of the Foundation for Government Accountability ("FGA") with Bridgett Wagner (Vice President for External Relations at The Heritage Foundation and Steamboat Institute board member with Dr. Matthew Spalding, Vice President of Washington Operations and Dean of the Van Andel Graduate School of Government for Hillsdale College in Washington D.C).

[7] Estero Classical Academy's Governing Board includes Chris Hudson (V.P. of Government Affairs for Americans for Prosperity), Glenton Gilzean (President and CEO of the Central Florida Urban League and former V.P. of Advocacy and Community Affairs for Step Up for Students), and Yvonne Caldwell (member of the Florida Education Practices Commission whose Husband, Matthew Caldwell, is a former member of the Florida House).

63.    Optima Foundation and The Classical Education Network, Inc. are involved in fundraising efforts to benefit OptimaEd's operations, such as "The Classical Education Network Christmas Celebration," offering ticket packages ranging from $10,000 to $30,000 to the consuming public for access to the party and a photo with Mrs. and President Trump:[8]



64.    Optima Foundation also actively solicits donations from the consuming public on its website for OptimaEd's operations:

---

[8] *See* https://www.aclassicalchristmas.com/

## What You Impact

Donors like you make Optima experiences possible. Your donations are used to support a variety of aspects crucial to the growth and success of our various initiatives.



### School Start-Up

As you can imagine, the costs associated with starting up a school are considerable. Your support provides critical bolstering to these and other initial costs.



### Virtual Learning Platforms

The equipment and programming development costs to bring these programs to life are crucial to making these experiences everything they can (and should) be.



### Schools in Operation

From utilities to supplies, salaries to security, and everything in between, it all adds up to a tidy sum. Your contribution helps us keep our house in order.



### Faculty Excellence

As with most things in life, you get what you pay for, and teacher salaries are no different. This is an area where having the right team makes all the difference.

65.     Hillsdale College is a private conservative liberal arts college based in Hillsdale, Michigan.  All of Hillsdale's educational efforts—from its undergraduate and graduate degree programs at its campus in Hillsdale, Michigan, to its national outreach programs—depend on the support of donors because it does not receive funding from any government funding, loans or grants.   Hillsdale College's endowment is nearing $1 billion.

66.     Hillsdale College's Barney Charter School Initiative ("BCSI") started in 2010 to launch K–12 charter schools across the country based on a classical liberal arts

model, with a strong civics component to "equip students to understand and defend
the principles of the Declaration of Independence and the Constitution."

67.    Hillsdale's BCSI has been described by some as "part of the far right's
national plan for schools":



68.    In May 2021, Hillsdale incorporated American Classical Education,
Inc. ("American Classical Education") in Delaware.  In early 2022, Hillsdale
registered American Classical Education to do business in Tennessee—shortly before
Tennessee Gov. Bill Lee announced plans with Hillsdale to launch as many as 50
BCSI charter schools in Tennessee.

69.    Hillsdale began applying to open its charter schools in Tennessee
through American Classical Education around the same time E. Donalds' Classical
Education Network began applying to open several new charter schools in Florida.

70.    Arnn has served as Hillsdale's President since 2000.  He is one of the founders of The Claremont Institute, serving as its President from 1985 to 2000, and has also served on the Board of Directors of The Heritage Foundation since 2002 and on the Board of Advisors for Landmark Legal Foundation.

71.    Arnn's daughter, Kathleen O'Toole ("O'Toole"), is Assistant Provost for K-12 Education at Hillsdale College, where she leads Hillsdale's work in K-12 education and the BCSI.

72.    O'Toole and E. Donalds serve together as Advisory Board Members for Classic Learning Test ("CLT"), a standardized test developed by Classic Learning Initiatives designed as an alternative to the SAT and ACT.

73.    Phillip Kilgore ("Kilgore") was the Executive Director of Hillsdale College until September 2019 and responsible for BCSI until July 2019, when O'Toole took over.

74.    Eric Coykendall ("Coykendall) is a graduate of Hillsdale College and Associate Director of Hillsdale's BCSI, where his job duties and responsibilities include charter school founding efforts, guiding schools through the application process, and writing and defending charter applications.

75.    Chris VanOrman ("VanOrman") is a professor at Hillsdale College and was appointed its Provost in 2019.

76.    Mike Harner ("Harner") is Chief Staff Officer and Assistant to the President at Hillsdale College.  Harner is also Board Chair of Hillsdale's American Classical Education.

77.     Arnn was and is the ultimate decisionmaker at Hillsdale and directed and approved all of the actions of Hillsdale, O'Toole, Kilgore, Coykendall, VanOrman, and Harner alleged herein.

78.     CCSB is the elected policy-making body of the Collier County School District ("CCSD").  CCSB Board Members focus on policy and governance and appoint the Superintendent of Schools in Collier County, who is the Secretary and Executive Officer of the CCSB and administers daily operations in the CCSD.  The CCSB is composed of five members, elected at large, for staggered four-year terms. CCSB sponsored MCA's Charter.

79.     Kamela Patton ("Sup. Patton") has been Superintendent of Schools in Collier County since 2011 and is scheduled to leave her position following the 2022-2023 school year.

80.     Fishbane is a licensed attorney in the state of Florida and employed by CCSD as its General Counsel pursuant to a contract of employment with CCSD.

81.     Fishbane previously worked at the Roetzel & Andress[9] law firm with James Fox ("Fox"), who represents the CCSB as outside litigation counsel in several matters adverse to MCA, Lichter, and Bolduc.  Fishbane and Fox are friends and have worked together for many years.

---

[9] Roetzel & Andress was the Naples City Attorney until May 2021.

82.     Vickaryous was MCA's Principal from October 4, 2019 through June 5, 2020.  Prior to joining MCA, she worked as a CCSD Administrator, Principal, and Assistant Principal.

83.     Before working at MCA, Vickaryous was fired from Manatee Middle School after allegations of erratic and abusive behavior through targeting, bullying and undermining staff.  After Vickaryous was fired as Principal of Manatee Middle School, Yormak filed a whistleblower lawsuit on her behalf against the CCSD.

84.     Yormak is a licensed Florida attorney who specializes in employment and disability law and regularly represents individuals in employment and whistleblower claims.  Yormak's clients include Vickaryous, former MCA employee Scott Moore, and Durst.

85.     Former MCA attorney, Shawn Arnold ("Arnold"), is a licensed Florida attorney whose practice is focused on representing charter schools and educational management organizations ("EMOs") in transactional and litigation matters throughout Florida.  Arnold's firm, The Arnold Law Firm, L.L.C., is a Florida Consortium of Public Charter Schools[10] ("FCPCS") preferred vendor that represents charter and private schools, EMOs, educational service providers, investors, and others similarly situated.

---

[10] FCPCS is Florida's leading charter school membership association with a membership of nearly 75 percent of all operating charter schools.  FCPCS provides technical support, mentoring, training, networking, and purchasing services to its membership; and advocates for all Florida public charter schools.

## IV.    FACTUAL BACKGROUND

### A.    Overview of Florida's Charter School System

86.    Charter schools in Florida are part of the state's program of public education and formed and operated pursuant to a statutory framework laid out in Part III of Chapter 1002, *Florida Statutes*.  *See* § 1002.33, *Fla. Stat*.

87.    Charter schools are "sponsored" by the district school board in the county in which the charter school is located. *See* § 1002.33(5)(a), *Fla. Stat*.

88.    Charter school "sponsors" have specific enumerated duties, such as the review and approval of new charter school applications, renewal of charter contracts, and monitoring and reviewing school progress and certain operations. *See* §§ 1002.33(5)(b) & 1002.345, *Fla. Stat*.

89.    As publicly acknowledged[11] by CCSD representative Sheryl Rogers concerning MCA in October 2018:

> Sheryl Rogers, administrative director of curriculum and instruction and charter school liaison for the Collier school district, said the district does not have a supervisory role over charters.
>
> "Their board is the governing body of that school," she said.

90.    A charter school sponsor cannot apply its policies to a charter school unless the charter school agrees.  *See* § 1002.33(5)(b)(1)(d), *Fla. Stat*.  Moreover, a sponsor cannot impose additional reporting requirements on a charter school so long

---

[11]        https://www.naplesnews.com/story/news/education/2018/10/05/former-mason-classical-treasurer-alleges-financial-mismanagement/1251257002/

as the charter school has not been identified as having a deteriorating financial condition or financial emergency.  *See* § 1002.33(b)(1)(j), *Fla. Stat.*

91.    Section 1002.33(8), *Florida Statutes*, specifies very limited causes for nonrenewal and termination of charters.  Sponsors are required to "make student academic achievement for all students the most important factor" in renewal and termination decisions.  *See* § 1002.33(8)(a), *Fla. Stat.*  Sponsors "may choose not to renew or may terminate [a] charter only if the sponsor expressly finds that" one of the following three grounds "exists by clear and convincing" evidence:  (1) failure to participate in the state's education accountability system or failure to meet the requirements for student performance stated in the charter; (2) failure to meet generally accepted standards of fiscal management due to deteriorating financial conditions or financial emergencies determined pursuant to § 1002.345; or (3) material violation of law. *Id.*

92.    A charter can only be terminated immediately where the sponsor "sets forth in writing the particular facts and circumstances demonstrating that an immediate and serious danger to health, safety, or welfare of the charter school's students exists and is likely to continue, and an immediate termination of the charter is necessary.  *See* § 1002.33(8)(c), *Fla. Stat.*

93.    Charter schools are exempt from Chapters 1000-1013, Florida Statutes, with certain enumerated exceptions.  *See* § 1002.33(16)(a)-(b), *Fla. Stat.*

94.    The governing board of a charter school is required to exercise continuing oversight over charter school operations, responsible for establishing and maintaining

certain internal controls and compliance with governing laws and participate in governance training approved by FDOE. *See* § 1002.33(9)(i)-(j), *Fla. Stat.*

95.    Members of a charter school governing board are subject to §§ 112.313(2) [solicitation or acceptance of gifts], 112.313(3) [doing business with one's agency], 112.313(7) [conflicting employment or contractual relationship], and 112.313(12) [exemptions], and 112.3143(3) [voting conflicts], *Florida Statutes*. *See* § 1002.33(26)(a), *Fla. Stat.*

96.    **A charter school sponsor and FDOE have no authority to appoint or remove charter school governing board members**.

97.    In the performance of their official duties, Florida charter schools (such as MCA) and their Governing Board members (such as Lichter and Bolduc) are required to comply with the U.S. Constitution and several Federal laws, such as the:

- Elementary and Secondary Education Act of 1965 (ESEA), as amended;

- Family Educational Rights and Privacy Act (FERPA);

- Civil Rights Laws, including Title II of the Americans with Disabilities Act, Title IX of the Education Amendments of 1972, and Title VI of the Civil Rights Act of 1964;

- Individuals with Disabilities Education Act (IDEA); and

- Workforce Innovation and Opportunities Act (WIOA).

## B. The Economics & Politics of Charter Schools

98.     Although publicly funded, operated by non-profit organizations, and sponsored by local school districts, charter schools are significant sources of political capital and private revenue *for some* people and organizations (like Defendants).

### (1)     The Economics of Charter Schools

99.     In 2021-2022, Florida appropriated $182,864,353 to charter schools through the Florida Education Finance Program ("FEFP").  Funding for each charter school is directly tied to its student enrollment.

100.     Management companies or EMOs play a prominent role in Florida's charter school system.[12]  Over 40% of Florida charter schools are managed by EMOs, which receive a percentage of the public funds appropriated to a charter school in exchange for their management services.

101.     By way of example, Optima typically receives a 10% to 12% management fee from each charter school it manages.

102.     Charter school campuses are also a significant source of revenue in the form of rent charter schools pay to lease their facilities and interest charter schools pay on loans they use to purchase and build charter school campuses.  Some EMOs (directly or through related entities) own and rent campuses to charter schools.

103.     Organizations can also generate significant revenue from representing charter schools and EMOs during the charter application and renewal process.

---

[12] Two of the largest EMOs in the country are based in Florida (Charter Schools USA and Academica).

104.   Not surprisingly, EMOs and other businesses in the charter school industry are active in Florida politics.  By some estimates, EMOs have provided over $13.5 million in political spending in Florida since 1998, and several EMOs have direct and indirect connections to elected officials.

**(2)    The Politics of Charter Schools**

105.   When Optima Foundation was formed in 2017, E. Donalds was a sitting CCSB Board Member and Rep. Donalds was a member of Florida's legislature and Vice Chair of the Prek-12 Appropriations Subcommittee, where he worked closely with Florida's then-Speaker of the House, Richard Corcoran—who appointed E. Donalds to Florida's 2017-2018 Constitution Revision Commission ("CRC"), on which she served as the Chair of the CRC's Local Government Committee and on the CRC's Rules, Education, and Declaration of Rights Committees:.

106.   In 2017, Florida significantly expanded the economic opportunities associated with charter schools in the state through the "Schools of Hope" legislation (HB 7069), which allows (among other things) "Hope Operators" to manage charter schools in areas where there are "persistently low-performing" public schools.  EMOs that meet certain criteria (including management of *three (3) or more charter schools*) can be designated "Hope Operators" by the state and entitled to be paid their management fee for operating Schools of Hope.[13]  These management fees can range

---

[13] In 2020-2021, there were approximately **159** "persistently low-performing" public schools in Florida, presenting significant financial opportunities for EMOs that can qualify as Hope Operators.

from hundreds of thousands to millions of dollars depending on a school's enrollment. *See* § 1002.333(2), *Fla. Stat.*

107.   HB 7069, which was introduced by Rep. Manny Diaz, Jr. and co-sponsored by Rep. Donalds, was a top priority of then-Speaker Corcoran and eventually resulted in hundreds of millions of dollars for Florida charter schools.

108.   E. Donalds and Rep. Donalds are one of several Florida political families with ties to the charter school industry that were centrally involved in HB7069 and other legislation expanding school choice programs:

      A.  <u>Corcoran</u>:  Richard Corcoran served as Speaker of the Florida House from 2016-2018 and Florida's Commissioner of Education from 2018-2022, when Gov. DeSantis appointed Corcoran to the Board of Governors of the State University System.  Corcoran's wife, Anne, has been active in Hillsdale College's BCSI.  She founded and served as CEO of Classical Academy Preparatory School in Pasco County, Florida, and helped found and served on the Board of Tallahassee Classical School, a Hillsdale BCSI charter school.  Corcoran's brother, Michael, is the founding partner and CEO of Corcoran Partners, a lobbying firm that has worked for the FCPCS and several charter school management companies;

      B.  <u>Diaz</u>:  Manny Diaz, Jr., was a member of Florida's House from 2012-2018 (where he served as Chair of the Choice and Innovation and K-12 Appropriations Committees) and a member of Florida's Senate from 2018-2022 (where he served as Chair of the Senate Education

Committee).  Diaz was appointed by Gov. DeSantis in 2022 as
Corcoran's replacement for Education Commissioner.  In addition to
sponsoring HB 7069 with B. Donalds, Diaz also sponsored legislation
to allow more private online education providers to offer classes to
public school students and allow students to take classes in public
virtual schools in other counties, as well as 2020 legislation that
significantly expanded publicly funded vouchers for private schools.
Diaz also served as COO of Doral College, which was paid millions
by Academica, Florida's largest private charter school organization.
Diaz's wife, Jennifer, is the former Vice-Chair of the Governing
Board of Tallahassee Classical School.

C. <u>Bileca</u>:  Michael Bileca served in the Florida House of Representatives
from 2010-2018, where he maintained a focus on education and served as
Chairman of the Education Committee.  Bileca is now the Executive
Director of the Dennis Bileca Institute for Character and Excellence, a
foundation that primarily funds schools focusing on virtue-based education
with an emphasis on a classical liberal arts curriculum.  Bileca has also been
the CEO of True North Classical Academy in Miami since 2020.  His wife,
Vivian, is the Director of recruitment for True North Classical Academy.

D. <u>Negron</u>:  Former Martin County School Board Member Rebecca
Negron voted to approve E. Donalds' first charter school (Treasure
Coast Classical Academy) and helped E. Donalds lobby the state of

Florida to approve FCSBM. Her husband, Joe Negron, is Florida's former Senate President and wrote the initial legislation for the Florida Tax Credit Scholarship program.

E. Ziegler: Sarasota School Board Member Bridget Ziegler helped E. Donalds start FCSMB and is one of the co-founders of *Moms for Liberty*, which held its National Summit in Tampa on July 14-17, 2022, at which the featured speakers included Gov. DeSantis, Betsy DeVos, Dr. Ben Carson, and Senator Rick Scott. E. Donalds serves on *Moms for Liberty's* advisory board and Optima Foundation sponsored *Moms for Liberty's* National Summit with The Heritage Foundation and Leadership Institute.

F. Robinson: Former Sarasota Republican Party Chairman and School Board Member Eric Robinson is known as the "prince of dark money" and one of the go-to accountants for any candidate seeking office in Florida. His wife, Christine, was appointed by Governor Charlie Crist to c the Sarasota County Commission and heads influential business organization the Argus Foundation. Robinson or his accounting firm are believed to have loaned money to help fund Optima's operations.

G. Caldwell: Matthew Caldwell is a former member of the Florida House. His wife, Yvonne, was recently appointed to the Board of Estero Classical Academy.

H. <u>Arza</u>:  Ralph Arza was a member of the Florida House from 2000-2006, serving as Chair of the PreK-12 Education Committee and Vice Chair of the Education Council, and sponsored the "Charter School Bill."  Arza is a close ally of Corcoran and the Director of Government Relations of the Florida Charter School Alliance ("FCSA").[14]  He is also the CEO of Arza Consulting Group, which provides strategic consulting services with a focus on education political lobbying.  Arza's wife, Eris, is a member of Quality Charter School Solutions, LLC.

109.  The campaigns and businesses of several of these powerful Florida political families were funded by many of the same people and organizations that support Hillsdale's national plan for education.

110.  Over the past decade, through the BCSI and Arnn's connections, Hillsdale College positioned itself at the forefront of conservative politics and secured a prominent role in Florida's education system.[15]

111.  Hillsdale alumni and supporters filled prominent roles in the Trump Administration, and Arnn was on former-President Trump's shortlist for Education Secretary before the nomination went to Betsy Devos—whose family is actively

---

[14] FCSA's Treasurer, John Kirtley, also serves as Chairman of the  Florida School Choice Fund and Vice Chairman of the American Federation for Children.
[15] Hillsdale's school speakers including Supreme Court Justice Clarence Thomas, former Vice President Mike Pence, Mike Pompeo, Sidney Powell, William Barr, and Donald Rumsfeld.  Virginia Thomas was the associate director of Hillsdale's DC operations from 2008-2009.

involved in the school choice movement and donated millions of dollars to Hillsdale and organizations that funded the campaigns of many prominent Florida Republicans.

112.   On December 18, 2020, Trump appointed Arnn Chair of the 1776 Commission, which released its 41-page "The 1776 Report" on January 18, 2021.

113.   Hillsdale's political influence in Florida has steadily grown over recent years and many of its major donors live in the Naples area.

114.   In January 2019, Gov. DeSantis issued Executive Order 19-32, which directed the Commissioner of Education (Corcoran) to comprehensively review Florida's K-12 academic standards and provide recommended revisions for civics education and the elimination of Common Core.

115.   Soon thereafter, Florida HB 807 was introduced, which required instructional materials for civics education courses to be reviewed and approved by the Commissioner of Education in consultation with certain entities and individuals to identify errors and inaccuracies in state-adopted education materials.

116.   In March 2019, HB 807 was amended to specifically identify Hillsdale College among a small group of organizations approved to assist the Commissioner of Education with reviewing and approving civics education course instructional materials. *See* § 1003.4156, *Fla. Stat*.

117.   In 2019 and 2020, Hillsdale also worked with Corcoran to review Florida's standards for civic education and its English language arts and mathematics curriculums, primarily through BCSI:

> Much of the work in reviewing Florida's curriculum has been headed up by the Barney
> Charter School Initiative, a project of Hillsdale College that promotes classical K-12 edu-
> cation by establishing charter schools across America, including in Florida. "Hillsdale
> College and its Barney Charter School Initiative are leading the effort to prepare the men
> and women of this generation to again govern the American Republic according to the
> principles of liberty," said Kevin Hoeft, education policy development director at the
> Florida Department of Education. "It is my confident hope that Florida's revised civics edu-
> cation standards will contribute to this noble and essential work."
>
> The Barney Charter School Initiative had a team who worked on the project,
> composed of former teachers with experience in civics, government, and United States
> history. The primary contributors were Kathleen O'Toole, Hillsdale's assistant provost for
> K-12 education; Daniel O'Toole, who teaches U.S. Constitution at Hillsdale College and
> contributed to the initiative; and Jordan Adams, associate director of instructional
> resources. The team combed through each individual standard and provided reviews,
> feedback, and suggestions for improvement.

118.   In 2020, Hillsdale reviewed Florida's civics materials alongside the Bill
of Rights Institute (launched in 1999 by the Koch family and its foundations, and
whose President, David Bobb, taught at Hillsdale College).

119.   Corcoran spoke at Hillsdale College on May 5, 2021 about the
importance of education and charter schools to the conservative agenda, with Arnn
introducing him as "one of the most important men in the U.S. today":



120.    After FDOE adopted new civics standards recommended by Hillsdale in 2021, Hillsdale was one of only four groups selected to create a civics training program for Florida teachers.

121.    On February 23, 2022, Gov. DeSantis was the keynote speaker at Hillsdale's National Leadership Seminar in Naples, at which Arnn introduced Gov. DeSantis as "one of the most important people living" and commented that his "most important work is before him—and we need him."

122.    In March 2022, the Florida legislature passed and Gov. DeSantis approved HB1467 establishing term limits for school board members, requiring certain meetings regarding instructional materials to be open to the public, and imposing requirements regarding school libraries.

123.    In March 2022, Gov. DeSantis also appointed E. Donalds to Florida Gulf Coast University's ("FGCU") Board of Trustees.[16]  FGCU's Board Chair, Blake Gable (CEO and President of Barron Collier Companies).

124.    In April 2022, FDOE rejected dozens of math textbooks based on the recommendations of Jonah Apel (a sophomore student majoring in political science at Hillsdale) and Jordan Adams (a civics education specialist at Hillsdale tied to the "1776 Curriculum").

125.    In July 2022, the University of Florida received $3 million in unrequested funding to establish a civics program backed by the Council on Public University Reform, whose representative, Josh Holdenried, previously worked with The Heritage Foundation and is currently pursuing a master's degree from Hillsdale College.

### C.    The Founding and Achievements Of MCA[17]

126.    In 2011, after exploring the public-school options for their two children in Collier County, Florida, Lichter and her husband decided to start a K-12 charter school.  During that process, they began working with Hillsdale because its BCSI offered assistance to classical charter school boards in their formative years at no charge.

---

[16] The FGCU Foundation is a channel for private donations to FGCU.  Its elected Board Members include Bill Barker and Gail Markham.  Bill Barker is also a Director of the Naples Chamber of Commerce with Blake Gable (Board Chair-Elect), Ayers (Vice Chair), and Sup. Patton (Ex-Officio).

[17] "Mason Classical Academy" was named after Lichter's late father, Donald W. Mason.

127.   The CCSB approved MCA's charter application in October 2012 and executed MCA's initial Charter Contract on August 30, 2013, which provided for MCA to open in August 2014.  The term of MCA's original (2013) Charter Contract ran through June 30, 2017.

128.   On November 15, 2013, MCA and Hillsdale entered into an Agreement pursuant to which it would assist MCA in launching its charter school.

129.   From 2014 through 2017, MCA's academic and financial performance was exceptional.   It received "A" ratings from the state of Florida every year.

130.   On June 13, 2017, CCSB executed another Charter Agreement with MCA for a term of five (5) years ending on June 30, 2022 (Ex. 1).  Notably, MCA's Charter Agreement with CCSB does not contain any provisions requiring MCA to be affiliated with Hillsdale.

131.   On October 13, 2017, FDOE notified MCA that it had met the criteria for "high performing" charter status pursuant to section 1002.331, *Florida Statutes*, and MCA and CCSB executed the First Amendment to the Charter Agreement, which extended the term of MCA's charter through November 30, 2032 (Ex. 2).

132.   Under Florida law, a "high-performing" charter school is entitled to certain important benefits:[18]

---

[18] See https://www.fldoe.org/schools/school-choice/charter-schools/charter-school-faqs.stml

**What are the benefits offered to a high-performing charter school?**    ⌄

A high-performing charter school is authorized to:

- Increase its student enrollment once per school year to more than the capacity identified in the charter, but student enrollment may not exceed the current facility capacity.
- Expand grade levels within K-12 to add grade levels not already served
- Submit quarterly rather than monthly financial statements to the sponsor
- Consolidate under a single charter the charters of multiple high-performing charter schools operated in the same district by the charter school's governing board
- Receive a modification of its charter to a term of 15 years
- Replicate its educational program in any district in the state

A high-performing charter school must notify its sponsor, in writing, by March 1 if it plans to increase enrollment or expand grade levels for the next school year.
A high-performing charter school may submit an application in any school district in the state to establish and operate a new charter school that will substantially replicate its educational program. A high-performing charter school may not establish more than one charter school within the state in any year. A high-performing charter school system may also replicate one of its high-performing charter schools in the same manner.

133.    On December 13, 2017, MCA entered into another Agreement with Hillsdale, a copy of which is attached as **Exhibit C**, which extended their relationship through January 1, 2023.  This 2017 Agreement was terminable for any reason on 60-days' notice and specifically provides that Hillsdale has no control over MCA or its governance and that MCA is not required to implement any strategy suggested by Hillsdale.  The 2017 Agreement further provides that Hillsdale "shall provide MCA Corporation a general model for a curriculum of a charter school," but that all decisions concerning the curriculum and teaching materials shall be made solely by MCA.

134.    MCA continued to maintain its exceptional performance record even after its disassociation with Hillsdale in 2019.  In fact, MCA continued its streak of "A" ratings in Florida's most recent school grades, while Naples Classical Academy,

a Hillsdale Member school managed by E. Donalds and Optima and operated by
Mathias and Phoenix, was only able to muster a "C" rating.

### D.    The Seeds of the Conspiracy To Take Over MCA

135.    Despite MCA's exceptional performance since opening its doors in 2014,
it has been forced to endure an ongoing and relentless effort to seize control of the
school and oust its Governing Board.

136.    Lichter and most of the people who helped establish MCA as one of
Florida's highest performing schools are not insiders in Naples or Florida political
circles and have no close ties to Hillsdale.

137.    When MCA opened its doors to students in 2014, its governing board
consisted of Lichter (President), Rep. Donalds (Vice President), Jason Lane
(Treasurer), and Shelly Connors (Secretary).  E. Donalds and Mathias were advisory
board members.

138.    Mathias helped MCA's fundraising efforts and was trying to secure
funding for MCA to purchase and make capital improvements to the building it was
leasing.

139.    Eventually, Mathias was forced to resign from MCA's Board because of
a conflict of interest associated with several unsecured loans he procured for MCA that
benefited his family members.

140.    As a result, Mathias started working with Rep. Donalds to take over
MCA, including trying to use a promise of a construction loan to gain a seat for

Mathias on the MCA Board with the "understanding" that if Rep. Donalds could convince Lichter to resign, Mathias would secure loans on better terms for MCA.

141.   This tactic came to a head at a May 9, 2016 MCA Board Meeting, at which Rep. Donalds tried to convince Lichter to resign in exchange for Mathias's loans, knowing that he would ascend to MCA Board Chair if he could convince Lichter to step down.[19]  The effort to strong-arm Lichter into resigning failed.

142.   On August 8, 2016, Baird joined MCA's Board and was appointed Treasurer.  However, he resigned from these positions in October 2016.

143.   On November 1, 2016, Rep. Donalds announced he was resigning as an MCA Board Member and stepping down as Vice President.

144.   In February 2017, the state of Florida orchestrated the first private takeover of an entire school district in Jefferson County, Florida.  Then-Senate Education Committee Chair Diaz helped secure legislation and funding that enabled Somerset Academy (operated by Academica) take control of all public schools in Jefferson County.

145.   On March 10, 2017, Rep. Diaz, Rep. Donalds, and others introduced HB 7069 in the Florida House.  HB 7069 originated in the House Education Committee as a 6-page proposed committee bill regarding the "Best and Brightest Teachers and Principals" program.

---

[19] An audio recording of the May 9, 2016 MCA Board Meeting captured Rep. Donalds suggesting Lichter resign for MCA to receive the construction loan arranged by Mathias with his family members as financial beneficiaries.

146.  In reality, HB 7069 was the first step in a plan that would enable then-House Speaker Corcoran to spearhead legislation that would drastically transform public education in Florida.

147.  Even though HB 7069 as originally introduced in March 2017 had nothing to do with charter school funding, Rep. Diaz and Rep. Bileca were recruiting charter networks to open more schools in Florida and assuring them more money was on the way through the "schools of hope" program.

148.  As an insider amongst the legislators advancing the "schools of hope" legislation, Rep. Donalds knew that this money was on the way for charter schools and relayed this information to E. Donalds.  Both were already familiar with Hillsdale from their time at MCA, and E. Donalds was about to enter into a partnership with Hillsdale to start to launch its schools throughout the state.

149.  Around this time, even though the CCSB had already voted unanimously to renew MCA's charter (set to expire June 30, 2017), Fishbane, CCSB Members Stephanie Lucarelli and Erick Carter,[20] and the *Naples Daily News* tried to thwart MCA's renewal.

150.  Fishbane stalled the negotiation and approval of MCA's renewal Charter Agreement while *Naples Daily News* reporter Anika Hammerschlag started digging through public records to piece together negative stories about MCA.

---

[20] Lucarelli and Carter's School Board campaigns received substantial support from Save Our Public Schools, an anti-charter school PAC.

151.     Among other things, Fishbane tried to add provisions to MCA's renewal Charter Agreement that were not in Florida's model Florida Charter Agreement[21] (several of which were specifically rejected by Florida's legislature), not mandated by MCA's charter renewal, and not in other Collier County charter school contracts; including a requirement that MCA have five Board members located in Collier County.

152.     MCA repeatedly requested to put its charter renewal contract on the May 2017 CCSB Agenda, but Fishbane successfully delayed the vote until the June 2017 CCSB meeting, allowing more time for Hammerschlag and *Naples Daily News* to publicly attack MCA and its Governing Board.

153.     One Saturday in April 2017, Hammerschlag emailed then-MCA attorney Arnold and told him that MCA's charter agreement would not be one the May 2017

---

[21] Section 1002.33(7), *Florida Statutes* (2017), provides that:

> The sponsor and the governing board of the charter school shall use the standard charter contract pursuant to subsection (21), which shall incorporate the approved application and any addenda approved with the application. Any term or condition of a proposed charter contract that differs from the standard charter contract adopted by rule of the State Board of Education shall be presumed a limitation on charter school flexibility. The sponsor may not impose unreasonable rules or regulations that violate the intent of giving charter schools greater flexibility to meet educational goals.

Section 1002.33(7)(d) (2017) further provides: "A charter may be modified during its initial term or any renewal term upon the recommendation of the sponsor or the charter school's governing board and the approval of both parties to the agreement."

CCSB agenda as planned—demonstrating that Fishbane was working closely with Hammerschlag and feeding her inside information about MCA's renewal agreement.

154.    On June 12, 2017, ***the day before the CCSB Public Meeting to vote on MCA's renewal Charter Agreement***, the *Naples Daily News* published an article about MCA's May 9, 2016 Board Meeting (at which Rep. Donalds and Mathias sought to oust Lichter), including quotes from Rep. Donalds:

EDUCATION

# Charter school board faces criticism, complaints

 **Annika Hammerschlag**
Naples

Published 9:51 p.m. ET June 12, 2017 | Updated 3:26 p.m. ET June 29, 2017

Donalds, who left the Mason board when he was elected last year as a state legislator from Collier, said he can't explain Lichter's decision.

"It's not the decision I would have made," said Donalds, whose wife, Erika, helped establish the school. "I made my point on that pretty clear."

Just two of the six board members who served during the first term hold their position; a total of three members currently serve on the board.

> Donalds, who recently introduced a bill that would allow boards to meet in private, conceded Mason's minutes are, in general, "very thin."
>
> Donalds repeatedly pushed for the adoption of a Five-Year Strategic Plan for Mason that would increase the minimum number of board members from three to five by the 2015-16 school year and to nine by 2017, records show.
>
> The plan, which Donalds helped draft, would have also required school staff to participate in customer service training. The board, led by Lichter, voted against it.
>
> Donalds said he included this requirement because of what he called the Mason administration's "demonstrative tone" toward parents, citing specifically Lichter and David Hull, the school's principal.

155. Hours prior to the *Naples Daily News* publishing this article, Hammerschlag emailed MCA's then-counsel, Arnold, and asked, "Why did Kelly reject the offer, especially considering it was at a far lower interest rate than the other loan offered at 14%?" Arnold replied:

> Previously, Mathias demanded repayment of the loan. MCA's attorney reviewed the loan documents between MCA and Mathias and found no provision for the loans to be recalled unless the payments were not being made or other conditions which did not occur. The attorney advised Mr. Mathias of this fact, and he withdrew his demand letter. Mathias then tried another approach offering money at a lower interest rate if Lichter resigned. The Board did not want to do business with Mr. Mathias due to his improper demand for repayment and the fact he resigned from the Board due to a previous conflict of interest. Mr. Mathias had a duty of trust to his clients as well as to the School. Knowing this to the be conflict, Mr. Mathias brokered deals with the School and his clients nevertheless. Moreover, an offer for the lending of money that will be paid back over a period of more than one year must be in writing otherwise it violates Florida law. As such, there was nothing for the board to vote upon. Ms. Lichter chose to continue on the Board and remains there for numerous reasons. She is the founder of the school named after her late father. The Board is

by Florida Law the fiduciary for the School. The idea that
someone would attempt to peddle influence over the school by
using others money is offensive to the Board. The School is
highly successful and will be able to obtain lower rate financing
in the future when it receives its high performing charter status.

156.    Nevertheless, MCA's Renewal Charter Agreement was finally

approved at the CCSB June 13, 2017 meeting—just days before HB 7069 was signed

into law.  During that meeting, Fishbane confirmed that all of MCA's finances were

in order.  Lichter also publicly confronted him about the delay in approving MCA's

agreement and his apparent collusion with the *Naples Daily News*.

## E.    MCA's Enemies Unite for a Common Goal

157.    As noted above, Florida HB 7069 was introduced in March 2017.

158.    Once HB 7069 reached the Florida Senate, an amendment by

Appropriations Committee Chair Latvala stripped the bill of its content and the

essentially empty bill was adopted by the Senate in April 2017 and referred to a joint

House-Senate Appropriations Conference committee that included Rep. Donalds.

159.    The public and some legislators were left in the dark about the content of

HB 7069 until it emerged from the conference committee in May 2017 as a 278-page

package involving numerous bills on a variety of topics, including "Schools of Hope."

160.    This new version of HB 7069 was placed in an unamendable form before

the full membership of the House and Senate on the final day of the legislative session,

passing on a largely party-line vote in the House and by a slim margin in the Senate.

161.   On June 15, 2017, Gov. Rick Scott approved HB 7069.  Once it took effect in July 2017, HB 7069: mandated school districts share capital outlay tax revenues with charter schools; provided $140 million for "schools of hope;" modified enrollment, application, contract, and reporting requirements for charter schools; eliminated restrictions on virtual school eligibility; allowed students to enroll in virtual charter schools across school district lines; increased the ability of charter school networks to form Local Educational Agencies; and granted important rights and benefits to "high-performing" charter schools that made it easier for them to open new schools.

162.   Rep. Donalds and E. Donalds knew in advance about these provisions of the final bill and the incredible financial opportunity they presented.

163.   In October 2017, Corcoran, Rep. Donalds, Rep. Diaz, and Rep. Bileca appeared together at a press conference[22] to promote Florida's "Hope Scholarship" program.

164.   By that time, E. Donalds and Rep. Donalds had already started working on Optima charter school network, including the partnership with Hillsdale to expand its schools in Florida.

165.   On December 6, 2017, E. Donalds incorporated Optima Foundation, the stated goal of which is **"the successful launch of Hillsdale College BCSI classical academies and other schools of excellence across the state of Florida."**

---

[22] https://www.youtube.com/watch?v=JjYRoTWVoTk

166.   On December 7, 2017, E. Donalds incorporated Treasure Coast Classical

Academy ("TCCA") (then-known as "Alpha Classical Academy, Inc."), a Hillsdale

member school.

167.   The following month, on January 31, 2018, E. Donalds submitted

TCCA's Charter Application, which identified Hillsdale's Coykendall and Chuck

Marshall as affiliated with the school:

Names, roles, and current employment of all persons on applicant group, i.e. anyone with a role in drafting the substantive content of this application or expected to have a significant role with the school, including any consultants or employees of an Education Service Provider.  Add lines as necessary.

| Full Name | Current Job Title & Employer | Role with Proposed School |
|---|---|---|
| Shawn Frost | Business Consultant, MVP Strategy and Policy, LLC | Board of Directors |
| Erika Donalds | CFO/COO, DGHM & Board Member, CCPS | Board of Directors |
| Lynda Daniel | N/A | Board of Directors |
| Eric Coykendall | Associate Director, Barney Charter School Initiative, Hillsdale College | Advice and Support |
| Chuck Marshall | Compliance Officer, Mason Classical Academy | Consultant |
| Add Additional Members to Applicant Group (As Needed) | | Remove Row |

Projected Date of School Opening (Month/Year):  August 2019

168.   In January 2018, consistent with Corcoran's goal in nominating her for

the CRC, E. Donalds proposed several Florida constitutional amendments, one of

which (Amendment 8[23]) would have created 8-year term limits for school board

members, enshrined Florida's statutory civics education graduation requirement in its

Constitution and paved the way for Florida's legislature to authorize and oversee

charter schools outside the authority of local school boards.

---

[23] In September 2018, Florida's Supreme Court decided in a 4-3 decision that Amendment 8 should remain off the ballot in the November election.

169.    In early 2018, one of Baird's children withdrew from MCA.  At that time,

Baird made numerous positive statements about MCA and its then-principal, David

Hull.

170.    Around that same time, E. Donalds was discussing with friends pulling

her children out of MCA, her animosity toward the school, Rep. Donalds filing a

"formal Complaint" against MCA, and using her political connections to take action

against MCA:



171.   Not long after, the Donalds' pulled their children out of MCA.

172.   On April 17, 2018, the Martin County School Board (including Board member Negron) approved TCCA's charter application; marking the **first of the three schools** E. Donalds needed to start qualifying as a "Hope Operator."

173.   When some Martin County residents raised concerns over TCCA's affiliation with Hillsdale, E. Donalds made the following comments about expanding classical schools into "every community":[24]

> Ms. Donalds, who now holds a seat on the Collier County School Board, explained that Martin County parents recruited her for the local charter campaign for a Hillsdale classical school.
>
> "I learned that Martin County has very few public school choice options (none for elementary and middle outside of the school for autistic students), and has the second-highest percentage of students attending private school in the state (nearly 27 percent)," she said. "I believe in the classical model and want to see it offered as a free public school option in every community."
>
> Mr. Frost, who currently serves as the chairman of the Indian River County School Board and said his role in Martin County was strictly in a non-official capacity as a volunteer board member, echoed Ms. Donald's sentiments.

174.   In May 2018, Baird informed MCA that the rest of his children would not return for the upcoming school year, but asked that they be permitted to participate in MCA athletic programs—which was not possible and led to an argument

175.   In retaliation, Baird filed a false and retaliatory complaint with FDOE in early June 2018 alleging financial mismanagement and bullying by MCA's then-

---

[24] https://www.hometownnewstc.com/news/parents-protest-approved-charter-school/article_b33b5475-5b69-58be-8bb6-32dcde39b24e.html

49

principal, David Hull,[25] also naming Lichter and Laura Miller as accomplices. Unsurprisingly, Baird went out of his way to exonerate E. Donalds and Rep. Donalds from any wrongdoing—as they were speaking with each other regularly around this time:



176.   At the same time, Baird started a line of constant communication with Fishbane, including  hundreds of emails and text messages and numerous calls over the course of a year.

177.   Working with E. Donalds, Baird also started encouraging parents of MCA students to advocate for the termination of MCA's charter and removal of MCA's Board.  Baird and E. Donalds also discussed trying to open an investigation

---

[25]FDOE determined that Baird's complaint was outside its jurisdictional purview and forwarded it to CCSB.

into "the treatment of students at MCA," but were told it would not go anywhere because "no amount of maltreatment will get us anywhere" and they would have to show "actual harmful effects of abusive behavior… [such as]…depression, suicidal tendencies etc."

178.   E. Donalds also enlisted Hillsdale during this time in the effort against MCA:



179.   E. Donalds and Baird also talked about getting the media to go after MCA, as well as E. Donalds' lawyer counseling Baird about talking to the media:

Would your attorney be able to advise me about speaking to the media? I'd be a lot more comfortable if I had legal counsel. I'm especially worried that if nothing is found David will come after me with everything he's got.

Good question. I'll find out

180.   On June 21, 2018, Baird emailed Sheryl Rogers for help ensuring that information he got from the Inspector General's Office would get into Adam Miller's hands at the FDOE, and Sheryl Rogers forwarded Baird's email to Miller.

181.   On July 10, 2018, E. Donalds emailed the same Adam Miller at FDOE regarding "Charter Revocations," asking for data on "forced charter closures":



From:        Erika Donalds [erikadonalds@███████om]
Sent:        Tuesday, July 10, 2018 5:43 PM
To:          Miller, Adam
Subject:     Charter revocations

Can you please send me the annual historical number of forced charter closures in FL for as far back as you have it?

Erika B. Donalds, CPA, CGMA
Cell: 239.███████

182.   E. Donalds also enlisted the *Naples Daily News* to attack MCA and accomplish a change in its leadership. On July 30, 2018, Annika Hammerschlag asked E. Donalds for Baird's phone number. E. Donalds reached out to Baird, who was happy to speak with Hammerschlag.

183.    During this time, E. Donalds spoke with Hammerschlag extensively and told her that she, Rep. Donalds, and Baird would go "on record" to get a story published about MCA:



184.    On August 8, 2018—in a clear indication that E. Donalds was already working with Hillsdale against MCA—Baird texted E. Donalds to ask whether Hillsdale's Kilgore wanted to talk about anything.  E. Donalds responded that Kilgore would want to talk to Baird directly and asked Baird for a "sharable copy" of the complaint he filed against MCA with FDOE:



185.    During this time period, Baird and E. Donalds were communicating with

MCA's landlord, who they hoped would also help in the plot to "pressure a leadership

change" at MCA.

186.    E. Donalds was also meeting with Sup. Patton and pushing for action

against MCA as part of the effort to take over the school:



187.    On August 31, 2018, E. Donalds updated Baird about meetings she had

with Fishbane (on August 29, 2018) and Hammerschlag from the *Naples Daily News*

(on August 30, 2019):



188.    On September 20, 2018, further evidencing the conspiracy and collusion amongst Defendants, E. Donalds and Baird texted about the status of the *Naples Daily News* releasing the article they were securing about MCA, as well as Rep. Donalds meeting with Fishbane:



189.    As part of the plan to seize control of MCA, E. Donalds, Rep. Donalds,
and Baird succeeded in their efforts with  Hammerschlag and the *Naples Daily News*,
resulting in the publication of to two negative, false and defamatory articles about
MCA.

190.    The <u>first</u> article was posted at <u>3:31 p.m.</u> on October 5, 2018 and was about
Baird's Complaint:



191.    After summarizing Baird's false accusations, the first article discussed

how E. Donalds and Rep. Donalds "corroborated" them:

> Mason Classical is a public charter school co-founded by Collier County School
> Board members Kelly Lichter and Erika Donalds in 2012. Donalds and her
> husband, state Rep. Byron Donalds, a co-founder and former Mason board
> member, corroborated the allegations made in the complaint. The couple no longer
> are involved in the school.

192.    The second October 5, 2018 article was posted at 3:41 p.m. and was

about proposed legislation Rep. Donalds was "mulling," which "he said is still in the

'conceptual' stage, would require charter schools to publish student and teacher

turnover rates 'to give parents the additional information they need to make the best

choice for their child' and would mandate a minimum of five board members."

Rep. Donalds and E. Donalds were both interviewed for this article and criticized

MCA:

**EDUCATION**

## State Rep. Donalds mulls legislation to increase charter schools' accountability



**Annika Hammerschlag**
Naples

Published 3:41 p.m. ET Oct. 5, 2018 | Updated 4:43 a.m. ET Oct. 7, 2018

> The Donaldses said many of the issues they encountered at Mason could have been avoided by having oversight from more board members, such as a required minimum of five board members. The school now has just three.
>
> Erika Donalds described Mason and other charter schools that have had difficulties as "bad apples."
>
> To assume she and Byron support charter schools "no matter what" is a misconception, she said.
>
> Charters that perform poorly, fail to serve all students or break the law should not be allowed to continue operating, she said.
>
> "That doesn't mean that charters don't have a place in our education system," she said. "It means we need to clean up the ones that are not following the law."

193.   The October 5, 2018 *Naples Daily News* articles were the first public mention of Baird's baseless complaint.

194.   When E. Donalds and Rep. Donalds "corroborated" Baird's baseless allegations, E. Donalds was still a CCSB Board Member and Rep. Donalds was a member of the Florida House, serving as Vice Chair of the PreK-12 Appropriations Subcommittee, and on the Education Committee and PreK-12 Quality Subcommittee.

195.   The second October 5th article clearly demonstrates how Rep. Donalds' position as a member of the Florida House was being used in the ongoing effort against MCA.

196. To coincide with these articles, on October 9, 2018, E. Donalds distributed a letter attacking MCA and Lichter, while simultaneously promoting herself and her new management company:

Erika B. Donalds, CPA, CGMA

October 9, 2018

Friends and Colleagues,

Recently, the Naples Daily News published a story about leadership issues at Mason Classical Academy (MCA), the Hillsdale College charter school whose advisory board I volunteered on during the school's founding from 2012 to 2014. My children attended MCA from its opening in 2014 until last year. My husband Byron served on the governing board from 2012 to 2016. In 2014, I stepped away from my volunteer role at MCA to run for the Collier County School Board, to which I was elected and have since served. In 2017, I started working with Hillsdale College to help open other classical charter schools across the state. Byron and I care deeply about the success of the Hillsdale classical model, our education community in Collier County (and across Florida) and, in fact, MCA. This story and the situations surrounding it have been painful and personal for Byron and me.

The leadership and governance issues cited in the article occurred, and continued, in spite of our repeated objections and Byron's efforts as a minority member of the founding board. MCA's Principal is at the center of the concerns brought forward by the former MCA board treasurer as well as dozens of parents and teachers. The issues range from lack of appropriate financial controls to unacceptable mistreatment of teachers, parents and students. As an MCA board member, Byron voted against this Principal's contract after the first year of operations revealed major leadership concerns and lack of sound judgement. Byron pushed for more transparency and accountability for excessive student turnover and parent complaints. He insisted on expanding the (now three-person) board to bring in a broader range of expertise for improved board governance. Byron and other former board members tried to implement a financial oversight committee, a long-term strategic plan, and a more comprehensive principal evaluation system. All of these efforts were blocked by the board chair and board secretary, who many times made up either a majority or a filibuster when the board stood at just three and four members, respectively.

My experience with MCA was a primary factor in the establishment of the Optima Foundation, a non-profit which provides financial, management, governance, and operational support to public charter schools. As a vocal proponent for the expansion of school choice, I hate to see poor decision-making by a few bad actors damage our movement. As a finance and compliance professional, I know the level of diligence and expertise required to overcome scrutiny that comes with operating a charter school. As a mom, I want to ensure that other children and families are never mistreated at their school, which should be a haven.

Being a part of a charter school is not for the faint of heart, and unfortunately it requires us to answer to every negative news story about other charter schools – related and unrelated. We know that in the end, we are helping children succeed in school and in life. We are changing families for generations, and changing our entire state for the better. It is well worth the effort.

Feel free to reach out with any questions or concerns on my cell at 239▮▮▮▮ or by email Erika@OptimaEd.org.

Sincerely,

*Erika Donalds*

Erika Donalds

197.    Also on October 9, 2018, Baird and E. Donalds texted about the progress of the "*phase[s]*" of the "*plan*" against MCA, referencing the *Naples Daily News* articles and E. Donalds' letter as "Phase 1 (or maybe this was 2 or 3?!)":



198.    On October 29, 2018, Hillsdale's Kilgore and Harner discussed a meeting

they had scheduled with Fishbane in Naples on November 13, 2018 about MCA, as

well as their meetings with E. Donalds, while noting that "***Only Erika [Donalds] knows***

***we are meeting with him***":

> From:        Phil Kilgore
> To:          Mike Harner
> Subject:     Fw: Your Flight Receipt - MICHAEL HAROLD HARNER 12NOV18
> Date:        Monday, October 29, 2018 4:05:51 PM
>
> I have us at the Sheraton 4 Points near RSW. We have a meeting with John
> Fishbane from 0830-1030 on Tuesday morning. He's the CCSD attorney. Only Erika
> knows we are meeting with him. We meet with the MCA board from 11-2. We'll
> probably meet with Erika briefly after that to exchange G2, but she and Kelly must
> attend their last CCSD board meeting at 4:30 pm. We will meet with Erika the next
> morning for a bit before we go to the airport to return home, probably something like
> 0830-1030. I'll pick you up either at campus or home at 11:00 am on Monday, Nov
> 12. Maybe 10:50 if home.

199.    Around this same time, Baird admitted on Facebook that E. Donalds was

secretly "working very hard on" the "***initiative***" against MCA and its Board:



200.   On November 8, 2018, Baird made a direct plea on Facebook for parents

to contact Fishbane about "maltreatment and abuse at the hands of the MCA Board"

and "allegations [that] could result in felony charges":



201.   In the same post, Baird revealed the falsity of allegations in his FDOE

complaint by admitting that he "*had access*" to "*Mason's Google Drive with all their*

*financial information in it…*"

 Joe Baird Lee Dixon - Of course I had access - I am not aware that the expense reports were stored on that Google Drive. I had to request scanned images that were emailed to me, and the scanning job was so sloppy that I couldn't tell what I was looking at. I could post copies of these sloppy

202.    On November 12, 2018, Hillsdale's Harner and Kilgore met with Lichter in Naples.  Lichter asked them to visit MCA the following day, but they declined due to prior "donor business" commitments.

203.    Contrary to this lie, Kilgore and Harner met with Fishbane at CCSD headquarters the following day regarding the supposed "investigation" into MCA. Kilgore later admitted in an internal Hillsdale email that he was concerned about the possibility of Lichter discovering their secret meeting with Fishbane:

> Also, a minor additional thing he mentioned: Kelly submitted a public records request for a list of visitors to CCPS offices during the month of November 2018, which was the time Mike and I visited there.  We went to meet Jon Fishbane because of the article that ran in the Naples Daily News about an investigation that was referred from the DOE to CCPS based upon the Baird complaint.  This was when we made our initial inquiry to see if there really was an investigation and how it would proceed.

204.    As noted above, Kilgore and Hillsdale did not learn about the "investigation" from the October 5, 2018 *Naples Daily News* article.  Rather, they had known about the "investigation" since at least early August 2018.

205.    On November 16, 2018, Harner emailed Kilgore about how to skirt Florida's Sunshine and Public Records laws to  keep Hillsdale's activities secret:

| From: | Mike Harner |
|---|---|
| To: | Kathleen O"Toole |
| Subject: | FW: MCA Notes/Thoughts |
| Date: | Monday, November 25, 2019 9:41:21 AM |
| Attachments: | Mason Classical Academy assist visit notes.docx |

My after action report.

MHH

**From:** Mike Harner
**Sent:** Friday, November 16, 2018 10:41 AM
**To:** Phillip Kilgore <pkilgore@hillsdale.edu>
**Subject:** MCA Notes/Thoughts

My 20,000 foot review of our meetings. Had a good talk with a Florida sunshine law expert yesterday. Anything we send the board is public record. We either have to be very careful in crafting those recommendations, or deliver the unadulterated critique to each board member individually either in person or telephonically. I will speak with Dr. Arnn about this. If Kelly inquires, let her know we will give her feedback on Tuesday.

MHH

206.    On December 6, 2018, Harner emailed Lichter (copied to Kilgore) several actions to consider "to promote and ensure good governance at MCA":

Mike Harner <mharner@hillsdale.edu>                                    Thu, Dec 6, 2018 at 8:15 AM
To: Kelly Lichter <klichter@masonacademy.com>
Cc: Phillip Kilgore <pkilgore@hillsdale.edu>

Kelly.

I hope this finds you well. It has been three weeks now since Phil Kilgore and I met with you in an effort to identify
specific areas where board action might help alleviate some of the contention MCA is currently experiencing. After
much discussion and a thorough review of Florida law and statute we believe you should consider the following
actions.

1. Expand the MCA board from 3 to no fewer than five members.
2. Conduct conflict of interest reviews of all board members as they pertain to the board's oversight of MCA
   employees.
3. Conduct Board training on Florida Sunshine statutes.
4. Retain a consultant to conduct a financial processes risk assessment.
5. Review, update, and amend, as necessary, board policies concerning the handling of inquiries, concerns, and
   complaints.
6. Adopt a comprehensive social media policy.
7. Adopt a board Code of Conduct.

It is our belief that the implementation of the above will do much to promote and ensure good governance at MCA. We
stand ready to assist you in your efforts to that end.

Best regards,

Mike Harner

Chief of Staff

Hillsdale. College

207.    Of course, this was not part of a legitimate effort to help MCA, and

Hillsdale did not tell MCA or its Board anything about Fishbane's ongoing

"investigation" or the secret meeting with Fishbane in November, nor their ongoing

meetings and discussions with E. Donalds.  Likewise, Hillsdale did not raise any

concerns over the propriety of Fishbane's investigation or how it was being conducted,

nor try to protect MCA's interests in any way.

208.  In December 2018, Governor-elect DeSantis announced his transition team advisors, which included E. Donalds (appointed to serve on Gov. DeSantis's Transition Advisory Committee for Education and Workforce Development) and Keith Flaugh, CEO and co-founder of Florida Citizens Alliance.

209.  Florida Citizens Alliance ("FCLA") is an organization that champions educational reform through legislative action, community activism, and alternative education resources.  It lists its goals and achievements as:



**What We Do**

Through legislative action, community outreach, scholarships, and education alternatives, Florida Citizens Alliance provides solutions for improving K-12 education in Florida.

**What motivates us**

We are motivated every time we see a child and their parents take advantage of their education. We strive to educate parents on their options so that they feel empowered to make the best decision for their family.

Our public education system is failing America's students academically, civically and morally. Florida children are being indoctrinated in a public school system that undermines their individual rights and destroys our nation's founding principles and family values.



210.    FCLA's CEO, Keith Flaugh ("Flaugh"), is actively involved in Florida politics and educational issues.

211.    On January 16, 2019, as part of the ongoing effort to expand Hillsdale's reach in Florida through E. Donalds, Rep. Donalds, and Optima, E. Donalds and Arnn spoke at an event sponsored by Florida Citizens Alliance in Naples:





212.   Around the same time, E. Donalds announced the launch of "School Choice Movement," an organization advocating for the expansion of school choice and education scholarship accounts, as well as charter school independence.

213.   On January 19, 2019, Kilgore emailed Arnn about the "confidential report of investigation" being prepared by Fishbane (5 months before it would be issued), commenting specifically about how the report was "*being designed*" and noting that Hillsdale had not disclosed that *"we intend to break relations with the school"*:

On Jan 19, 2019, at 10:58 PM, Phillip Kilgore <pkilgore@hillsdale.edu> wrote:

Sir,

Things have been relatively quiet at Naples over the past two or three months,
meaning the concerns about the school being voiced to us from the parent and
employee community have subsided, at least for now.  One of the three board
members resigned in December, and the remaining two (Kelly Lichter and Laura
Miller) have identified a replacement.  We are also vetting people identified by
John Cervini in Collier County who could be additional board members.  We await
the confidential report of investigation by the school's authorizer, Collier County
School District, on the complaints on the principal's pattern of behavior and what
remedy/consequences will issue from that report.  We have made no statements
that we intend to break relations with the school.  We (Mike Harner and I),
following our visit to Naples in early November, sent a message to the board with
advice on actions it should take to correct deficiencies and mitigate risks.  Mike
advised me that he plans to follow up with the board on Monday to inquire if it
has acted on any of those recommendations.

I think this family would likely find the school experience for their kindergarten
child to be a good one regarding the teacher and the classroom instruction and
culture.  It is my hope that some future rehabilitative pressures on the principal
would prevent any problem from developing between him and the parents.  The
District's report is being designed to effect some form of correction on that score.

Phil

214.   Hillsdale's clandestine meeting with Fishbane and this email
demonstrate that it and Arnn were working hand-in-hand with E. Donalds and
Fishbane, contrary to MCA's best interests, to seize control of MCA so that Optima
could step in and manage the school.

215.   Around this time, Bolduc joined MCA's Board and was appointed
Treasurer.

216.    On February 7, 2019, E. Donalds had further discussions with Hillsdale about their ongoing conspiracy and agreement to take over MCA and oust its Board, including Fishbane's impending report, which Fishbane agreed to share with E. Donalds and Hillsdale, and E. Donalds planned on sharing with the media:



217.    In early March 2019, Baird and E. Donalds texted about their ongoing collaboration with Fishbane on the MCA investigation and the timing of Fishbane's anticipated report:



218.     On March 18, 2019, Hillsdale's Norton, Harner, Arnn, and Kilgore held

an operations meeting, during which they confirmed a separation from MCA was

already "impending" and discussed the report Fishbane was writing and Arnn's idea

to get Rep. Bileca involved:

> Naples:
>
> Meeting with Norton, Harner, Arnn, Kilgore (recap from Phil)
>
> - Everyone agreed that they're nuts, a separation is impending.
> - John Fishbane is write a report, keeps getting slowed down because more
>   information keeps coming forward. He's supposed to provide us with a draft.
> - Kelly Lichter was really snarky to parent with a complaint about his daughter
>   receiving a suspension. We saw it, Fishbane saw it.
> - Arnn's idea: Get Mike Bilecka involved?
>   - o   Phil pointed out that Bilecka is a fan of Hull.
> - Mike sent a letter with 7 recommendations...
>   - o   Followup: send a letter asking if they've made any progress.
>   - o   When they say no or don't reply, we indicate that there's a schism
>   - o   ARNN: I thought we were trying to repair the relationship.

219.     In addition to his relationship with Rep. Donalds, Rep. Bileca has

connections with Hillsdale and Arnn dating back to at least 2018, including

discussions with Arnn about how through recent legislation [HB 7069] "we were able

to benefit charters as well as *create easier replication of high-performing schools and*

*systems*" that provides "***an opportunity for the Florida Hillsdale schools to benefit from this***

***to allow for easier expansion***":

From: Michael Bileca <mbileca@bilecafoundation.org>
Date: Thursday, February 22, 2018 at 9:43 AM
To: Victoria Bergen <vbergen@hillsdale.edu>, "Larry P. Arnn" < >
Subject: <no subject>

President Arnn,

I have to cancel my trip to Hillsdale this week. In the Florida Legislature we are
dealing with some tough issues with respect to the Parkland shooting.  We are
debuting legislation tomorrow and expect a strong media response.  Its been a crazy
time and if you were witness to the hysteria from the students that were instigated by
the activist adults, you would be more convinced than ever that are current education
system is failing our Nation.  It has  been terrifyingly sad to witness the media and
leftists agenda collusion in using students as a shield and prop.

I very much would like to visit though.  We talked last year at the beginning of
Legislative session and we were able to accomplish our ambitious goals we set forth
to further parental choice by passing some of the most sweeping Education
legislation in the past decade.

Of immediate impact was the sharing of the capital outlay with charters - I believe
Mason alone received an additional 1.4 million this year for buildings and facilities.
There were many other areas we were able to benefit charters as well as create
easier replication for high performing schools and systems.  I think there is an
opportunity for the Florida Hillsdale schools to benefit from this to allow for easier
expansion.

We also revamped of our civics education requirements for high school graduation
and have standards in place close to Core Knowledge standards as well as we now
require a civics class (with specific knowledge standards) to be required for state
university graduation.

I think there are meaningful ways for Hillsdale to be more involved in Florida via the
Charter initiative as well as our civics education platform.

Our legislative session ends beginning of March, would welcome the opportunity to
meet after at Hillsdale or if you find yourself in Florida, would love to host you at our
school in Miami.  I could probably have Senator Rubio (who's children go to our
school) join in as well.

220.   On March 24, 2019, Baird spoke with Fishbane about the status of the

report about MCA:



221.    On April 8, 2019, Baird texted E. Donalds after speaking with Fishbane

again about the substance of his report**:**



222.   Now aware of Fishbane's "investigation," on April 12, 2019, MCA's attorney (Arnold) emailed Fishbane and asked him what "Who ordered your investigation?"  However, Fishbane never responded to this question.

223.   At an April 18, 2019 MCA Board Meeting, Lichter advised that she would compose a complaint to the FDOE regarding the improper investigation of MCA:

**Good of the Order**

Kelly Lichter will compose a complaint to the DOE regarding the negligence and abusive nature of the supposed "CCPS Investigation" of MCA, being unfairly conducted outside state mandated guidelines. She will send a draft of the letter for board review prior to submitting the official complaint.

Laura Miller Mlinarich will compose a letter to MCA parents explaining the need for support at the upcoming CCPS board meeting and will send a draft for board review prior to sending it to our community.

224.   During this same time frame, the MCA Board decided Bolduc should explore captivated insurance programs for schools which may benefit MCA.

225.   On May 7, 2019, Fishbane confirmed during a telephone conference with CCSD's Director of Budgets, Siobhan Fox, that MCA's financials "have been appropriate and timely submitted":



Telephone Conference with S. Fox – May 7, 2019

1.   Discussed with Ms. Fox the financial documents we had received from MCA (from Mr. Arnold, Ms. Turner, etc.).

2.   Discussed with her the financials that MCA submits to the District monthly and/or otherwise and whether they conform from an auditing and statutory standpoint from her perspective in addressing matters of this sort including other charter schools.

3.   She advised that the Finance Department monitors closely charter school financials and related submissions.

4.   She further advised, based on my questions, that MCA's financials have been appropriate, and timely submitted for District purposes.

5.   She mentioned she would also review the matter with Mr. Spencer.

226.    At a May 7, 2019 CCSB meeting, Bolduc spoke publicly as an MCA
parent to defend MCA and expressed concern over the propriety of CCSB's
investigation and what appeared to be an improper effort to seize control of MCA.
This put Bolduc in the conspiracy's crosshairs with Lichter.

227.    On May 8, 2019, Fishbane confirmed during a telephone conference with
CCSD's Assistant Superintendent of Financial Services, Bob Spencer, that MCA's
"financials have been timely, and conform to audit and statutory criteria":



Telephone Conference with R. Spencer – May 8, 2019

1. Spoke with Mr. Spencer about my conversation with Ms. Fox. She had apprised him of the
discussion we had and the financial issues involved.

2. He confirmed that he was aware of no impropriety in MCA's submissions, that the financials
have been timely, and conform to audit and statutory criteria. In sum, he noted that the financial
documents and information that his team have received and reviewed from MCA have been
acceptable.

228.    Of course, Fishbane intentionally excluded the exculpatory evidence he
learned from Fox and Spencer from his report.

229.    On May 7, 2019, the Duval County School Board approved Jacksonville
Classical Academy's charter application, which marked E. Donalds' **second**
(Hillsdale) charter school in Florida.

230.    At a May 16, 2019 meeting, the MCA Board voted unanimously to
submit a complaint to FDOE about the investigation of MCA.

231.    Lichter submitted MCA's Complaint against Fishbane, Sup. Patton, E. Donalds, and the other CCSB members to FDOE on May 20, 2019, a copy of which is attached hereto as **Exhibit D**.

232.    During an Operations meeting on May 20, 2019—***before*** Fishbane's report was released—Hillsdale leadership was already discussing speeding up **"severing the relationship with" MCA**:

> - Can we speed up severing the relationship with Mason? Phil will try to get Mike to send a follow up letter.

### F.    The Rush to Terminate MCA's Charter, Seize its Assets and Reconstitute its Board without Authority or Due Process

233.    On May 30, 2019, Fishbane completed his investigative report concerning MCA (the "Investigative Report").  Fishbane had no authority to conduct the investigation nor to prepare or release the Investigative Report.

234.    On the afternoon of June 3, 2019—***before* it was publicly released**— Fishbane delivered a copy of the Investigative Report to Hillsdale, which Coykendall circulated to Hillsdale's "PR Team":



235.   MCA first learned about Fishbane's Investigative Report on the night of June 3, 2019, during CCSB's public meeting, when Fishbane spoke about the report and recommended that the MCA Board resign and that then-principal David Hull undergo additional training or resign.

236.   Notably, Fishbane was asked during the meeting if CCSB had the authority to remove charter school board members and he admitted that it did not.

237.   During the June 3, 2019 CCSB meeting, Fishbane also went out of his way to promote Hillsdale, including statements such as: "And I say that because one of the key people who was a consultant for Hillsdale College, and Hillsdale College, as you know, is the College that has provided the curriculum and instructional model which has made the school academically a strong school" and "Part of the issue too,

unfortunately, is the lack of disclosure in these applications, and I've read them all from these different Districts. It is the very school, Hillsdale College, that provided the instructional model for the school's success is never mentioned in any of these, when in fact, in the actual policy binder there's a section that has to be acknowledged that Hillsdale College provides the curricular support, curricular structure and so on, and yet, you exclude that from your consultancy. I think that's a problem."

238.    Fishbane's supposed "investigation" of MCA commenced shortly after Baird's June 2018 complaint and culminated in a 61-page hit piece, blessed by Hillsdale, amounting to a full-scale attack on MCA and its Board that was completely silent on the original purpose of the investigation and lacked any evidence substantiating Baird's allegations—the goal of which was to provide a basis to give control of MCA to Hillsdale and E. Donalds/Optima.

239.    Fishbane's supposed "investigation" was a sham.  Aside from briefly speaking with Principal David Hull after MCA repeatedly demanded to be interviewed, Fishbane did not interview any MCA staff or Board Members or obtain sworn statements from any of the accusers.  In fact, Fishbane's investigation was completely devoid of basic due process requirements and resulted in a recommendation to force the removal of MCA's Board, which Fishbane knew CCSB had no authority to do.

240.    Incredibly, Fishbane went out of his way in the Investigative Report to defame MCA and its Board, never disclosing Fishbane's secret meetings and communications with Hillsdale, E. Donalds, Mathias, and Baird, nor his collusion

with all of them to oust MCA's leadership and allow Hillsdale and E. Donalds/Optima to take over the school.

241.    Among other things, the Investigative Report unfairly and prejudicially took sides with Hillsdale, advocating for its interests and the interests of E. Donalds, B. Donalds, and Optima, while falsely accusing Plaintiffs of violating federal laws and the U.S. Constitutional rights of others.

242.    Not long after the Investigative Report was published, MCA retained the law firm of Coleman, Hazard, Taylor, Klaus, Doupe & Diaz, P.A. to independently audit and analyze Fishbane's allegations.

243.    In a clearly orchestrated effort to capitalize on Fishbane's Investigative Report, on June 4, 2019 (*__the day after__* Fishbane's Investigative Report was publicly revealed), E. Donalds launched the Optima website and announced their "grand opening" on social media, of which Hillsdale surely was aware:



**The Optima Foundation**
June 4, 2019 · 🌐

The Optima Foundation is having a Grand Opening! A virtual one, that is. Our brand new website is now LIVE! Visit our site and see the services that Optima offers to help create excellent schools of choice across Florida and beyond. We look forward to hearing from you! Also, be sure to LIKE our Facebook page and SHARE.



OptimaEd.org – Building Optimal Education Opportunities



OptimaEd.org – Building Optimal Education Opportunities

**The Optima Foundation**
@OptimaEd

The Optima Foundation is LIVE! Visit our brand new website to see the services we provide to help start excellent schools of choice across Florida and beyond. And please follow!  Go to OptimaEd.org



5:33 PM · Jun 4, 2019 · TweetDeck

244.    On June 4, 2019, Hillsdale's Kilgore spoke with E. Donalds about the

anticipated fallout from Fishbane's Investigative Report.    The following morning,

Kilgore sent an email to VanOrman, Harner, Whalen, and O'Toole discussing

Hillsdale's plan to work with Fishbane, E. Donalds, FDOE, and CCSB to force out

MCA's Board and take over control of the school, while also noting Rep. Donald's

position as a "sitting member of the Florida House of Representatives":

**From:** Phillip Kilgore
**Sent:** Wednesday, June 5, 2019 9:50:39 AM
**To:** Chris VanOrman; Mike Harner; David Whalen; Kathleen O'Toole
(kathleenarnn█████████████████)
**Subject:** RE: Actions re: Mason Classical Academy

An update from last night, speaking with Erika Donalds, one of our key contacts in all
things FL charters and former member of the Collier County School Board (husband is a
former member of Mason's School Board and is a sitting member of the Florida House of
Representatives):

The FL DOE is quite energized by this report and is going to communicate to the Collier
County School Board that it thinks that CCSB should have already initiated the charter
revocation process.  The FL DOE asked what Hillsdale is going to do, stating that a move of
discipline on our part will strengthen the hand of both the CCSB and heighten the gravity of
the situation.

Here is a possible sequence of events:

1.    Hillsdale sends the letter to the MCA school board.

2.    Board capitulates and we help with corrective action (not likely)

3.    If not #2 above, then more forceful action by governmental entities, either

        a.    FL DOE or Governor's office removes current board members, with new
        appointments being made, (501c3 is retained) or

        b.    CCSB takes over the charter, becoming the board for a time until a new
        one is appointed (501c3 is unnecessary because it is a district charter until
        that changes).

In any event, we can re-engage with a new board if the current board doesn't meet our 30
June deadline and we sever relations and then watch while the state takes its actions, waiting
to step back in.

It seems the next step is to send the letter if that is the decision of all the HC executive
players.

Phil

245.    Later in the day on June 5, 2019, Kilgore spoke with Adam Miller in
FDOE's Office of Independent Education and Parental Choice about the plan to
revoke MCA's charter and efforts Hillsdale could take to "strengthen" the CCSB's
hand—which he laid out in a follow-up email to Harner, O'Toole, Whalen, and
VanOrman:



246.    As Kilgore notes in this email, Adam Miller at FDOE confirmed "**the
private nature of [MCA's] Board protects them from forcible member ejection by a
state entity**"—further demonstrating Fishbane's lack of authority to investigate MCA
and its Board, prepare and publicly release the Investigative Report, and recommend
the Board's removal.

247. On June 5, 2019—again acting in lockstep with Hillsdale—E. Donalds also spoke to FDOE—presumably Adam Miller—about the conspirators' plan for MCA:



248. Hillsdale, Fishbane, E. Donalds, Rep. Donalds, Optima, Mathias, and Baird all agreed and conspired to terminate MCA's Charter and oust its Governing Board with full knowledge of and cooperation with FDOE.

249. In fact, consistent with the planning outlined in Kilgore's June 5, 2019 emails, Hillsdale sent a letter to the MCA Board on June 6, 2019, effectively terminating the December 2017 Agreement between MCA and Hillsdale unless MCA ceded to Fishbane's baseless demands:



250.   Around this time, Durst joined in the conspiracy and started working with E. Donalds and Mathias and regularly communicating with Fishbane by email and phone about MCA.

251.   On June 6, 2019, Hillsdale and E. Donalds discussed how FDOE responded to the Investigative Report and was going to apply pressure to take action against MCA, as well as the "**transition plan**" for taking over MCA and ousting its Board:

- Mason report is now a public record—Erika received it this morning via a public records request.
  ○ There was no public comment on John Fishbane's report at the meeting.
  ○ Kelly sent some nasty texts to Erika when she received it.
  ○ Erika hasn't gotten any emails from school administration (she usually gets a forward from parents), so presumably nothing has been sent out.
  ○ DoE is upset that the district has gone soft on the school. DoE thinks that district shouldn't have said in report that they don't want to close the school (this is important leverage to use against the school). The department will be putting pressure on the district to do something.
    - The district school board members haven't really understood their role or power here—they responded to the report with exasperation and felt like they couldn't do anything. Erika thinks they
  ○ Is there any way to let Kelly save face? Erika thinks maybe if we chose a board, Kelly would go for it.
    - How to do it? Start calling alumni and major donors, get them on a conference call.
    - Work with some parents. Erika knows a few—one is a CPA who isn't controversial, but has been there since the beginning and have been hoping and praying for a change; he would be a good person—Derek Aires.
    - Jason Lane—he was on the board before. He's stayed in relatively good graces, didn't leave with drama, left because he said he didn't have time.
    - Holly Miller—an OB/GYN who was previously on the board of the Christian classical school, has her kids at Mason.
  ○ Business manager, Susan Turner, reached out to Erika looking for a position elsewhere. She'll leave if there's not a change.
  ○ Principal? John Brunner. He was at the school in the beginning as a teacher, came from classical private school. He's good for academics, terrible from a business perspective. He
    - He's now teaching in the district at a high risk school.
    - Potentially bring him in as interim, conduct a formal job search during the school year.
  ○ We should put together a transition plan, propose it to the Mason board and the district. Kelly may not go for it, but this is the only plan that she might agree to. District is more likely to go for it. Parents would like it.
  ○ What about teachers who are part of the old guard?
    - Erika: loyalties change very quickly when power changes. We lose Gena Smith. Joe Whitehead gets fired. A few teachers might leave, but we might also get some back.

252.    On June 6, 2019, E. Donalds also texted Baird about Hillsdale forcing the MCA Board to resign and already working on having a "**reconstituted board picked out**":



253.    Indeed, E. Donalds and Mathias were already busy identifying new potential MCA Board Member candidates to send to Hillsdale for approval:



254. On June 11, 2019, E. Donalds and Coykendall texted about getting Coykendall access to an MCA Facebook page and MCA parent email list:



255.   On June 14, 2019, mentally and emotionally exhausted from the onslaught of harassment and false accusations orchestrated by Defendants, Principal

Hull made the difficult decision to resign and sent a letter notifying the MCA

Community of his decision:



Dear MCA Community,

This letter serves to inform you of my resignation from Mason Classical Academy.

This is by no means an admission of wrongdoing. Some faulty paperwork over a confusing tie-teacher-salary-to-state-tests law is not something anyone should resign over. Neither is being accused of violating privacy law by sharing disciplinary and academic information with a student's very own teachers. Other accusations each have valid, logical explanations as well. The recent activity on the MCA Community

Facebook page demonstrates perfectly why there have been some negative interactions between parents and me in the past. Like it or not, if certain, extremely difficult decisions were not made, and certain, very challenging parents were not told 'no' over these past five years, MCA would not be what it is today. The underlying premise behind almost all the negativity surrounding MCA remains: because of educational privacy law, only one side of a story gets told; and social media perpetuates a lack of truth, trust, and civility.

Interestingly, one of the main leaders of those wanting to see new leadership referenced the classic work Animal Farm. His post seemed to imply that the MCA leadership is tyrannical. However, as any 8th grade MCA Paladin can tell you, he clearly missed the point of the novel and confused the characters. In the novel, farm animals rose up in rebellion because they were unhappy with the farmer. One of the leaders gathered them all for a meeting in the big barn to discuss their oppression by the farm leadership. Sound familiar? Some of the more vocal animals took charge, began propagandizing others, and eventually became the very thing they despised. "All animals are equal, but some are more equal than others," does not describe the leaders of the school; it describes the leaders of the rebellion. As a parent of four current MCA students and founding principal of one of the finest educational establishments in the state of Florida, I pray dearly that the school does not ultimately end up like the book.

256.    Of course, Defendants immediately rejoiced over this development, with

E. Donalds texting Hillsdale's Coykendall that **"Step 1" of their plan** had been

accomplished



257.    On June 14, 2019, Mathias emailed Fishbane about MCA and disclosed

that "*[s]ince 2015, I've been trying to find ways to reconstitute MCA Board of Directors*…":

Mr. Fishbane:

My name is M██ M██████...a 27 year resident of Collier County. In regard to "education" in our community, I've been involved with Junior Achievement as a guest "instructor" in 4th, 8th and 12 grades and The Education Foundation (now Champions for Learning) as a former Board Member, a multi-year Chair of the Take Stock in Children selection committee and a "Take Stock" mentor to 2 different students over the years.

1

I'm also a former Board member of Mason Classical Academy, former Finance Committee Chair (when we had one) and a very proud parent of a ██████ heading into ██ grade this fall.

I'm hoping we can have a meaningful discussion about what "hypothetical" options we may have in locating our children in schools...given several different hypothetical outcomes. And, I also want to explore any POSSIBLE pathways to resolution with minimal disruption.

Full disclosure: Since 2015, I've been trying to find ways to reconstitute MCA Board of Directors, create a more appropriate board infrastructure and significantly improve the "Corporate Governance" of this body. I attach a "5-Year Strategic Plan" for MCA which, along with 10 other parents, we developed in 2015 and presented to the Board at a "workshop". When the conversation about "Board Tenure" began, one Board member slammed the entire document and refused to continue any further discussion about the concept of a strategic plan. I only attach it in an effort to clearly express the seriousness I have around proper Board Governance, recognizing ALL constituencies for a Charter School Board: the students, student parents, teacher, administration, the District, the State of Florida and, in the case, Hillsdale College. The Board must maintain open and positive relationships with each of these constituents...even if they are at odds from time to time.

I had e-mailed Lisa Morse (a friend of mine) earlier this week, requesting a conversation with both you and Ms. Patton...but I recognize ████████████████. ..████████ ████████████████. Not wanting to wait for another week to have a conversation, I thought I would reach out to you directly and humbly request a conversation.

258.    On June 14, 2019, Baird and Durst openly discussed on Facebook the plan to keep MCA open "**under new leadership**" and the "**takeover of a cancelled charter school**":



259.   It is clear from this Facebook exchange that Olivia Durst's comment about what a "parent" told her about a conversation with FDOE's Adam Miller is a reference to E. Donalds.

260.   Later in the same Facebook conversation, Baird revealed more about the nefarious conspiracy taking place:



261.   On June 15, 2019, E. Donalds and Mathias texted again about talking to

"Hillsdale about *their plan*" concerning MCA:



262.   On June 17, 2019, Hillsdale sent another letter to the MCA Board (copied to Fishbane and Adam Miller at FDOE), confirming that its June 6, 2019 letter constituted 60-day notice to terminate its December 2017 agreement with MCA:

Without confidence in a school's governance, the College cannot sustain a fruitful partnership. In the June 6, 2019 letter to the MCA Board, the College again made this point and advised the Board to act on the Investigative Report's recommendations by June 30, 2019. The resignation of Mr. Hull is an important first step in this process, and we remain hopeful that the rest of the recommendations will be followed. Failing that, the Board has effectively severed its relationship with Hillsdale College and BCSI.

We are in mutual understanding with regard to the 60 days' notice required to terminate the relationship between Hillsdale College and MCA, and will uphold this agreement. For the purposes of our contractual obligations, the MCA board should regard the June 6, 2019 correspondence from Hillsdale College as sufficient notice to begin the 60-day termination period. If the MCA board does

hillsdale.edu                    33 East College Street, Hillsdale, MI 49242                    (517) 437-7341

Page 2
Board of Mason Classical Academy
June 17, 2019

not make the appropriate changes by June 30, 2019, then our relationship will formally terminate on August 5, 2019.

In many of its essential aspects—students, teachers, staff members, and families—we believe that MCA is a good school. We firmly believe that the identification of a new principal and an entirely new set of board members is the best path forward for MCA. Hillsdale College hopes to have the opportunity to assist MCA in the recruitment of new leadership and to continue in support of the good work of its teachers and students.

Sincerely,

Dr. Christopher A. Van Orman
Provost Hillsdale College

CAV/cfb
cc: Jon Fishbane, fishbj@collierschools.com
    Adam Miller, Adam.Miller@fldoe.org
encl: June 11, 2019 correspondence from Mason Classical Academy Board

263.    In a clear sign of their ongoing collusion, *just two hours* after Hillsdale emailed its June 17th letter to MCA's Board—which was *only* copied to Fishbane and Miller—Michelle Caswell emailed Bolduc regarding "just receiv[ing]" a copy of Hillsdale's above letter.

264.   Even more astounding, on June 17, 2019, Coykendall also texted E. Donalds to make sure Hillsdale's letter "**hit the new parent FB** [Facebook] **Group**":



265.    On June 19, 2019, Bolduc sent an email to the MCA community about his public comments at the May 7, 2019 CCSB public meeting.  E. Donalds quickly forwarded Bolduc's email to Hillsdale and it was circulated internally.  O'Toole then acknowledged that Kilgore was "quick to turn on principals" and noted Hillsdale's lack of involvement with MCA since early 2018:

From:        Kathleen O'Toole
To:          gw_king@yahoo.com
Subject:     Fwd: Message From Mr. Bolduc
Date:        Wednesday, June 19, 2019 10:24:03 PM

This is a good summation of how Phil thinks about things. The responsibility of the school is to maintain a friendly relationship with us so that we can help. He is quick to turn against principals who don't talk to BCSI regularly.

What he neglects to mention here is that we did make a major mistake with respect to Mr. Hull. Apparently someone in BCSI sent someone else in BCSI a lengthy email listing frustrations with Hull, and then that person mistakenly sent the email to Hull himself. Embarrassing. Hull cooled pretty quickly on us after that point, though there were problems before that.

Sadly I think all of this could have been avoided, or mitigated, if we had the right people in place. Water under the bridge now, I guess.

Sent from my iPad

Begin forwarded message:

> **From:** Phillip Kilgore <pkilgore@hillsdale.edu>
> **Date:** June 19, 2019 at 10:13:58 PM EDT
> **To:** Kathleen O'Toole <kotoole@hillsdale.edu>
> **Cc:** Chris VanOrman <cvanorman@hillsdale.edu>, Mike Harner <mharner@hillsdale.edu>
> **Subject:** Re: Message From Mr. Bolduc
>
> Our last visit was in early 2018. We haven't been down there this year because we've had no relationship with the principal. The only communication has been his nasty emails to me in November. He did not permit us to have contact with any of his teachers except that we go through him. There has been no relationship, and so no means to help.
>
>
> P. Kilgore
> Director, Barney Charter School Initiative
> Hillsdale College
>
>
> -------- Original message --------
> From: Kathleen O'Toole <kotoole@hillsdale.edu>
> Date: 6/19/19 22:09 (GMT-05:00)
> To: Phillip Kilgore <pkilgore@hillsdale.edu>
> Cc: Chris VanOrman <cvanorman@hillsdale.edu>, Mike Harner <mharner@hillsdale.edu>
> Subject: Re: Message From Mr. Bolduc
>
> Now this is getting ugly. Is it true that we haven't visited them in over 18 months? I thought someone had been down there more recently.
>
> Sent from my iPad

266.    During a call with Hillsdale on June 20, 2019, E. Donalds confirmed she

was going to hire Susan Turner from MCA and discussed Chuck Marshall's status:

- Erika is going to hire Mrs. Turner from Mason—she's not going to stay at Mason under the current leadership. She really doesn't need her yet, but she doesn't want to let someone with her experience get away.
    - MCA still needs Chuck Marshall, but he's out of sorts with the MCA board.

267.    On June 20, 2019, E. Donalds also laid out the steps in the ongoing

conspiracy to take down MCA and its Board in a text to Baird, which notably ***included***

***the filing of lawsuits against them***:



268.    Consistent with the "parent letter" step listed in this plan, on June 20,

2019, Michelle Caswell and Olivia Durst sent a letter to Gov. DeSantis regarding

MCA (copied to, among others, Hillsdale):

June 20, 2019

*Sent Via Electronic Mail*

The Honorable Ron DeSantis
Governor of Florida
400 S. Monroe St.
Tallahassee, FL 32399-0001
ron.desantis@eog.myflorida.com

Re:    *Mason Classical Academy*

Dear Governor DeSantis,

I am writing on behalf of a group of concerned parents of students at Mason Classical Academy ("MCA"), a Hillsdale affiliated charter school located in Naples in Collier County.

We are respectfully forwarding to you a copy of the enclosed report from Jon Fishbane to the board of Collier County Public Schools ("Report")[1] alleging serious misconduct by members of the board of directors of MCA ("Board"). The Report, the result of a year-long investigation by CCPS into numerous reports from parents and community members of misconduct by the MCA Board, includes, among others, allegations of Sunshine Law violations.

In response to the Report, the Board is pursuing a course of action that will cause irreparable harm to one of the finest charter schools in Florida and cause significant irreversible damage to our children.

We respectfully request that you intervene, suspend the current board, and appoint an interim board that will prevent any further damage to the school until the matter can be fully and properly adjudicated.

Respectfully submitted,

| | | |
|---|---|---|
| Michele W. Caswell | /s/ Ashley Tucker Stacell | /s/ Olivia Durst |
| mwothe@hotmail.com | Ashleystacell@gmail.com | livvys@gmail.com |
| /s/ Christopher Durst | /s/ Kelsey Norton | /s/ Denis Buckley |
| /s/ Matt Stacell | /s/ Jonothan Norton | /s/ Kim Buckley |
| /s/ Juliette Bloom Lysiak | /s/ Melanie Nero | /s/ Erin Gannon Bryant |
| /s/ Adam Lysiak | /s/ Anell Robbins | /s/ T. Foster Bryant |
| /s/ Robyn Domes Mathias | /s/ Tony Robbins | /s/ Maureen Gerrity |
| /s/ Matthew W. Mathias | /s/ Sheri Ojanovac Dorta | /s/ Kevin Gerrity |
| /s/ Jodi Bain | /s/ Bob Dorta | /s/ Amee Rachu |
| /s/ Adam M. Bain | /s/ Cindy Walker-Palladino | /s/ Ron Rachu |

[1] The Report is attached hereto as **Exhibit 1**.

269. On June 20, 2019, Hillsdale discussed Caswell's letter internally and raised the possibility of having her write a "Letter to the Editor" for the *Naples Daily News*:

From:        Eric Coykendall
To:          Emily Davis; Joe DiBenedetto; Matt Witkowski; "Morgan Greenberg"; Clare Liening; Ashten Waite
Subject:     Fwd: Mason Classical Academy
Date:        Thursday, June 20, 2019 3:52:07 PM
Attachments: 2019.06.20 Ltr to Governor DeSantis with Report.pdf

See below and attached. Perhaps we could encourage Mrs. Caswell to write an LTE for the local
paper?

Regards,

Eric

Get Outlook for iOS

**From:** Phillip Kilgore <pkilgore@hillsdale.edu>
**Sent:** Thursday, June 20, 2019 1:45 PM
**To:** Mike Harner; Eric Coykendall; Emily Davis; Kathleen O'Toole
**Subject:** FW: Mason Classical Academy

**From:** Michele Wothe Caswell <mwothe@hotmail.com>
**Sent:** Thursday, June 20, 2019 1:23 PM
**To:** ron.desantis@eog.myflorida.com
**Cc:** commissioner@fldoe.org; Adam.miller@fldoe.org; ashley.moody@myfloridalegal.com;
doss.virlindia@leg.state.fl.us; stateattorney@sao.cjis20.org; Passidomo.kathleen@flsenate.gov;
Byron.Donalds@myfloridahouse.gov; Bob.rommel@myfloridahouse.gov; Lucars@collierschools.com;
Mitchj3@collierschools.com; Cartee1@collierschools.com; TerryRo@collierschools.com;
WestbeJo@collierschools.com; Fishbj@collierschools.com; Patton@collierschools.com; Chris
VanOrman <cvanorman@hillsdale.edu>; Phillip Kilgore <pkilgore@hillsdale.edu>; Hillsdale Charter
School Initiative <charterschool@hillsdale.edu>
**Subject:** Mason Classical Academy

Dear Governor DeSantis,

Attached please find correspondence sent on behalf of 107 concerned parents of students at
Mason Classical Academy for your review and action. Thank you for your consideration.

270.    The same day (June 20, 2019), Lewis's involvement in the conspiracy
took shape when she and Durst launched the "Citizens Concerned for MCA"
Facebook Page (which Baird immediately joined) and Lewis started the mca-
info.weebly.com website, which was little more than a front Defendants used to post
numerous false and defamatory attacks against MCA and its Board:





271.    On June 24, 2019, in further support of the ongoing conspiracy, Durst filed a retaliatory complaint with CCSB against MCA and its Board, in which he requested that CCSB "appeal to the Governor of the state of Florida…to remove the current board at MCA and allow Hillsdale College to step in and assist…":

> environment for the children attending the school. I would request that the CCPS Board appeal to the Governor of the State of Florida, as the parents already have, to remove the current
>
> board at MCA and allow Hillsdale College to step in and assist with efforts to install a Board that will actually adhere to the Pillars of Virtue, also called the Pillars of Character Development, that all Board Members are required to sign and date upon their appointment to the Board.
>     Thank you for your time and I appreciate the time and consideration you have given me in reviewing this complaint.
>
> Sincerely,
>
> Christopher Durst
> Concerned Parent of MCA Student

272.   On June 26, 2019, Lewis also tagged Gov. DeSantis in a post on the Citizens Concerned for MCA Facebook page (which was liked by CCSB Board member Lucarelli) falsely accusing the MCA Board of being "engaged in unethical and criminal activity," and Baird tagged Gov. DeSantis in a comment on Lewis's post:



273.   Also on June 26, 2019, Durst emailed the following cryptic threat to the MCA Board:



From: Christopher Durst <callendurst@_____com>
Date: Wed. Jun 26, 2019 at 1:41 PM
Subject: RE: Your games are about to end!!
To: <lmiller@masonacademy.com>, <klichter@masonacademy.com>, <dbolduc@masonacademy.com>

Board Members,
   It is unfortunate that it has come to this, but it appears that the games you are playing are about to come to an end. I would hope you would choose the honorable way out and allow the school to survive, however I don't think any of you have the moral fortitude to do what is right.

   I also hope that the three of you and your families are planning on moving from this area once all is said and done, as your names will be "mud" in this town. Trust me when I tell you that all of these families that you are hurting by hurting this school will take this personally and make sure any business you had in this town will be destroyed forever. Sounds vindictive doesn't it? Well, you reap what you sow!

   We all know the three of you will stand up and scream, "It's CCPS fault!! We told you so!!!" But, your shenanigans have become more and more transparent the last year and the people that still support you are starting to see you for what you are...criminals! Good luck ever succeeding at anything in this town again.

274.   The same day (June 26, 2019), Durst also sent a group email to MCA

parents, which E. Donalds promptly forwarded to Coykendall and Kilgore:

**From:** Phillip Kilgore <pkilgore@hillsdale.edu>
**Date:** June 26, 2019 at 10:43:56 PM EDT
**To:** Eric Coykendall <ecoykendall@hillsdale.edu>, Rebecca Holland <rholland@hillsdale.edu>
**Subject: Fwd: Response to Kelly Mason Lichter**

I've forwarded this with some comments up the chain.


P. Kilgore
Director, Barney Charter School Initiative
Hillsdale College


-------- Original message --------
From: Erika Donalds <erikadonalds@_____om>
Date: 6/26/19 21:43 (GMT-05:00)
To: Phillip Kilgore <pkilgore@hillsdale.edu>, Eric Coykendall <ecoykendall@hillsdale.edu>
Subject: Fwd: Response to Kelly Mason Lichter


---------- Forwarded message ---------
From: Christopher Durst <callendurst@_____om>
Date: Wed, Jun 26, 2019 at 9:28 PM
Subject: RE: Response to Kelly Mason Lichter
To:

Fellow Parents of MCA Students,
   I apologize for having to send this email to you, as your email should be private and not accessible by any other parent at MCA. However, your email was obtained from an email sent by MCA earlier this year, in which they forgot to cover all of the email addresses.

   Typically, I would not engage in a back and forth with a person such as Kelly Lichter, as there is no benefit to such engagement. But, since she has grabbed everyone's attention and has "spun" the narrative once again to attack a new set of "enemies", I thought it would be the perfect time to engage the parents that

275.   On June 26, 2019, Kilgore sent an internal Hillsdale email discussing how Fishbane told him "*confidentially*" about a *not yet publicly announced* CCSB meeting that was going to take place on July 11, 2019 to start the process of revoking MCA's charter:

-------- Original message --------
From: Phillip Kilgore <pkilgore@hillsdale.edu>
Date: 6/26/19 22:43 (GMT-05:00)
To: Mike Harner <mharner@hillsdale.edu>, Chris VanOrman <cvanorman@hillsdale.edu>,
Kathleen O'Toole <kotoole@hillsdale.edu>, Robert Norton <rnorton@hillsdale.edu>
Subject: Fwd: Response to Kelly Mason Lichter

Today, Jon Fishbane told me confidentially that the CCPS board will meet on 11 July
to discuss the commencement of a 90-day timetable to revoke the charter. The
thinking is that the MCA board has been so belligerent and vitriolic since the release
of the investigative report that it is forcing the hand of the CCPS board to bring the
problem to a close. There will likely be an appeal process afterward which will drag
on for a few months, so in the meantime the CCPS board will take over the school as
of 11 October and govern it until the adjudication is complete. That could easily
continue into the spring, perhaps March or April, and it is therefore likely that CCPS
would operate the school through the end of the school year.

Phil

P. Kilgore
Director, Barney Charter School Initiative
Hillsdale College

276.   Unbeknownst to MCA, in late June and early July 2019, Arnn and Florida Education Commissioner Corcoran were speaking on the phone almost nightly and discussing the plan to take over MCA and assistance FDOE would continue to provide.

277.   On June 27, 2019, Mathias texted E. Donalds to confirm what he should cover in a scheduled "meeting with Fishbane today":



278.    On June 27, 2019, MCA parent, Tamara Switken, posted a comment on
Facebook about information Sup. Patton revealed about a CCSB Board meeting the
week of the July 8th and that "***they want to keep the school open, but with new leadership.***"
Tamara Switken was one of the people E. Donalds identified for Hillsdale as a
potential Board Member for the planned "reconstituted" MCA Board.

279.    On June 28, 2019, Tamara Switken emailed Sup. Patton and Fishbane to
confirm their in-person meeting scheduled for July 1, 2019, which was also attended
by Heather Ayers (married to Derrick Ayers), another proposed Board Member, and
Michelle Caswell.

280.    On July 1, 2019, Lewis posted on the Citizens Concerned for MCA
Facebook page about Hillsdale ending its relationship with MCA, referencing an email
sent by Hillsdale's VanOrman:



281.    On July 2, 2019, the *Naples Daily News* published an article about
Hillsdale cutting ties with MCA:



282.    On July 3, 2019—pursuant to the plan to use FDOE to pressure the MCA
Board to resign—FDOE reached out to Arnold to ask whether MCA wanted to
mediate with CCSB pursuant to section 1002.33(7)(6), *Florida Statutes*.

283.    **That same day** (July 3, 2019), Hillsdale sent the following letter to MCA
parents, which Lewis almost immediately posted to the Citizens Concerned for MCA
Facebook page:



**HILLSDALE COLLEGE**

July 3, 2019

Dear Mason Classical Academy Parent:

I am writing to update the concerned parents of Mason Classical Academy (MCA) students regarding Hillsdale College's affiliation with the school.

As you know, the College's Barney Charter School Initiative (BCSI) has provided academic support and advice in governing practices to MCA leadership and teachers since MCA's founding. And as we shared previously, despite the academic successes of MCA, its governing and leadership practices—especially as pertains to its Board—have generated serious concerns.

BCSI staff members observed these poor practices firsthand, and Hillsdale College sent a written communication on the severity of the issues and recommendations for changes to the MCA Board President in December 2018. Additionally, Jon Fishbane, General Counsel to the Collier County School District, issued an extensive Investigative Report.

Unfortunately, because the MCA Board has not made the appropriate changes—either as outlined by Hillsdale College or as described by Collier County School District's Investigative Report—the College will terminate its affiliation with Mason Classical Academy on August 5, 2019.

The decision to terminate this relationship did not come easily and is based on the severity of the problems at hand and the MCA Board's failure to comply. We have seen the outstanding work and dedication of the school's teachers and staff members, and we commend students, teachers and staff for their notable success.

As we have shared with the MCA Board, if the current MCA leadership demonstrates compliance with the aforementioned recommendations before August 5, Hillsdale College would explore reconsidering its decision.

Should you have further questions about the role Hillsdale College's BCSI plays in advising affiliated schools, please contact charterschool@hillsdale.edu.

Sincerely,

Dr. Christopher A. VanOrman
Provost, Hillsdale College



284.    On the evening of Sunday, July 7, 2019, the CCPS posted a Public Notice

for a special meeting on July 11, 2019 to review "***whether to issue a notice of termination***

***of the charter with Mason Classical Academy***.":



285.   Lewis quickly posted CCSB's July 7, 2019 Public Notice and the CCSB Agenda for the July 11, 2019 meeting on Facebook, describing it as **"Step 1 in taking back our school…"**:





286.    On the morning of July 8, 2019, Arnold emailed FDOE Assistant General Counsel, Lois Tepper, that MCA's Governing Board "need[s] to be populated with new board members":



287.    That same day (July 8, 2019), Arnold emailed a letter to Fishbane stating, "Please send me the District's offer for settlement ASAP." Fishbane responded to Arnold with a "Proposal to Resolve the Controversy with Mason Classical Academy." This "proposal" called for two (2) of the three (3) MCA Board Members to resign, then MCA will add four (4) new Board Members *preselected by Hillsdale College* and stated that "*the proposal has been discussed with the appropriate persons at Hillsdale College who are in support of it.*":



July 8, 2019

*Sent Via Email*

Shawn Arnold, Esq.
6279 Dupont Station Ct.
Jacksonville, FL 32217

Re:     Proposal to Resolve the Controversy with Mason Classical Academy

Dear Shawn:

In follow up to our conversation, the following will set forth a proposal that I believe will resolve the controversy in everyone's best interest in advance of the District School Board's July 11, 2019, Special Board Meeting. The proposal has been discussed with the appropriate persons at Hillsdale College who are in support of it.

With this in mind, the MCA Board would call a Special Board Meeting by July 25, 2019, to vote in four new Board Members from a list of candidates to be provided by Hillsdale College. Upon the voting in of the four new Board Members, Ms. Miller and Mr. Bolduc would step down and Ms. Lichter would stay on the Board. Within two weeks after the formation of the new Board, the Board will meet to select new Officers for the Board.

Moreover, Hillsdale College has advised it will use the good offices of the recruitment/selection firm it relies upon to locate a Principal for MCA to have in place by the opening of school. This search will be made a high priority by the College to help MCA.

During the July 2, 2019, MCA Meeting, Ms. Lichter stated that she wanted to repair with Hillsdale College. This provides her with an important opportunity to do so. If this proposal is accepted, Hillsdale will agree to continue its relationship with MCA and provide support to MCA's educational growth and development by working with its administrative team, faculty, and the Board in the best interests of MCA students and parents.

Please encourage your client to accept this offer. This would need to be voted on at a Special Meeting prior to July 11, 2019. I would like to be able to report to our Board on July 11, 2019, and Hillsdale College that the proposal has been accepted.

288.    At that time, unbeknownst to MCA, Arnold was also representing E.

Donalds' Optima Foundation in connection with other Hillsdale charter schools.[26]

289.    On July 8, 2019, Hillsdale emailed an extortionate letter to Lichter

advising that it would not recommend the revocation of MCA's charter to CCSB if

she and MCA ceded to Fishbane's demands:

---

[26] Arnold also represented Hillsdale BCSI school Tallahassee Classical Academy in its appeal of the School Board of Leon County's denial of its Charter Application, filed May 31, 2018.



290.   On July 8, 2019, Hillsdale internally circulated notes concerning the July 7, 2019 CCSB meeting, including a reference to E. Donalds "recruiting people to serve as new MCA board members" during the meeting:

From: Emily Davis
To: Chris VanOrman; Kathleen O'Toole; Mike Harner; John Cervini
Cc: Matt Schlientz; Eric Coykendall; Phillip Kilgore
Subject: Highlights: Video from MCA
Date: Monday, July 8, 2019 1:42:13 PM

One note: A mention that Erika Donalds is recruiting people to serve as new MCA board members

**Some highlights from this meeting:**
29:50 BCSI schools are a "sea of average"

291.   On July 8, 2019, Lewis emailed CCSB, Fishbane, and Patton about how "**we**" would fill a new board and author a new charter once MCA's was terminated:



As scary as it sounds to request CCPS to "terminate the MCA charter", I am in favor of your doing so so that a new charter application can take its place. If you do not, the current administration will feel invincible and above the law - they will be victorious and will point to the summer of 2019 as the main example for why they are 100% in the right in all of their actions. It will be SO MUCH WORSE than it already has been in the past.

Many MCA Parents are ready to handle the load if MCA's charter is terminated. We will author a new charter application, we will fill a new Board, we will populate a PTA, and we will volunteer - we will do what it takes to carry the school we love forward. We will use Hillsdale's resources to guide our way, we will heal, and we will take MCA to the next level.

292.    On July 9, 2019, Mathias texted E. Donalds to confirm Hillsdale's continued involvement in terminating MCA's charter:



293.    Mathias and E. Donalds also discussed their own charter application, Fishbane's involvement in the conspiracy, and their recruitment of Douglas Schumann—MCA's landlord—to help their conspiracy, including locking MCA's doors after its charter was terminated:



294.    On July 9, 2019 Coykendall emailed O'Toole about correspondence between MCA and Fishbane provided by E. Donalds, as well as correspondence Coykendall obtained while secretly monitoring an MCA Facebook group:

| | |
|---|---|
| **From:** | Eric Coykendall |
| **To:** | Kathleen O"Toole |
| **Subject:** | 2019.07.09 MCA Attny lt: to Fishbane.pdf |
| **Date:** | Wednesday, July 10, 2019 8:26:16 PM |
| **Attachments:** | 2019.07.09 MCA Attny lt: to Fishbane.pdf |
| | ATT00001.htm |

Katy,

Just to make sure you have the most recent chatter from MCA:

1. Attached is the MCA board letter to Fishbane. It was sent to me by Erika Donalds (I neither requested it, nor responded).

2. You can read Fishbane's response over here: https://drive.google.com/file/d/1Ar_4n1iRVTe-6xlv5OVr8i2_afyqw-ef/view (It was posted to a Facebook group created to follow all this madness. I follow the group as a silent observer.)

295.    On July 10, 2019, Mathias texted E. Donalds about Durst sitting on the

Naples Classical Academy Board, and Ayers' thoughts about other potential board

members:



296.    During this July 10, 2019 text exchange, Mathias and E. Donalds also

discussed E. Donalds' knowledge and Durst's knowledge of what Fishbane would be

offering at the special meeting on July 11, 2019 to terminate MCA's charter:



297.   Also on July 10, 2019, Baird posted on Facebook about offers that would

be made to MCA on July 11, 2019 and Hillsdale's role in the plan:



298.    Also on July 10, 2019, **the day before the CCSB specially set meeting
to discuss revoking MCA's charter**, Bolduc received an unsolicited call on his cell
phone from Bob Olson, who told Bolduc that he had been talking to Rep. Donalds
about the MCA situation and that he "*need[ed] you guys to step down*" because Hillsdale
had plans to "*take this national*."

299.    Bob Olson is a "big" Hillsdale Donor and close with Keith Flaugh
(FCLA)—who also talked to Lichter about resigning before the July 11, 2019 CCSB
meeting.

300.    On July 10, 2019, Mathias and E. Donald continued to text about Durst
serving on the Naples Classical Academy Board and recent Facebook posts:



301.   On the morning of July 11, 2019 at 5:44 a.m., at Arnn's instruction,

Harner emailed Fishbane Arnn's notes from a private call he had with Lichter on the

night of July 10, 2019 "at the urging of Bob Olsen":

**From:** Mike Harner [mailto:mharner@hillsdale.edu]
**Sent:** Thursday, July 11, 2019 5:44 AM
**To:** Fishbane, Jon (Jonathan) <fishbj@collierschools.com>
**Subject:** FW: This is the note that I hope someone can get to Mr. Fishbane first thing in the morning.

Mr. Fishbane,

Below find a note from Dr. Arnn regarding a call he had with Kelly Lichter last night.

Best regards,

Mike Harner
Chief of Staff
Hillsdale College

**From:** Larry P. Arnn
**Sent:** Thursday, July 11, 2019 12:10 AM
**To:** Kathleen O'Toole <kotoole@hillsdale.edu>; Robert Norton <rnorton@hillsdale.edu>; Mike
Harner <mharner@hillsdale.edu>; Chris VanOrman <cvanorman@hillsdale.edu>
**Subject:** This is the note that I hope someone can get to Mr. Fishbane first thing in the morning.

Report of a Conversation with Kelly Lichter
At the urging of Bob Olsen, I sent a text this evening to Kelly Lichter. This was after he had
scheduled her to call me at 10:00 a.m this morning, but she did not. Getting my text, she did
call about 8:45. I talked to her for 40 minutes.

Main points:

        At the end of the conversation I told her that if anybody characterized this conversation
with me at the meeting or in any public forum differently than it was then we would never
have another private conversation. I said that I called to make three points.

302.   The CCSB held its special meeting on July 11, 2019, during which

Fishbane recommended that CCSB mediate with MCA and FDOE. CCSB voted to

proceed to Mediation on August 1, 2019. During the public comment portion of this

meeting, dozens of supportive MCA parents spoke on behalf of MCA and MCA
parent, Melissa McMurray, presented a petition titled "Keep MCA Open" with more
than 1,700 signatures.

303.    Consistent with his ongoing collusion with Hillsdale, and in an effort to
turn parents against MCA leadership, Fishbane falsely claimed at this meeting, that
Hillsdale was the reason why MCA was able to thrive and function at a high level.

304.    On July 11, 2019, Fishbane also had a telephone conference with
O'Toole and Harner, which O'Toole summarized in an email:



| From: | Kathleen O'Toole |
| To: | Kathleen O'Toole |
| Subject: | Fishbane call 07/11/2019 |
| Date: | Thursday, July 25, 2019 11:47:24 AM |

**Fishbane call 07/11/2019**

Harner, O'Toole

Going to mediation on August 1
The board will defer a notice to terminate until we have a chance to see how mediation goes
Fishbane was going to motion that if mediation fails we terminate but decided not to because so many emotional families and
wanted to lower tension

Fishbane explained that the board member list from Hillsdale was just revealing the names of people who had already
expressed an interest in helping, not taking over the board
His goal was to explain that everything about Hillsdale offer was positive

Some parents asked why they held the meeting with Hillsdale - Fishbane felt it was appropriate to have a meeting because so
many parents concerned about the MCA Hillsdale relationship
Hillsdale is the institutional partner in the application

Bizarre logic that because the school is going well it must therefore me because of leadership
Fishbane agrees with us that it was in spite of leadership

At the end of the meeting Fishbane did a final presentation in which he went over the report and listed 10 areas of concern
Indicated that there was some effort to cure on board's part but Fishbane said that was not persuasive
Has a system for district staff to evaluate the level of cure

Fishbane asked the attorney who helped coordinate the mediation if Hillsdale could be present for mediation and the mason
attorney said no
But they may reach out to us via phone on August 1

We need to think of solutions for reconfiguring the board and some other concrete things we can offer if they call

Fishbane wants to make sure we have a copy of the cure document
Will also send some other correspondence

We commit to being available on August 1 and to any other help needed

305.    During the July 11, 2019 CCPS meeting, E. Donalds and Mathias texted about the timetable for revocation of MCA's charter:



306.    On July 12, 2019, E. Donalds exchanged a series of messages with Coykendall about her meeting with Hillsdale in Michigan planned for the following

week, as well as the "plan" to terminate MCA's charter and using the mediation "**to take away MCA argument that they didn't get due process**":



307.    As demonstrated by this text exchange, at this point the conspirators'
plan was to use the mediation as a ruse and then get MCA's charter terminated but
also keep the school open and transfer its assets to the group E. Donalds and Mathias
were putting together with Hillsdale's oversight.

308.    At that time, under the stewardship of MCA's Governing Board
Members (who Defendants were unlawfully trying to oust), MCA had over $2 million
in its reserves and MCA was a "high-performing" school, which opened the door to
significant, valuable benefits under Florida law.

309.    On July 12, 2019, E. Donalds also texted Mathias about Rep. Donalds
talking to Rep. Bob Rommel (Florida House of Representatives, District 106) and
bringing a "DOE-seated Board" to the MCA mediation:



310.    On July 12, 2019, Baird and E. Donalds texted about having a "replacement charter and board" ready and Baird speaking with Fishbane about terminating MCA's charter:



311.   On July 15, 2019, E. Donalds and Mathias texted about conversations with Rep. Rommel and Hillsdale:



312.    On July 17, 2019, E. Donalds met with Hillsdale leadership in Michigan.

O'Toole's notes from her meeting with E. Donalds memorialize discussions about the

replacement board for MCA and submitting an application for a new charter as soon

as CCSB pursued termination of MCA's charter so that CCSB could turn over MCA's

assets to this new group.    These notes also reveal that Sup. Patton approached

E. Donalds "asking her to submit an application" and that Coykendall had a meeting

planned with E. Donalds the following week regarding Jacksonville Classical Academy:



From: Kathleen O'Toole
Sent: Wednesday, July 17, 2019 10:56:43 AM
To: Mike Harner; George King; Eric Coykendall
Subject: Notes from conversation with Erica Donalds - George and Eric, to do items for you at the end

**Erica Donalds**
Mike Harner, Katy O'Toole

Thinks that mediation is going to fail

Met in person with a group of parents and community members who would be willing to serve as the board
Matt Matthias willing to be the chair
Tim hall

Bill tuog is a Hillsdale grad

There are also 5 parents of MCA students willing to serve on the board

Matt wants to have a 9 person board
Because important to show a strong support base
One is a CPA
One owns a construction company
One is an OBGYN and was on the board of the private school that preceded MCA
One works as an accountant for the city of Naples

Did the name nick reid come up?
No she says
She doesn't know who he was

These people had an initial meeting last night
They are going to file to be a corporation with the state
Erica is going to assist them in filing for nonprofit status

Their intention is to submit the application as soon as termination is pursued by the district
Erica says if mediation fails she has no doubt that the school will be closed
Then she backs up a bit
The district is begging Erica to have an application ready if mediation fails
Three CCPS board members and the superintendent have come to her asking her to submit an application

The district doesn't have much choice, doesn't want to run a classical charter school.
Their best option is to hand over the assets of MCA to this new group

Mike: we are not going to work exclusively with Erica
If someone else comes forward we are willing to consider supporting them

Out goal is to keep the school open
This is not Hillsdale College and the optima foundation getting together and conspiring to take over the school

Erica says she is willing to help but is not actively pursuing anything

GEORGE and ERIC : We need to review the profiles of these board members very carefully
What kind of application process do we make them go through
This is a chance to have more oversight than we had before
The conversation will start happening next week when Eric is in Florida meeting with Erica re: Jacksonville

313.    In response to O'Toole, Hillsdale's George King emailed the following:



314.    On July 17, 2019, Fishbane had a call with Hillsdale's General Counsel,

Robert Norton:



315.    On July 17, 2019, E. Donalds texted Mathias about Hillsdale being "***IN***

***on the 'keep MCA open' plan!***" which included submitting a charter application for two

Naples campuses:



316.    In the same July 17, 2019 text exchange, E. Donalds confirmed to

Mathias that Susan Turner was coming to work for Optima, but to keep that quiet:



317.   On July 18, 2019, former MCA employee Susan Turner (who began
working for Optima Foundation not long after) e-mailed MCA's bank to give Ashley
Hamilton from the accounting firm Markham, Norton Mosteller Wright & Co access
to MCA's on-line banking privileges.  Gail Markham, founder of Markham, Norton
Mosteller Wright & Co., also serves on FGCU's Foundation Board.

318.    On July 18, 2019, E. Donalds met with Arnn for two and a half hours and discussed the "**ongoing partnership between Hillsdale and Optima**" and Hillsdale "pulling from their large donor list in the Naples area" for new board members once MCA was taken over:



319.    Notably, Mathias and E. Donalds indicate in this text that they should, "have a few parents [on the new board] **for appearances**."

320.    On July 19, 2019, Coykendall also met with E. Donalds in Michigan and
they discussed that MCA's then-lawyer, Arnold, was working for E. Donalds and
Optima and the "plan" for taking over MCA:



19.07.19, Meeting with Erika Donalds in Hillsdale
Friday, July 19, 2019    8:35 AM

Meeting w/ Erika ——

• Debrief from yesterday ——

1 From Mason:
  - Erika has 9 board members, 7 of
    whom are MCA parents
  - We're planning to offer six
    board members
  ↳ If we can't fix the school publicly,
    openly, above board, then the
    parents, students, & teachers will leave
    & school will fail.



321.    After her meeting with Coykendall, E. Donalds texted Mathias:



322.    On July 21, 2019, E. Donalds emailed O'Toole and Harner about people

who had committed to serve on the new "Collier classical charter school board (yet to

be named)" including Mathias, **Heather Ayers**, and **Tamara Switken**:



From: "erika@optimaed.org" <erika@optimaed.org>
Date: Sunday, July 21, 2019 at 1:16 PM
To: Mike Harner <mharner@hillsdale.edu>, Kathleen O'Toole <kotoole@hillsdale.edu>
Subject: Board members

Good morning Dr. O'Toole and Mr. Harner,
Thank you for your time yesterday and for your efforts to ensure a Hillsdale Classical Charter School remains available for families in our community. I look forward to workng together towards a effective solution to this disappointing situation.

The individuals who have committed to serve on the new Collier classical charter school board (yet to be named) are:
Matt Mathias – Chairman, Finance professional, MCA parent & former board member
Dr. Holly Miller – MCA parent, OBGYN with extensive board experience
Heather Ayers, CPA – MCA parent, Accounting professional
William (Bill) Truog – Non-parent, Hillsdale alumnus, former business owner with non-profit experience
Jodi Bain – MCA parent, City of Naples accountant
Tony Palladino – MCA parent, Owner of Palladino Custom Homes
Tamara Switken – MCA parent, works for Florida Southwestern State College
Tim Hall – Non-parent, retired, founded and ran a private school for students with disabilities for 15 years

The Chairman is working on one more to bring the count to 9 board members at the outset. The MCA parents listed have all been at the school since its founding.

323.    On July 24, 2019, Mathias and E. Donalds met with Coykendall, after

which they texted about not being "public" about Hillsdale's "explicit support":



MM
Matt M

What they asked is that we not be public about their explicit support until after mediation fails. Which is why we are not making anything official until then, but there's no reason they would not be on the LOI

Jul 25, 2019, 7:32 AM

That was in the back of my mind...just would have been nice for him to be up front about that....assuming he even knew about your meetings w/ Katy and Arnn. Though, I'm not sure I understand the downside of them being more public about their support of the northern campus..just continues to build the pressure on KL? But, I do have lots to learn in the art of politics.🙂

As do they

324.    On July 29, 2019, Rep. Bileca emailed Arnn about the upcoming MCA

mediation and Corcoran's involvement:

**From:** Michael Bileca <mbileca@bilecafoundation.org>
**Date:** Monday, July 29, 2019 at 5:36 PM
**To:** Larry Arnn <larnn@hillsdale.edu>, John Cervini <jcervini@hillsdale.edu>
**Subject:** Mason Classical Academy

President Arnn,

Hope all is well with you. I finished a conversation with Education Commissioner Corcoran and he asked me to take a more active role in helping to resolve the ongoing issue at Mason. I would like to connect to discuss the situation.

Given the nature of the mediation and proceedings, it would be great to connect sooner than later. I would like to understand Hillsdale's perspective as I look to provide some guidance and help.

Thanks in advance,

--

| | |
|---|---|
| **From:** | Madison Moore |
| **To:** | William Smith |
| **Subject:** | For IN: Michael Bileca FW: Mason Classical Academy (Michael Bileca) |
| **Date:** | Tuesday, July 30, 2019 8:49:40 AM |

**From:** "Larry P. Arnn" < >
**Date:** Monday, July 29, 2019 at 6:56 PM
**To:** Michael Bileca <mbileca@bilecafoundation.org>
**Cc:** Madison Moore <mmoore@hillsdale.edu>, Kathleen O'Toole <kotoole@hillsdale.edu>, Mike   Harner <mharner@hillsdale.edu>, Bob Norton <rnorton@hillsdale.edu>, Omnifocus <larnn.hshdc@sync.omnigroup.com>
**Subject:** Re: Mason Classical Academy (Michael Bileca)

Dear Michael,

Great.

We can talk tomorrow if that works for you. Could you do 4pm? I may have some other people, among whom all the facts will be known, with me. I bet you can help.

Best, LA

325.    On July 29, 2019, to drive public support for Hillsdale, Lewis posted on

the Concerned Citizens for MCA Facebook page about the college admissions

ramifications for students if Hillsdale was not involved at MCA:



326.    On July 30, 2019, E. Donalds emailed O'Toole about the ongoing plans

surrounding MCA:



327.    On July 31, 2019, Corcoran's office filed an Administrative Complaint

against Vickaryous (Case No. 178-2606) alleging that she bullied and humiliated

educators and improperly recorded private conversations while at Manatee Middle.

328.   On July 31, 2019, E. Donalds spoke with Sup. Patton and followed up with Mathias about the plan for MCA's charter termination:





329.    On July 31, 2019, Bileca emailed Arnn about conversations they were

having with Arnold:



330. MCA was not aware of and never authorized Arnold to call Robert Norton on July 30, 2019 to propose that Bileca be chair of the MCA Board.

331. On August 1, 2019, FDOE mediated the dispute between CCSB and MCA, resulting in a Mediation Settlement Agreement (the "MSA").

332. This MSA included a "Corrective Action Plan" and acknowledged that CCSB would "no longer pursu[e] termination of the Charter for Mason." The MSA further provided that "Both parties will work in concert for a smooth opening of the school on August 13, 2019," while acknowledging that Hillsdale notified MCA of its

intent to terminate their contract effective August 5, 2019. The MSA said nothing about Rep. Bileca being on MCA's Board.

333. Unbeknownst to MCA at the time, Fishbane was communicating with Hillsdale College representatives **during the mediation**.

334. On August 1, 2019, Mathias and E. Donalds texted about the mediation and a conversation with Coykendall that morning:



335.    On August 2, 2019, Fishbane and Baird texted about the MSA and Fishbane assured Baird that "*there is more than the initial reading* [of the settlement agreement] *discloses*"—foreshadowing the next phase of the conspiracy—including using the MSA to seize control of MSA:



### G.    The Next Phase:
### Manufactured MSA Breaches, False Complaints, Defamation & Retaliation

336.    On August 3, 2019, Rep. Bileca and Arnn exchanged emails about the MCA mediation:

**From:** Larry P. Arnn
**To:** Evernote
**Subject:** Fwd: Good work
**Date:** Saturday, August 3, 2019 4:03:34 PM

Begin forwarded message:

**From:** Larry Arnn <lspencer@hillsdale.edu>
**Subject: Re: Good work**
**Date:** August 3, 2019 at 3:41:42 PM EDT
**To:** Michael Bileca <mbileca@bilecafoundation.org>
**Cc:** Kathleen O'Toole <kotoole@hillsdale.edu>

Give me a call whenever you like this weekend at ███████, my cell, which
use anytime. Bob, our attorney, describes Mr. Arnold just as he describes Bob,
but worse (Arnold: we won, you get nothing). I spoke with Bob about that and
instructed him that we will not be making many demands but trying to make this
work, even in the face of provocation, of which we have plenty. Our strategy is to
help you make it work. We will be rescinding the notice of termination.

If friction prevails for months, it will not be our doing, but in that case we will
withdraw. I do not know how many months, not wishing to give any ultimata,
and not wishing to encourage the leaders of Mason to simply wait us out. My
team is worn out with Mason, but they will persevere.

Look forward to talking.

> On Aug 3, 2019, at 3:12 PM, Michael Bileca
> <mbileca@bilecafoundation.org> wrote:
>
> Larry,
>
> Would be good for us to do a quick call together. The result was
> favorable and the DOE weighed in heavily. Hillsdale's attorney
> however, reflected a very negative view of the settlement and
> expressed this to Mason's attorney - Arnold - who I have been in
> contact with. Arnold works for the Board and I am sure that went
> back to them already. I have a concern that we need to create some
> bridge between Hillsdale and the existing board and instead of
> starting that process post mediation settlement, it created further
> division. As of now according to Shawn, there is a termination
> notice from Hillsdale that has been sent to the Board and I believe in
> effect this upcoming week unless retracted.
>
> I am available anytime through the weekend or Monday after 11.

337.    On August 4, 2019, Lewis emailed CCSB, Fishbane and Patton about
the MSA, using complaints that are the handiwork of the conspiracy, including Baird's
complaint, Fishbane's report, and Hillsdale's findings, and emphasizing the
importance of Hillsdale remaining involved in the school. Two days later, Lewis
spoke at an MCA Board Meeting with a Hillsdale binder in her hand:



338.    Of course, Lewis never mentioned that she was deeply involved with co-Defendants in the plot to remove MCA's Board and take over the school, serving as a surrogate for Fishbane and Hillsdale to post false and defamatory statements about MCA and its Board.

339.    On August 5, 2019, O'Toole emailed Arnn about E. Donalds starting her charter school in Collier and wanting to talk to Hillsdale about MCA.

340.    On August 6, 2019, Hillsdale emailed a letter to the MCA Board attempting to rescind its termination of the December 2017 agreement with MCA, which had already become effective the day before (August 5, 2019). Although this letter is only addressed to the MCA Board with a cc to Fishbane, Lewis posted it on her Weebly site the next day:



341.   At a public meeting on August 6, 2019, CCSB discussed Hillsdale's letter attempting to rescind its termination. Predictably, Fishbane advocated that Hillsdale's rescission letter was valid and stated that if MCA did not recognize Hillsdale as their current partner, he would view that as a breach of the Charter Agreement.[27]

---

[27] Hillsdale is NOT a "partner" with MCA, as plainly stated in Hillsdale's contract with MCA: "*Nothing in this Agreement creates or is intended to create a partnership, employee relationship, agency relationship, or any relationship implying or ceding control over MCA Corporation, Charter School, the governance of Charter School, or the operations of Charter School to Hillsdale College, or any of Hillsdale College's employees, agents, or representatives.*"

342.    On August 6, 2019, O'Toole forwarded Arnn an email from Coykendall about the Florida chartering process to "*answer[] [Arnn's] question about how involved Corcoran would be in starting up new schools in Florida.*"

343.    On August 6, 2019, E. Donalds and Coykendall texted about the mediation and Corcoran's and Bileca's involvement:



344.    On August 7, 2019, Coykendall emailed O'Toole about Naples being able to support two schools and being "sensitive to *the Optima Foundation's need to grow to at least three schools*":



345.    This clearly is a reference to E. Donalds' need for three schools to qualify as a Hope Operator.  In fact, Coykendall later testified as follows:

```
 9   Q.    Yeah.  Now, you -- at the end of the third paragraph

10         of your email to Katy O'Toole in Exhibit 31 you

11         mentioned that you were sensitive to the Optima

12         Foundation's need to grow to at least three schools.

13         What did you mean by that?

14   A.    Yeah.  So in order to have a successful management

15         company in the charter school business you have to

16         work on certain economies of scale.  A management

17         company typically takes a percentage of the total

18         revenues to a school and provides a set list of

19         services.  And the Optima Foundation's business plan

20         was such that I think basically they were spending

21         their investors' money and not recovering anything on

22         that investment until they had at least three

23         schools.  And so there was financial pressure on

24         Erika Donalds to have a third school as part of her

25         portfolio.
```

```
14   Q.    So I think if I understand you correctly, you

15         understood from Erika Donalds that from a business

16         perspective it was better to get to three schools as

17         soon as they could, and if this Naples school could

18         be opened, then that would help in what they were

19         trying to achieve?

20   A.    That's right.
```

346.   On August 7, 2019, MCA attorney Michael Coleman responded to
Hillsdale's attempted recission of its termination of the December 2017 agreement
with MCA:



347.   Although this letter was only addressed to Hillsdale with a cc to the MCA
Board, it was posted to Lewis' Weebly website for public viewing **the same day**.

348.   On August 7, 2019, Mathias and E. Donalds exchanged a series of texts
about applying for two campuses "***but be more general about whether one is MCA***" and
that "***Hillsdale is back in the picture***" because "***Corcoran has something to do with it***":



349.    On August 7, 2019 Hillsdale also had a call with Steve Read (a teacher
at MCA sympathetic to Hillsdale), during which Hillsdale was careful not to say
anything about Bileca or Corcoran:

> • → **I·did·not·say·anything·about·Mike·Bileca·or·Richard·Corcoran.·I·did·say·that·we·want·to·help·
> MCA·however·we·can,·and·we·have·agreed·to·help·the·school·as·long·as·it·welcomes·our·help·
> and·improves·its·governance·practices·(paraphrasing·Katy's·quote·for·Erika·Donalds).·¶

350.   On August 8, 2019, E. Donalds continued pushing Coykendall for "approval" so she could get her third school:



351.   On August 8, 2019, O'Toole emailed Arnn about the conversation with Steve Read:



352.   Later, O'Toole emailed Arnn about another conversation she had with E. Donalds:



353.    On August 8, 2019 (within 48 hours of the MSA being approved and

Fishbane advocating that MCA no longer having Hillsdale as a partner is a breach of

MCA's Charter Agreement), Mathias filed Phoenix's Articles of Incorporation.

354.    Also on August 8, 2019, Mathias tried to give Coykendall access to a

video of the MCA August 8, 2019 Board Meeting and offered access to "**our** 'MCA

Concerned Parents'" Facebook group:



355.    On August 9, 2019, Mathias emailed Rep. Rommel about the plan to reconstitute the MCA board after having MCA's charter terminated and *"passing the school along to a [his] newly approved…Hillsdale affiliated…charter school."*  According to an invoice from Jim Fox's Roetzel Law Firm to CCSB, Fox "received and reviewed" this email from Mathias to Rommel:

From: M▉ M▉ <▉▉▉▉▉>
Sent: Friday, August 9, 2019 9:37 AM
To: bob@representativebobrommel.com <bob@representativebobrommel.com>
Subject: Mason Classical Academy

Bob:

You and I had a brief conversation prior to the mediation between the Collier County School Board District and Mason Classical Academy.  Well, the mediation is over, and I can't be more disappointed in the outcome.

It appears the state of Florida representatives in Tallahassee believe "change" can occur by simply adding a special person on the Board of Directors at MCA.

Included in this e-mail are two examples of why I was explaining to you this strategy will not work.

The first (attachment) is a cut from a recording of a call/video conference among a limited number of MCA parents....with Kelly Lichter presiding.  Kelly explains how there is a group of parents who are "undermining" the school and lays blame for the school's difficulty on the feet of those parents.  She does only to explain her exasperation as to why these parents continue to have their children educated at MCA.  On the heels of the mediation (August 1st and 2nd), this message of divisiveness is most troubling.  If the intention for the outcome of the mediation was for the MCA Board Leadership to behave more in line with the "8 Pilars of Virtue" it purports to live by....well, this is a most unfortunate action by Ms. Lichter.  So, this is the first example of how behaviors have NOT changed.  She CLEARLY cannot separate the curriculum delivered by the teachers...versus the behaviors and decision-making of the 3 board members.

The second (URL Link Below) is a you tube video of a MCA Board of Directors meeting held on August 8th.  It's rather lengthy, but I encourage you to listen/watch the entire video.  If the intention of the mediation outcome was for MCA and Hillsdale College to mend fences and work together...well...clearly this is not the result...as you can determine for yourself.  If the intention of the mediation outcome was for the MCA BOD to "come around" and behave in a civil manner...mending fences with all stakeholders (the Collier County School District; founding families; parents; the Landlord; the state of Florida taxpayer; etc...) you can interpret for yourself why this is not happening.  If they are supposed to add a new board member agreed upon in mediation, why didn't they do so...or why wasn't that even discussed at this board meeting...where other board candidates were discussed?  How is one person, one vote, supposed to overcome the 4 vote alliance of this Board?

https://www.youtube.com/watch?v=8vBANEnIQqc&feature=youtu.be&fbclid=IwAR3Z0xG0UM0KEgxd0zqTAbjmPtoFwkhHO_kw7HgrOm0Jton892p4nzxke8c



**MCA Board Meeting 08 08 2019**
MCA Board Meeting 08 08 2019
www.youtube.com

Time will tell, Bob, but the residents of Collier County and the Florida tax payers...particularly those who believe strongly in School Choice and Charter Schools...were dealt a disservice, in my opinion, by emboldening and empowering these board members to continue their intimidation tactics, continue to thumb their noses at their "sponsor" (the Collier County School District), continue to demonize their original education partner (Hillsdale), continue to WASTE tax payer dollars on legal fees, continue to squander financial resources by poor fiscal decisions and continue to abuse the charter school rules as they exist today.

Please understand, this is NOT about closing MCA...this is about reconstituting the Board of Directors....even if it means terminating the contract for MCA...and passing the school along to another newly approved...HILLSDALE COLLEGE AFFILIATED...charter school. This is a pathway to accomplish EVERYONE's objectives. This needs to be the communicated narrative to the entire universe. This notion of anyone trying to "close the school" is utter nonsense. But, given the current laws in Florida, the current MCA Board is empowered to do ANYTHING they want...ONLY BECAUSE THEY ARE A HIGH PERFORMING SCHOOL. This is a perfect argument for the opposition of charter schools. Just wait until those who fight against charter schools get ahold of this entire scenario. This Charter School "pushes out" low performing students (a 20% student attrition rate)...this Charter School wastes tens of thousands of Florida Tax Payer dollars on attorneys fees in its efforts to skirt Florida laws...this Charter School wastes hundreds of thousands of Florida tax payer dollars by paying off its lowest interest loans and retaining its highest interest loans....this Charter School squanders opportunity to own its campus and adjacent land free and clear, by upsetting and ostracizing the BENEVOLENT landlord...the State of Florida Department of Education supported them and emboldened them by not only allowing them to get away with it historically, but also by energizing them to continue their behaviors...the State of Florida Department of Education intervened by not allowing the Collier County School District to do their duty for the good of the citizens of Collier County.

My apologies if this e-mail is a bit assertive, but I simply ask you to understand we've been dealing with this nonsense for over 5 years. Just as we thought we could see light at the end of the tunnel, the state of Florida stepped in and crushed any hope for real improvement...real change...at MCA. This is truly disheartening.

356.    On August 9, 2019, **Arnn sent a letter thanking Fishbane** for his help on

the MCA situation:



357.    On August 9, 2019, Mathias and E. Donalds exchanged texts about Tom
Grady (who served on the Florida CRC with E. Donalds in 2017 and was appointed
to the FDOE in 2015) and Blake Gable (CEO of Barron Collier Companies, Chairman
of the Board of Trustees of FGCU), including Grady meeting with Sup. Patton about
the MCA situation.

358.    On August 14, 2019, Fox sent a letter to Arnold alleging "Settlement
Agreement Violations," which included "Rejecting its Contract with Hillsdale

College." Fishbane later stated at a CCSB board meeting in October 2019 that he co-authored this letter and all future letters sent in Fox's name to MCA.

359. On August 29, 2019, Mathias emailed Jacob Olivia at FDOE about a "***pathway to reconstitute*** the existing MCA Board of Directors":



360. On August 30, 2019, Coleman spoke with FDOE about Commissioner Corcoran's demands regarding, among other things, Bileca being appointed MCA Board Chair (to which MCA never agreed at mediation).

361. On September 4, 2019, Fishbane and Fox co-authored another letter asserting baseless breaches of the MSA focused on Hillsdale's involvement.

362. On September 6, 2019, the MCA Board approved hiring Vickaryous as principal.

363.    On September 17-20, 2019, Durst sent a series of emails to MCA concerning an alleged failure to provide an annual FERPA Notice under 20 USC 1232(g) and 34 CFR 99.

364.    On September 24, 2019, Coleman responded to Fox's September 4, 2019 letter with a cc to the MCA Board and Arnold.  This letter was also quickly posted on Lewis' Weebly website.

365.    On October 3 2019, Bolduc emailed the MCA Board and incoming Principal Vickaryous to document how MCA Compliance Officer, Scott Moore, lied to MCA Staff and the MCA Board on the reason for developing a Violation of Established Policies Notice, and also lied about "mistakenly" sending it to CCSB.

366.    On October 4, 2019, Vickaryous officially started as MCA's Principal.

367.    On October 4, 2019, E. Donalds publicly announced that Optima Foundation partnered with the Phoenix to submit a charter application  for Naples Classical Academy.



368.    The application did not identify any school facility or site.  According to the charter application, Optima Foundation receives 12% of the school's gross revenues.

369.    The timing of the submission of this application did not comply with the CCSB's standard charter school application time frames that had been followed for several years.

370.    On October 7-8, 2019, Bolduc and Vickaryous attended a Captivated Health annual meeting of the membership in Massachusetts to learn more about the health insurance program for schools. Bolduc initially invited MCA interim Principal Joe Whitehead to join him, but Whitehead suggested Bolduc invite Vickaryous instead because she was starting as Principal on October 4, 2019. Vickaryous asked Lichter if joining Bolduc would be a good idea, and Lichter responded it would be a great idea.

371.    On October 10, 2019, Vickaryous emailed Mark Gaunya, Captivated Health's Founder and President stating, **"***Hello Mark, Thank you for having David and I at the annual conference this week…. Can't wait to follow up with Dean to see what is next! All the best from Naples! Pam."*[28]

372.    On October 10, 2019, E. Donalds spoke with Hillsdale about continuing to work with Fishbane:

---

[28] Vickaryous later testified under oath on April 20, 2020 that *"I have also been a firsthand witness to David Bolduc's misuse of his position as MCA's Treasurer to further his own personal financial interests, not the least of which was his acting in dual roles as an MCA board member and as a Director at Captivated Health when he took me to Boston and Orlando. On those trips, he acted as an agent of Captivated Health in procuring deals, including one with MCA, all without ever making any public disclosure of his vested financial interest during MCA's meetings*

> - Matt Mathias reached out to the school board and Fishbane (general counsel) says he
>   doesn't think they should talk to school board members before the vote. On Fishbane's
>   counsel, the school board members and superintendent won't talk to them. Matt is
>   planning to meet with Fishbane on October 24. Erika is trying to break through so they
>   can talk to school board members.
> - No press interest yet.

373.    On October 13-15, 2019, Mathias texted with E. Donalds about the status

of John Bruner being the principal at Naples Classical Academy after "***what might have***

***been a swift MCA takeover***" failed:



374.    On October 17, 2019, Fishbane and Fox co-authored another letter to

MCA about supposed violations of the MSA:



375.    On October 21, 2019—in a glaring admission of her and Rep. Donalds'

considerable influence in Florida's legislature and their vendetta against Lichter—E.

Donalds and Optima Foundation posted on Facebook to drum up support for Florida

Senate Bill 536, which would streamline the application process for "high-performing"

charter schools (like MCA, which she and her co-conspirators were trying to take over)

and Senate Bill 526, which would prohibit owners of charter schools that close or are

terminated from applying to open another school for five years—both of which E.

Donalds clearly was pushing for in connection with the ongoing conspiracy against

MCA:

The Optima Foundation
October 21, 2019 · 🌐

Two bills that would have an impact on Florida charter schools have been filed for the 2020 legislative session by state Sen. Manny Diaz, R-Hialeah. S.B. 536 would streamline the application process to allow high-performing charter schools to expand in a timely fashion. It calls for a council to to review applications and make decisions within 30 days of receiving them. S.B. 526 would prohibit owners of charter schools that close or are terminated from applying to open another charter school for five years.

👍 7

376. On October 28-29, 2019, Bolduc invited Vickaryous to the Florida Charter School Conference because there were several service providers in attendance whose services might help MCA. Vickaryous attended but was witnessed seeking out and exchanging several minutes of pleasantries with E. Donalds, despite Vickaryous knowing E. Donalds was involved in trying to have CCSB terminate MCA's charter and hand over the school's assets to Phoenix.

377. The Conference was also attended by several other people involved in the effort to take over MCA and remove its Board:



378.   On October 30, 2019, Coleman, Hazard, Taylor, Klaus, Doupe & Diaz, P.A., finalized its Investigative Report of Allegations Made Against Mason Classical Academy (the "Coleman Report"), which completely exonerated the MCA governing board and administration.

379.   On October 31, 2019, Vickaryous and Yormak mediated her pending whistleblower lawsuit against the CCSB with Fox and Fishbane.  Not long after, Vickaryous embarked on a mission to sabotage MCA by secretly altering the employment contracts of several MCA employees without MCA Board knowledge, including adding lump sum payout provisions that could cost MCA $350,000 should the employees exercise them, and increasing Moore's salary to $65,000 (more than most teachers at MCA.  Steps such as these clearly were being engineered by the conspiracy to cause MCA to violate § 1002.33(8).

380.    On October 31, 2019, Mathias emailed Coykendall about supporting

Naples Classical Academy's charter application:



381.    On November 16, 2019, Bolduc forwarded an email from Dean Bushey

of Captivated Health to Vickaryous, stating, "*Per the attached and below, Dean Bushey*

*has forwarded a list of data elements which Captivated Health utilizes to run a no obligation*

*proposal for MCA. If interested to see what a Captivated Health Proposal will look like, please*

*provide the desired data elements directly to Dean.*"

382.    Bolduc was **not** secretly working for Captivated Health in 2019 and did

not even hold a Florida 2-40 Health Insurance License at the time.  Bolduc instructed

Vickaryous to deal directly with Captivated Health on all data elements to offer a no obligation proposal.

383.   On December 2, 2019, Bob Harden joined Optima Foundation.

384.   On December 3, 2019, Lewis emailed Erick Carter in support of Phoenix's Charter School Application, which was set for vote on the CCSB December 9, 2019 agenda.  This incredibly expedited timeframe for approval of Phoenix's charter application was inconsistent with CCSB's standard timeframes for charter school approvals.

385.   On December 9, 2019, the CCSB Board approved Naples Classical Academy's charter application, just 65 days after it was submitted.  No charter school application had been fast tracked this quickly in Florida.  That approval gave E. Donalds and Optima Foundation the **third school** they had been pushing for:



386.    Lewis a commented in a Facebook post,  *"We will remove the 'Mason'
name from the school so as to REBRAND the NEW school..."*:

> to take the school down with them. Kelly Lichter named the
> school after her father - her maiden name. She said she doesn't
> want anyone else running the school with her dad's name on it -
> so be it. Whatever happens, we will rebuild - and we will remove
> the "Mason" name from the school so as to REBRAND the NEW
> school from the 5 years of bad press that have occurred due to
> this 1st round of leadership. Hopefully at the end of this process,
> we can demonstrate to the Naples community what a Classical
> Academy, founded on Civic duty, can truly stand for and
> accomplish.

387.    Meanwhile, following her mediation with Fishbane, Vickaryous continued her coordinated effort to destroy MCA from the inside.  Among other things, Vickaryous called for an informational after school parents meeting to discuss CCSB's stated desire to terminate MCA's Charter and asked MCA's IT Director, Fedor Steer, for access to MCA's Google Vault.[29]  Vickaryous also began secretly and illegally monitoring employee and Board member emails.

388.    On December 5, 2019, Carr, Riggs and Ingram emailed MCA's "Settlement Agreement Audit" required by the MSA to Vickaryous and Scott Moore. This Audit was the last item MCA needed to satisfy its obligations under the MSA.

389.    On December 10, 2019, Coykendall emailed O'Toole about the Naples Classical Academy application discussion at the December 9, 2019 CCSB meeting and the timeline of events associated with the MCA dispute:

---

[29] No other employee, in the history of the school, has had access to the school's Google Vault other than Steer.

On Dec 10, 2019, at 11:24 AM, Eric Coykendall <████████@hillsdale.edu> wrote:

Katy,

Per your request, I've reviewed the following:

- Local (Florida-based) news sites
- Facebook pages for Naples Classical Academy, Mason Classical Academy, Erika Donalds, Optima Foundation, and Concerned Parents MCA
- The Naples Classical Academy application
- The websites of Mason Classical Academy, Naples Classical Academy, and thehostiletakeoverofmca.com.

I have also begun reviewing the Collier County School District site. The main thing that I want to see is the footage from yesterday's (December 9) board meeting, where representatives of Naples Classical Academy spoke on behalf of their charter and representatives of Mason Classical Academy spoke against it. At present, that footage is not available. I will continue to look for it.

Having reviewed that information, here's my best answer to your questions:

1. When Naples applied, what they said about our involvement?

NCA's application reads like the application of an affiliated school, and is simply a modified and improved version of the application that Erika Donalds filed for Treasure Coast Classical Academy and Jacksonville Classical Academy. BCSI and/or Hillsdale College are referenced frequently in the following areas:

2. What role Mason had in the new Naples application?

As a general matter, it may be impossible to sever Mason completely from the NCA project—because several members of the NCA project were introduced to classical education through the founding and early years of Mason Classical Academy, and because these same members are seeking to get that quality of education without the current MCA leadership problems. That said, Mason did not have any direct role in the NCA application.

Over the summer, the Naples Classical Academy group hoped that the Mason charter might be revoked and that they might be able to stand in the breach (see, for example, my July 15 call notes). Erika Donalds was arranging the necessary pieces in order to make this plan feasible. Shortly after Mason's mediation meeting, however, that plan was put on hold or given up. From my August 15 call with Erika until now, there has been no mention of taking over the Mason campus. All group energy has been directed towards finding a school site that fits the parameters that we gave them—a campus approximately 20 minutes NE of Mason.

3. Has Erika been successful in working on the new school without mentioning Mason?

I believe that Erika and the Naples Classical Academy group have honored our requirement that they keep Mason out of all public conversations, etc, surrounding the proposed school. There is no mention of Mason in their application, on their website, on their Facebook page, in their press releases, etc.

390.   Meanwhile, Vickaryous continued her efforts to try to destroy MCA, including spending over $13,000 of MCA's money to hand out very expensive gift bags filled with swag for every faculty & staff member, ordered through her friend's company and invoiced as "school supplies."

391.   On December 16, 2019, Fox and Fishbane co-authored another letter to MCA's counsel regarding "Mason Classical Academy, Inc. (MCA): Continuing Contractual and Legal Concerns," which was replete with baseless allegations and concluding that, *"Your chronic disregard for the consequences of your actions, your unwillingness to honor your contractual commitments, and your expressed paranoid hostility to your contractual partner, leads us to concluded that you have no interest in, cannot abide by, nor will you accept any guidance, counsel, or even simple requests to follow the law. We are therefore constrained to advise our client that under these conditions any further contractual relationship with MCA is untenable."* Once again, despite the letter being addressed only to MCA with a cc to the CCSB, Lewis posted it on her website the same day.

392.   On December 20, 2019, the last day of school before winter break, after Vickaryous & Moore sat on the very important Settlement Agreement Audit for fifteen (15) days, Moore tried to stall on delivering it to Fishbane's office by claiming to need Board approval.   Upon learning this, Bolduc immediately called Vickaryous to demand that Moore send the MCA Board confirmation that the Mediation Settlement Audit was delivered to CCSB.

393. The Mediation Settlement Audit was delivered and almost immediately posted to Lewis' Weebly website, along with an email exchange between Moore and Fishbane's office on December 20, 2019 to schedule the hand delivery later in the day.

394. In late December 2019, Vickaryous secretly and illegally downloaded MCA documents to an outside server—eventually illegally downloading over 30,000 of the school's documents.

395. In January 2020, Vickaryous continued the pattern of unlawful conduct aimed at manufacturing MCA violations of state laws that could trigger the termination of MCA's charter (*See* § 1002.33(8)), including:

    A.    not providing proper 403(b) payments to some faculty & staff members;

    B.    moving the only laptop which contains the school's QuickBooks account to an outside vendor in Ft. Myers, exposing the school to potential fraud, waste and financial mismanagement;

    C.    recommending to MCA senior management that the school call the most academically achieving applicants to enroll them in MCA (which is a suggestion of illegal activity, as all new enrollment is subject to a blind lottery per Florida law); and

    D.    allowing Ayers to coach Middle School basketball without a Level II clearance which could be considered as an endangerment of student health, safety and welfare under Florida law.

396. On January 10, 2020, Bolduc sent a text to Vickaryous which stated, "*Good Morning, any feedback on the analytics for Captivated Health?*"     Vickaryous

responded same day, "*Morning, Ms. Daza is working on this, and we will provide the information requested to Dean [Bushey] today.*"

397.    On February 6, 2020**,** Lichter scheduled a phone call with Vickaryous to discuss Moore's misconduct.  Lichter wanted to discuss what, if anything, Vickaryous was going to do to hold him accountable.   Unbeknownst to Lichter, Vickaryous allowed Moore to listen to this call on speakerphone.

398.    On February 7, 2020, Vickaryous emailed Dean Bushey of Captivated Health, stating, *"Hello Dean!.....Since our board will be meeting in the near future, I wanted to find out what our next steps are in the process of considering health benefits through Borislow. Please advise. Thank you! Pamela A. Vickaryous, Principal, Mason Classical Academy"*

399.    On February 7, 2020, Vickaryous emailed Bolduc asking, **"***Are you available to join me Tuesday at 2pm for a call?"* Bolduc responded via text message to Vickaryous, stating, **"***Is the Tuesday call with Dean?"* and Vickaryous confirmed that it was.  Vickaryous later testified falsely under oath that she did not invite Bolduc to the February 11, 2020 meeting in her office.

400.    On February 12, 2020**,** Lewis and Durst's Citizens Concerned for MCA Facebook Page falsely claimed that Bolduc's son received a lenient 1-day suspension for "selling" vape products at school—even suggesting that if the Donalds' child was caught "selling" vaping products at school they would be expelled, instead of suspended for 1 day, like Bolduc's son.

Case 2:22-cv-00513-JLB-NPM    Document 75    Filed 11/30/22    Page 172 of 307 PageID
1215

401.    On February 18, 2020, Vickaryous (represented by Yormak), entered into a Settlement Agreement with Corcoran (as Florida Education Commissioner), resolving the administrative complaint based on her misconduct at Manatee Middle School [Administrative Complaint Case No. 178-2606] with a letter of reprimand and two years of probation.

402.    On March 19, 2020, Durst emailed MCA Board Member Conrad Wilcomm an extortionate demand to take action against the MCA Board under the subject line "In too Deep":

| | |
|---|---|
| **From:** | Christopher Durst <callendurst@▮▮▮om> |
| **Sent time:** | 03/19/2020 06:10:07 PM |
| **To:** | Conrad Willkomm <▮▮▮@masonacademy.com> |
| **Subject:** | Re In too deep!! |

Conrad

Do yourself a favor and get out now. You're in too deep and you're going to get hurt professionally sticking with these criminals. I still believe you came into this thinking the school was being treated unfairly, but you would be a fool to still think this. You've seen too much and unfortunately I believe you've acted unethically to a certain degree.

If I convince the AG into looking at the laundry list of violations and she determines there were criminal actions.....you are the only one that has a career at risk. Do you want(at a minimum)that asterisk under your license and something listed under your 10yr discipline history?

Why do I care whether you resign or not? I would prefer to see you and Ms Foster treated less harshly than the other three. You didn't get the school into this mess....but you certainly aren't holding them accountable as a member of the Board....are you? Getting out now would be a sign that you didn't agree with their actions and maybe you can be spared some of the embarrassment that the other three deserve.

Chris Durst

403.    On March 19, 2020**,** former Principal Hull was appointed as MCA's Executive Director.  This was a newly created position to provide leadership, support and guidance to the School as it confronted many challenges, largely due to COVID-19.  Until this point, Vickaryous only reported to the MCA Board and could easily

172

hide her sabotage of the school because the Board was not involved in the day-to-day operations of the school.

404.    As Executive Director, Hull was the top administrator at MCA and Vickaryous reported to him. His first responsibility was to initiate and fulfill an online learning plan.  Hull soon realized Vickaryous was not equipped to serve as principal, had committed several breaches of trust, and exhibited insubordination and a failure to comply with School policies and Board directives.  Among other things, Hull discovered issues with a lack of hiring and significant turnover amongst the employees, outstanding public records requests, improper access and misuse of the School's Google vault (document storage), unauthorized salary increases and lump sum provisions given to certain employees, and a lack of accountability, direction or organization.

405.    The day after Hull returned (March 20, 2020), Vickaryous spent the entire day conducting 63 separate searches of MCA employee emails, essentially having a live-feed of emails in and out of MCA.  .

406.    On March 21, 2020, Vickaryous emailed Dean Bushey of Captivated Health, stating, *"Hello again Mr. Bushey!...Would you happen to have anything for the board presentation on Monday that should be posted beside our agenda? If you do, please send to my attention. Thank you, Pamela Vickaryous, Principal, Mason Classical Academy."*

407.    This email clearly refutes Vickaryous' future false whistleblower claim that *"I have also been a firsthand witness to David Bolduc's misuse of his position as MCA's Treasurer to further his own personal financial interests, not the least of which was his acting in*

dual roles as an MCA board member and as a Director at Captivated Health when he took me

to Boston and Orlando. On those trips, he acted as an agent of Captivated Health in procuring

deals, including one with MCA, all without ever making any public disclosure of his vested

financial interest during MCA's meetings"

408.    Dean Bushey responded to all with, *"Hello Ms. Vickaryous, Thank you for*

*your note and we look forward to our meeting on Monday. The attached PDF is the presentation*

*we will discuss. The Zoom video technology allows us to share a version of this presentation for*

*real-time viewing".*

409.    On Sunday, March 22, 2020, Vickaryous continued surreptitiously

monitoring Lichter's and Bolduc's emails and conducted another 31 searches of

MCA's Google Vault, again having essentially a live feed.

410.    Thereafter, Vickaryous permanently deleted 19 MCA documents

(including critical charter amendments) and downloaded over 3,000 hand-picked

school documents to an unknown outside IP address.

411.    MCA also later discovered (after Vickaryous's termination) that she

wiped one of her school laptops and had BitLocker encryption installed on her other

laptop, making access to its data impossible.

412.    On March 23, 2020 –Captivated Health gave a presentation at an MCA

Board meeting.  Vickaryous later claimed *"it was exactly like the presentation they went*

*through with me on February 11ᵗʰ."*  After the Captivated Health presentation, the MCA

Board voted, **with Bolduc absent from the meeting**, to "approve moving forward in

next steps with Captivated Health."  There was no vote to approve an agreement or relationship with Captivated Health.

413.    Clearly demonstrating collusion with Vickaryous on a potential basis to go after Bolduc, Fox's March 23, 2020 time entry states that he *"reviewed meeting agenda and contract of this day."*.  There were only four documents posted to the MCA website in addition to the agenda:  meeting call-in instructions; Captivated Health PowerPoint discussion document; Captivated Health "Illustrative" Five Year Cost Projection; and Hull Executive Director Contract. Thus, the only "contact of this day" Fox reviewed on March 23, 2020 must have been David Hull's new Executive Director contact, not a Captivated Health contract, because it did not exist.

414.    Fox's March 25, 2020 time entry states, *"Spoke with concerned citizen. Reviewed 3/26 agenda and documents. Reviewed **first 44 minutes** of 3/23 meeting."*  The actual vote to move forward with next steps took place at **44:45**, or **45 seconds after** Fox's absurd entry that he stopped watching MCA's March 23, 2020 meeting at 44 minutes.

415.    Fox later falsely stated at the CCSB June 9, 2020 meeting that, *"We have reviewed every single [MCA] board meeting, every single committee meeting, the videos, we have kept track of the exact words used. We have examined every document provided by Mason Classical Academy. We have examined when they put things up on their agendas and when they didn't. There is absolutely no basis in truth to the claim that this is based on some sort of third-party web page [Lewis' MCA Weebly Page]"*

416.   On March 25, 2020, Mathias posted the following:



417.   On March 25, 2020, a press release was issued about Bolduc becoming Director of the Southeast Region for Captivated Health.

418.   On March 26, 2020, Bolduc asked Jeff Wood at Tripp Scott to draft a written possible conflict of interest disclosure, since Bolduc did not attend the March 23, 2020 MCA Board meeting.

419.   On March 26, 2020, due to COVID, MCA held its first Board meeting by Zoom, during which Vickaryous publicly revealed MCA's highly successful virtual learning program—and a video soon posted on Lewis' Weebly website focused on the plan so that it could be viewed in its entirety and unobstructed.

420.   During the March 26, 2020 MCA public meeting, there was one community comment, by Michelle Caswell: *"Because I was not able to get on last week's board of directors meeting* [meeting was in-person only, and did not have dial-in or Zoom instructions]*….I am not aware of whether Mr. Bolduc was present at the meeting and/or whether he voted on the Captivated Health proposal. My questions are as follows: (1) Did Mr. Bolduc vote on the Captivated Health agenda item? (2) Did Mr. Bolduc notify the board*

*prior to last week's meeting as to his employment with Captivated Health? To someone looking*

*from the outside, this appears to be a conflict of interest, which is alarming.*"

421.    On March 27, 2020, while Bolduc was in the midst of conferring with

MCA's outside counsel, Tripp Scott, to disclose his new relationship with Captivated

Health before the MCA Board voted on MCA formalizing any contractual

relationship with Captivated Health, Moore sent the MCA Board a Notice of Violation

of Established Policies falsely claiming Bolduc violated MCA Policy 6.0 on Conflict

of Interest.

422.    Working with Vickaryous, Moore sent this Notice of Violation in

violation of MCA's By-laws and policies, thwarting the policies and procedures

requiring the MCA Board to determine the existence of a conflict of interest and the

existence of a violation of the conflict-of-interest policy.  On April 1, 2020, Bolduc

emailed Moore a Notice of Disclosure and asked him to send it to the Board Members,

which Moore failed to do.

423.    Clearly, Bolduc was being set up.

424.    On March 31, 2020, Vickaryous emailed Lisa Byczko, Director of

Captivated Health Client Service stating, *"Thank you Lisa! would you also be able to invite:*

*Rmoore@masoracademy.com* *Scott Moore is our compliance officer."*

425.    On April 6, 2020, Robertson Ryan, MCA's current Health Insurance

Broker, emailed Vickaryous and Daza, stating, *"Are the captive projections medically*

*underwritten and approved by the Captive yet, or is this a projection, as the illustration states?"*

426.   On April 7, 2020, Hull prepared a draft report documenting Vickaryous's leadership failures, serious issues with staff and teachers, and other misconduct.  He provided an initial draft to Vickaryous, who became outraged and threatened to resign. As a result, Hull prepared an alternate version of the report that was less critical of Vickaryous.

427.   That same day (April 7, 2020), Vickaryous again secretly and illegally read Lichter's emails and believed that she was planning to terminate Moore at an April 14, 2020 MCA Board meeting.  Vickaryous later testified that she also believed she *"was next."*

428.   Consequently, Vickaryous and Moore started working with Yormak to contrive supposed Whistleblower claims against MCA.

429.   On April 14, 2020, in a completely unnecessary and yet another unauthorized action, and in response to the Coleman Report exonerating MCA and its Board, Fishbane and Fox sent a letter to MCA's counsel claiming that "*Mr. Bolduc's actions stand in violation of F.S. 1002.33(26), F.S. 112.313(3) & (7), and F.S. 112.3143(3)(9). In so doing, he also violated MCA Policy 6.0 -Conflict of Interest, which addresses many of the statutory issues noted above. These represent serious statutory and ethical violations for which he is accountable as a Board Member of a public school.*"  This letter falsely accusing Bolduc of committing multiple crimes was also posted to Lewis' Weebly website.

430.   **Fifteen minutes before** the MCA Board meeting, and at Fishbane's direction, in a completely unnecessary and yet another unauthorized action, Fox emailed MCA's counsel an 81-page document titled, "REPLY OF THE DISTRICT

GENERAL COUNSEL TO THE COLEMAN LAW FIRM'S INVESTIGATIVE REPORT OF ALLEGATIONS MADE AGAINST MASON ACADEMY," stating in his email, *"Our client would like confirmation the attached report is **delivered to MCA's Compliance Officer**"* (emphasis added).

431.   As was the case with his original Investigative Report, Fishbane gratuitously advocated on behalf of Hillsdale's interests in his Reply to the Coleman Report based on a slanted, misleading version of the facts.

432.   Vickaryous and Yormak were clearly conspiring and working with Fishbane to frame Bolduc and transform Moore's unauthorized Notice of Policy Violation into a Whistleblower notice so Yormak could file a lawsuit against MCA and Fishbane could use Bolduc's supposed criminal acts as part of the continuing effort to try to terminate MCA's charter and oust its Board.

433.   During the April 14, 2020 MCA Board meeting, Moore admitted that he did not speak MCA's counsel before sending his unauthorized notice, which Vickaryous participated in, and that he based on Caswell's comment the day before.

434.   As planned, Fishbane used the charges fabricated by Moore, Vickaryous, and Yormak in his Reply to the Coleman Report (**"…***on March 23, 2020, a Board Meeting was held not only to approve the contract for Mr. Hull but also another contract with a company called Captivated Health….Mr. Bolduc moved and the Board, including Bolduc, voted to approve the contract for which Mr. Bolduc had the inside track and knowledge and which inured to his personal and private benefit…Mr. Bolduc his all this from the Board and the public when he moved to approve and voted on the approval of the contract…This Reply, and the most recent*

Board actions, have shown the depth of Ms. Lichter's, Mr. Hull's, Ms. Miller's, Mr. Bolduc's, and others' capacity to deceive, mislead, terrorize, and control MCA stakeholders and the public through their statements and actions.").

435.    During the April 14, 2020 MCA Board meeting, Bolduc addressed Moore's false, unauthorized Notice of Violation, explained in detail why it was false, and stated, *"I feel this only confirms a pattern of working to undermine Mason Classical Academy. Mr. Moore, perhaps my fellow board members feel otherwise, but I believe your March 27th written notice of alleged violation, combined with your other just described documented actions, all with the tacit approval of Mrs. Vickaryous, have been in opposition to MCA's Pillars of Virtue the entire time."*

436.    During the April 14, 2020 meeting, the MCA Board voted against exploring Captivated Health any longer and, on the advice of counsel, terminated Moore.  Vickaryous attended this meeting and was fully aware on April 14, 20220 that MCA's current Health Insurance Broker was Robertson Rya, Florida Blue was the school's Health Insurance company, and that MCA's Board voted not to continue exploring Captivated Health.

437.    Not long thereafter, Fishbane sent copies of his Reply to the Coleman Report to Donalds' attorney, Hillsdale, Durst, and Baird.

438.    On April 15, 2020, Lewis and Durst's Citizens Concerned for MCA Facebook Page updated their profile picture to a photo including Lichter and Bolduc in prison jump suits surrounded by handcuffs:



439.    On April 17, 2020, MCA's Health Insurance Broker, Robertson Ryan,
emailed Vickaryous to confirm the renewal of MCA's insurance through Florida Blue.

440.    On April 20, 2020, as part of the continuing conspiracy and with
Yormak's assistance, Vickaryous sent multiple knowingly false complaints to the
Florida Commission on Ethics and various State and Federal Agencies, primarily
based on false allegations involving Bolduc and the Captivated Health situation:

> Following the April 14, 2020 termination of MCA's Compliance Officer, Scott Moore, after his written documentation regarding illegal conduct at MCA, it has become clear to me that MCA's Board will continue to violate Florida law, the Florida Administrative Code, MCA's Governing Charter Agreement, and the Mediation Settlement Agreement with the District School Board of Collier County unless something more drastic is done.
>
> Since beginning my employment with MCA as principal less than 7-months ago, I have been a witness to the Board President and certain Board Members committing and conspiring to commit a multitude of Sunshine Law violations. This ranges from ordering the delay on responding to and fulfilling valid public records requests to conducting MCA business outside of a properly noticed Board Meeting (i.e. private emails and texts) to deciding matters not on any agenda at Board Meetings in a choreographed fashion with other board members (i.e. firing Scott Moore) to even secretly removing staff's access to the email server so those completing public records requests would not find responsive documents. The list goes on and on. I have also been a firsthand witness to David Bolduc's misuse of his position as MCA's Treasurer to further his own personal financial interests, not the least of which was his acting in dual roles in that capacity and as a Director at Captivated Health when he took me to Boston and Orlando. On those trips, he acted as an agent of Captivated Health in procuring deals, including one with MCA, all without ever making any public disclosure of his vested financial interest during MCA's meetings. What's more, the Board President has directed me to assist in the thwarting of the very job Mr. Moore was tasked to do to keep MCA in compliance – and when I would have none of it, she set your focus on me. I have delayed implementing Captivated Health because of the illegality of the deal the board president and certain board members struck up behind closed doors.

441.   At the time, both Yormak and Vickaryous knew these accusations were baseless and false.

442.   On April 24, 2020, Lewis and Durst's Citizens Concerned for MCA Facebook Page posted Fishbane's Reply to the Coleman Report and the following comment:



443.   On April 24, 2020 , Lewis and Durst's Citizens Concerned for MCA

Facebook Page also posted:

> Author
> **Citizens Concerned for MCA**
> **Barbra Whaley** We agree....these
> criminals have tainted MCA to the point
> that no one will ever talk about this
> school without thinking about how the
> Lichter Crime Family & Friends ruined it
> for everyone. "THIS is why we can't have
> nice things!"

444.   On April 27, 2020**,** Lewis and Durst's Citizens Concerned for MCA

Facebook Page posted:

Citizens Concerned for MCA
April 27, 2020 · ⊗

It doesn't take an accounting degree to see how the
MCA Board's actions have started MCA down the
slippery slope towards dissolution!  The Finance Report
from today's Finance Committee meeting tells you all
you need to know....

9/6/2020 - 911 students enrolled
4/27/2020 - 882 students FTE on revised budget
Results - $907,165 shortfall in funding revenue

PLUS

$267,000 so far in legal fees as of 1/20/2020 with
another $200,000 in still sitting in lawyer's bank
accounts.  IF the MCA Board doesn't spend in excess of
the remaining balances (this budget adjustment doesn't
account for Feb, Mar, & Apr legal fees that have yet to
be billed), that's $467,000 in legal fees for the school
year.

EQUALS - $487,597 deficit instead of a $353,992 surplus.
The difference of $841,589 would have been even worse
if the Board had not spent $407,000 less in instruction
and ESE expenses.

THIS IS YOUR BOARD - Spend ~$467,000 on worthless
activities (lawsuits to defend the honor of people that
have no honor), spend $407,000 less on your child's
education (including 40% less on ESE programs), and
further erode the school's viability by chasing away
current and prospective students with the anti-social
(and often illegal) behavior of the leadership of this
school.

As Nicholas Lichter promised, he and Kelly Mason
Lichter will let the school fail rather than give in to a
change in leadership.  Probably the only promise he's
ver kept!

445.   On the afternoon of April 28, 2020**,** shortly before a scheduled MCA

Board meeting to discuss Vickaryous' complaints, Vickaryous emailed the Board a

"Principal's Report" and misleadingly asked for it to be "upload[ed] in advance of the

meeting," when she had already secretly posted this Principal's Report on MCA's

website, which Lichter quickly removed minutes later.

446.   Lichter notified Vickaryous that, "*The board meeting is an emergency*

*meeting and there was no principal report on the agenda.  Posting your "principal report" on the*

*website is a clear violation of policy B. 3.0.  Thank you!*"

447.   In clear coordination with her co-conspirators, the document Vickaryous improperly posted—which was not a "Principal's Report," but a false narrative alleging illegal activity at MCA and endangerment of the health, safety, and welfare of children—was almost immediately posted on Lewis and Durst's Citizens Concerned for MCA Facebook Page:[30]



---

[30] Fox later tried to cover for Lewis and Durst, claiming on May 28, 2020, that: *"Sometime on the 28th, a memorandum was posted on the webpage. The memorandum was from Principal Vickaryous to the board chair and was dated April 20 (eight days earlier). After appearing briefly on the MCA meeting page, it was taken down for unknown reasons—presumably to prevent the public from seeing it"……"A screenshot of this webpage (as it existed before it was altered) may be found at* https://mca-info.weebly.com/. *This same website details a fairly extensive practice at MCA over the last year of altering its meeting webpages to reflect its revisionist history."*

448.   Lewis and Durst's Citizens Concerned for MCA Facebook Page also posted:



449.   On April 28, 2020, Fox's friend, Heidi Jinkins, used her three-minute public comment at the MCA Board meeting to read Vickaryous' "Principal Report," followed by a comment by Durst: *"Based on the corroboration of the ongoing accusations against multiple board members of both unethical and illegal activity, I would expect you to….tender your resignations. Your departure is not going to save you from the numerous actions that are about to be taken against you as individuals."*

450.   On April 28, 2020, Durst also sent another email attempting to extort Willkomm by falsely claiming Durst was talking to the Attorney General:



451. On April 29, 2020, Yormak emailed MCA's counsel regarding interviewing Vickaryous about her complaints and requested that "counsel for CCPS [**Fishbane**] be in attendance."

452. On April 29, 2020, MCA scheduled another Emergency Meeting to address Stanley Walkeitz's supposed complaint (released by Vickaryous), as well as Vickaryous's alteration of numerous MCA employee contracts which could cost the school $350,000.

453. On April 29, 2020, Vickaryous emailed the MCA Board and Senior Administration, stating, *"Mrs. Lichter, I would like to add a Principal's Report according to Policy 3.0."*

454. Lichter responded, *"This is an emergency meeting, and we will not be addressing any principal or officer reports. Also, I should bring to your attention that yesterday you violated Policy B. 15.0, Principal Report. The 'principal report' that you posted on the MCA website does not adhere to MCA's policies regarding the Principal Report. Thank you!"*

455.    Lisa McCluggage of Tripp Scott also responded: *"Good Afternoon Principal Vickaryous: Please be advised that tomorrow's Board Meeting is an Emergency Board Meeting, and thus, Policy 3.0 doesn't apply.   Further, pursuant to Policy 15.0 governing Principal's Reports (not Policy 3.0), Principal Reports are required once a month which require the listed elements of enrollment data and trend analysis, staff changes, summary of school discipline and outcome and parameters.   You have already posted your monthly "Principal's Report" at yesterday's meeting (in violation of 15.0). Moreover, the posted agenda for tomorrow's Emergency Board Meeting identifies one of the items you posted on your "Principal's Report" yesterday. Accordingly, you are not authorized to post a Principal's Report for tomorrow's Emergency Board Meeting, and your request is denied. Thank you."*

456.    **Thirty-one (31) minutes prior to the MCA Board Meeting** on April 30, 2020, Vickaryous emailed the MCA Board, stating, *"This Principal Report is being submitted to the MCA Board for its consideration at the Emergency Meeting on 4/30/20, an agenda item of which relates to the contract of Assistant Principal Whitehead."*  Vickaryous' email contained five (5) attachments, including fraudulent, unapproved MCA Meeting Minutes from March 23, 2020 (which did not show Bolduc was absent), other documents accusing MCA of financial mismanagement; employment contracts which Vickaryous altered without Board knowledge (Moore's conveniently missing), and other documents attempting to frame MCA Board members for mismanagement and illegal conduct.

457.   Of course, these same documents were posted to Lewis' Weebly website that same day and eventually used by Fishbane as supposed proof of violations of law to try to terminate MCA's charter.

458.   On April 30, 2020, MCA maintenance employee Walkeiwitz admitted that Vickaryous prompted him to write his so-called health and safety report eight days prior—although the "report" was dated April 13, 2020, the day before Moore was terminated.

459.   On April 30, 2020, the MCA Board voted unanimously to suspend Vickaryous with pay.

460.   After Vickaryous was suspended, she invited someone into the school after hours to try to access Steer's school computer but was unsuccessful.

461.   On May 1, 2020, in what appears to be a reward for an MCA sabotage job well done, Yormak filed a Notice of Settlement in Vickaryous's Whistleblower lawsuit against CCSB.

462.   On May 1, 2020, Lewis and Durst's Citizens Concerned for MCA Facebook Page posted:



463.   On May 6, 2020, Lewis and Durst used Vickaryous's actions to publicly attack MCA on their Citizens Concerned for MCA Facebook page:

**Citizens Concerned for MCA**
May 6, 2020 · 🌐

MCA finally called the police!!!

UPDATE: I guess Kelly decided it looked bad that they had not called the police for the attempted theft of over $900,000 and had Joe try and report the real crimes. Unfortunately, Joe failed to divulge to the Naples PD that he was one of the accused. How typical. They told Joe to go away. We will make sure to update Naples PD with the whole story.

Yes, Kelly Lichter ordered Joe Whitehead to finally call the Naples Police Department yesterday, after the FDLE told him they couldn't help him. Why wouldn't the FDLE help MCA with the attempted theft of almost $900,000 by a handful of employees?????

Oh, Joe wasn't calling police for the real crime, especially a crime in which he was an accomplice. He was calling to file a complaint about Pam Vickaryous deleting some files from the school database. It is a real problem though if Pam deleted incredibly important files that can never be recovered. It could possibly cripple the attempt to modify the MCA charter if important information is gone forever.

Wait.....What? All those files that the MCA Board spent an hour obsessing over with Fedor Steer in the Monday Board Meeting are not gone? Uhhhhhh...nope. Luckily the database is backed up on a daily basis. But that scripted Board Meeting was very interesting. It was good enough that the MCA Drama Club aka the MCA Board may get to re-enact Monday's drama on the stand. It won't be Law & Order, but the Collier County Courthouse is a more than appropriate venue for these criminals. Don't worry, Nicholas Lichter can help them all acclimatize to their new surroundings afterwards. And Joe Whitehead might be able to make friends with his old buddies from the corrections department.....from the inside. If the prison has a pool to clean, David Hull will feel right at home. Kelly, Laura, Gina and Bolduc might be lucky enough to be housed in the same women's facility.....so they can all remain friends. What is it that Nick always says????? STAY TUNED.......

😮😆 10                                    6 Comm...

464.    Durst later commented, "**there's much more to come**":



465.   On May 9, 2020, Lewis and Durst's Citizens Concerned for MCA

Facebook Page posted:



466.   On May 11, 2020 - Lewis and Durst's Citizens Concerned for MCA

Facebook Page posted:



467.    In response, Robyn Matthias (now posting under "Robyn Lynn") posted:



468.    On May 14, 2020, Vickaryous testified falsely under oath that Bolduc

secretly worked for Captivated Health:

```
1        A.   So I'm sitting here, right here before you,
2   telling you that his own words is that there's a high
3   likelihood that he would be partnering and managing
4   Captivated Health in Florida.
5        Q.   Right.  So I understand what his words are.
6   What I'm trying to find out is what your statement is.
7   That's why we're here for your statement.
8        A.   Okay.
9        Q.   Okay.  So you're saying that it clicked to you
10  in January of 2020 that he had a financial interest in
11  Captivated?
12       A.   Yes.
```

469.    On May 16, 2020, Lewis and Durst's Citizens Concerned for MCA

Facebook Page posted:



470.    On May 18, 2020, O'Toole emailed Arnn, King, and Norton about
Fishbane's Reply to the Coleman Report and Arnn's desire to continue helping
Fishbane in the never-ending war against MCA and its Board:

From:        kotooie@hillsdale.edu
To:          George King; Robert Norton; Larry P. Arnn
Subject:     Fishbane strikes again
Date:        Monday, May 18, 2020 7:59:14 PM
Attachments: Jon_fishbanes_response_to_coleman_report_pages_1-15.pdf
             ATT00001.htm

Sending this so we can discuss. Fishbane's response to the Coleman report (authored by MCA to respond to his original investigation) is excellent. LPA thinks we should call Fishbane to thank him, and discuss how we can help him. Hillsdale is discussed in some detail in Part 6 of the report.

https://mca-info.weebly.com/uploads/1/2/6/1/126137162/jon_fishbanes_response_to_coleman_report_pages_1-15.pdf

471.   By this time, Hillsdale had no reason other than the ongoing conspiracy to be involved with Fishbane concerning MCA. Hillsdale's agreement with MCA terminated 9 months prior.

472.   On May 20, 2020, Durst sent an email from his new "Rogue Castaways" email address to Borislow Insurance, Bolduc's employer and program manager for Captivated Health, asking for Bolduc's hire date.

473.   On May 27, 2020, Durst published on his Rogue Castaways website, Episode 2 – "A Felon, an Insurance Salesman and a Priest Walk Into a Bar…"which he also emailed to hundreds of MCA parents, faculty, and staff. This post focused on Vickaryous and included Durst's statement:

On Tuesday March 28th 2020, Mason Classical Academy had an Emergency Board Meeting. The agenda for the meeting only included two items: An item titled 'Investigation' and another called – 'Closed attorney-client Session'.

Just prior to the meeting, on the school website, there was a document posted in an area that is typically used to post the agenda and documents discussed during the board meeting. The document posted on that day was only 'up' on the website for a few minutes before it was deleted altogether. Luckily, a savvy parent had downloaded the document and circulated it to other parents before it was deleted..

This document was a letter from the current Principal of MCA, Pamela Vickaryous, to the Board Chair, Kelly Mason Lichter. In the letter she accused the Board Members of committing a 'multitude' of Sunshine Law violations and goes on to detail their actions. Mrs. Vickaryous also states that she will no longer stay silent about the crimes and she notifies Mrs. Lichter that she has already reported these activities to the Florida Office of the Inspector General, the Florida Department of Education, and the Florida Commission on Ethics.

Along with the letter, Mrs. Vickarious included two emails...one from a teacher detailing what she called offensive and demeaning behavior directed at her by current Executive Director and former Principal, David Hull. The second was the email from the Director of Maintenance at MCA, Stanley Walkiewicz. His email, which we discussed at length in episode 1 of this podcast detailed many concerns about the deteriorating conditions of the school building and his belief that the building would not currently pass a health or fire Marshall inspection.

One paragraph from Mrs. Vickaryous' letter is particularly shocking.  It read:

Since the beginning of my employment with MCA as principal less than 7-months
ago, I have been a witness to you and other Board Members committing and
conspiring to commit a multitude of Sunshine Law violations.  This ranges from you
ordering the delay on responding to and fulfilling valid public records requests to
conducting MCA business outside of a properly noticed Board Meeting to deciding
matters not on any agenda at Board Meetings in a choreographed fashion with other
board members. To even secretly removing staff's access to the email server so
those completing public records requests would not find responsive documents.

Pamela Vickaryous continues: I have also been a firsthand witness to David Bolduc's
misuse of his position as MCA's Treasurer to further his own personal financial
interests, not the least of which was his acting in dual roles as an MCA board
member and as a Director of Captivated Health when he took me to boston and
Orlando.  On those trips, he acted as an agent of Captivated Health in procuring
deals, including one with MCA, all without ever making any public disclosure of his
vested interest during MCA's meetings.  What's more, you have directed me to assist
in the thwarting of the very job Mr. Moore was tasked to do to keep MCA in
compliance – and when I would have none of it, you set your focus on me.

---

I have delayed implementing Captivated Health because of the illegality of the deal
you and the other board members struck behind closed doors.

Wow.....The fact that the letter to Mrs Lichter and emails from staff members was
posted to the website and almost immediately taken down, leads us to believe that
Mrs. Vickaryous posted the documents with the intention of sharing them with the
public and that a board member or the Executive Director, Mr. Hull subsequently
removed them from the page to prevent the details of the contents from going
public.

Once the meeting was underway, Kelly Lichter did some quick housekeeping and
then stated that there had been an accusation by the Principal, Pam Vickaryous and
that she believes that the Board should engage their regular attorney to investigate
the accusations.  Board member, Conrad Willkomm asked what specifically would
the attorney be investigating.  Kelly restated that they would be investigating the
'accusations' and would not provide further details.  A motion was made, then
seconded, unanimous approval....again.

There weren't many people that had heard about this Captivated Health issue before this meeting, but there were a few that noticed when the school took steps to make the change in health insurance providers. What was this all about and how could it have gotten past everyone unnoticed that David Bolduc was involved with this company.

Some of the details are still a little fuzzy, but apparently in the Fall of 2019, Pam Vickaryous started to explore a change to a different health insurance provider at the request of David Bolduc. We don't know the exact details of the conversations, but by October 2019, it was evident that Pamela Vickaryous and David Bolduc had visited the offices of Captivated Health in both Orlando and Boston.

The supposed goal of the visits was to understand the features and benefits of this new plan and how it would be administered if the Board chose to make the change. According to Pam Vickaryous, it appeared to her that David Bolduc was already acting as if he was an agent of the company all the way back in October.

Things progressed with Captivated Health and fast forward to March 2020 when David Bolduc put the vote to approve the change to Captivated Health on the Board Meeting for March 23, 2020. Additionally, a teleconference was organized with two representatives of the company to present the details of the change to the Board. When the actual meeting was held, only Kelly Lichter and Laura Mlinarich showed up for the meeting in person. Pearline Foster attended the meeting via telephone. Conrad Willkomm did not attend the meeting and neither did David Bolduc.

That's strange......Bolduc put the health insurance item on the agenda and marked it to be an item in which the board would be required to vote. He was supposed to be the insurance 'expert'. Why wasn't he there? Who would be the representative of the board most qualified to answer other board member's questions? This was troubling....

> Bolduc immediately defended himself by stating that the school attorney had told
> him that it would be sunshine law violation to discuss the conflict with other board
> members outside a board meeting. THIS WAS TRUE. But you have to listen closely
> to what he was saying. He could not discuss the violation with the Board....that
> would have been an improper meeting. HOWEVER, he absolutely could have sent a
> message to every board member either (a) stating the facts of the conflict OR (b)
> simply telling them there's a potential conflict and there should not be a vote before
> Mr. Bolduc disclosed the details. That was all that was needed to stop the vote on
> the change in healthcare plan.
>
> Mr. Bolduc was trying to mislead everyone into believing that he couldn't
> communicate the issue to the board legally, so he decided to wait. Unfortunately,
> this deception wasn't a very good attempt at covering up his scheme, as there was a
> board meeting just three days later when the parent pointed out the conflict and
> Bolduc declined to comment, even though there was a board comment session after
> the parent pointed out the issue.
>
> This deception did not get past Willkomm either, who pointed out that he had every
> opportunity to disclose the conflict at the meeting on the 26th and he failed to do so.
>
> Bolduc did reveal that he had disclosed the possibility of a relationship to the
> attorney, but he failed to reveal that he had actually talked to the attorney back in
> EARLY February. Of course, Kelly Lichter chimed in and said the school attorney said
> that it wasn't a violation because Bolduc didn't vote. Which was incorrect or a lie...
> because the failure to disclose the relationship is absolutely a violation.

474.    On May 28, 2020, Fox and Fishbane co-authored a letter to MCA's counsel with a cc to CCSB, titled, "Mason Classical Academy, Inc. (MCA): Continuing Contractual Concerns," which was based on the Captivated Health situation and parroted the same false accusations Vickaryous made with Yormak's assistance. Lewis published this letter on her Weebly website the same day.

475.    When asked during a deposition how she came to possess Fox's May 28, 2020 letter, Lewis testified that she made a records request to CCSB days "before" May 28, 2020. However, in response to a public records request for all of Lewis's public records requests received by CCSB between April 15, 2020 and June 15, 2020, CCSB confirmed it had "*No Responsive Documents*."

476.    Clearly, Fishbane was continuing to coordinate with Lewis and Durst to publish false accusations and information detrimental to MCA and its Board as part of the plan to take over MCA and oust its Board, while also facilitating Yormak's lawsuits against MCA.

477.    On May 28, 2020, Durst disseminated another email in which he stated, "***Just resign Kelly and it will all stop.***"

478.    On May 29, 2020, Vickaryous filed a false complaint with the U.S. Department of Education regarding the Captivated Health issue.

479.    On June 5, 2020, the MCA Board terminated Vickaryous for "cause" based on gross misconduct, dishonesty, fraud, gross insubordination in violation of state and/or federal law and as outlined in the Employee Handbook, and failure to comply with reasonable and lawful documented directives of the Board or written policies contained in the School's Employee Handbook.

480.    **Within an hour**, Yormak filed a wrongful termination lawsuit on behalf of Vickaryous against MCA, claiming Vickaryous was terminated because she was whistleblower [Collier County Case No. **2020-CA-1791**]  Notably, whistleblower protections do not apply to employees who "disclose information known by the employee to be false." § 112.3187(4)(c), *Fla. Stat*.  Vickaryous later amended her whistleblower complaint against MCA to assert civil rights claims and join Lichter and Bolduc as Defendants, which led to the removal of her case to this Court.  [*See* M.D. Fla. **Case No. 21-cv-903-JLB-NPM**].

481.    On June 6, 2020, Durst published *ROGUECASTAWAYS: HOSTILE*

*TAKEOVER • EPISODE 3, Unchained* on his Rogue Castaways website and stated the

following about an email Lichter sent to the MCA community:

> The email in and of itself is a racist act....even though it is unlikely that the author
> would ever recognize it as such.
>
> Her single mindedness and pure hatred towards people have blinded her to
> recognizing what she has done by writing this email.  This is the true nature of
> racism.  The failure to even understand what you are doing by putting your egotistic
> desires above all else, even another person's humanity.

482.    At a Regular School Board meeting on June 9, 2020, under the guise

of an "Informational Item" without public comment, CCSB addressed the "*Mediation*

*Settlement Agreement violations, multiple letters concerning same and other matters sent by*

*outside counsel to MCA's counsel, General Counsel's Reply to the Coleman Report, and MCA*

*Board and employment events since March 20, 2020, and related matters.*"[31]  The last item

on the Agenda was a "Review of MCA Issues" and states:

> *FLORIDA STATUTE: 1002.33*
>
> *EXECUTIVE SUMMARY: General Counsel will review with the Board*
> *for informational and discussion purposes multiple areas of concern*
> *involving Mason Classical Academy.  These will include, but not be*
> *limited to, Mediation Settlement Agreement violations, multiple letters*
> *concerning same and other matters sent by outside counsel to MCA's*

---

[31] In response to a public records request for documents demonstrating how CCSB obtained
the documents attached to the Meeting Agenda, it responded that one was mailed
anonymously via USPS and the other four were "pulled" from the MCA website.  This is
false because those four documents were never posted to MCA's website.  They must have
been provided by Vickaryous and Yormak or downloaded from Lewis and Durst's website
and Facebook page, the true intent of which is to serve as a repository of otherwise non-public
information so it could be used by Fishbane in the never-ending quest to terminate and/or
takeover MCA.

*counsel, General Counsel's Reply to the Coleman Report, and MCA Board
and employment events since March 20, 2020, and related matters.*

*LEGAL APPROVAL: The item was reviewed and approved by Jon
Fishbane, District General Counsel.*

483.    At Fishbane's invitation, Fox made a presentation to the CCSB, during

which he falsely accused MCA and its Board of violating its policies, the MSA,

Florida's ethics laws, Florida's government in the Sunshine laws, Florida's public

records laws, the Constitution of the State of Florida, and the **Constitution of the**

**United States**, and stated, "This has to do with the governance. And the personal

attacks that have been launched against members of this board, ***Mr. Fishbane*** and

***myself***, in all my years of practice, I have never seen such unprofessionalism, not ever!"

484.    In response to a question from CCSB Chair Lucarelli, Fishbane

recommended *"to place MCA on 'probationary warning status' and ask the board to review*

*that recommendation carefully."[32]*

---

[32] During the meeting, CCSB Board Member Jen Mitchell stated, " It sure would be helpful
if our State Board of Education, whether it's the Commissioner or our faithful Chancellor,
whomever, would weigh in here, given the serious nature of these concerns and we are talking
about potential contracts of interest, contracts involving taxpayer money, potential activity
that may, or may not be legal, so I just am just hopeful that the state decides that they want
to weigh in here.  The Commissioner [Corcoran] has worked really hard to promote charter
schools and so I just think there's a real potential here to be a real black eye on them and so I
would just, I would hope that that's something that they would see fit to weigh in on. That's
really all I have to say."  Board member Jory Westbury stated, "Yes, I have some concerns.
First of all, Mr. Fox, thank you that was very enlightening. And I am troubled by the
information provided, there are, there's lots of information that I am trying to digest, but when
I look at the "Principal's Report" and I read something loke this… 'board chair after receiving
public records corroborating what she perceived to be the impending hostile takeover of
MCA, and new Classical School Application approval with CCPS, directed Principal to
protect staff friendly and sympathetic to her interests through lucrative contracts' There is a
lot  of information on this, and I think that it warrants, I wouldn't say the word investigation,
but I can't think of another word….and maybe purse at the next meeting,"

485.   Fishbane already knew that "Probationary Warning Status" has not existed under the operative *Florida Statutes* governing charter schools since 2012.

486.   On June 10, 2020, Lewis and Durst's Citizens Concerned for MCA Facebook Page posted:



487.   Durst personally commented on this post:



488.   Durst and Lewis were fully aware of their role in the ongoing conspiracy to fabricate criminal charges against Bolduc being used to place MCA on "Probationary Warning Status."

489.   At the July 28, 2020 CCSB meeting, Fishbane also falsely claimed that Bolduc submitted a letter of resignation, resigned from the MCA Board, and then voted himself back on the board.  Board member Westbury claimed that she was seeing

on social media and receiving emails that MCA people are being mistreated. Fishbane responded with "*correct.*" Fishbane also falsely claimed that MCA was not complying with the MSA, MCA's Charter Agreement, and Florida Law.

490. On July 28, 2020, even after Tripp Scott attorney Thomas Strenberg spoke and advised CCSB that "probationary warning status" did not exist, CCSB voted unanimously to place MCA on "Probationary Warning Status" and to require MCA to respond to all alleged violations and show compliance by November 6, 2020. Several school board members also specifically referenced termination of the Charter Agreement with MCA if MCA failed to comply with this "Probationary Warning Status." based on supposed breaches of the MSA. Fishbane requested and advised that the School Board keep MCA on "Probationary Warning Status" for "each violation" on a rolling basis.

491. **At that same meeting on July 28, 2020, CCSB approved its Vickaryous whistleblower lawsuit settlement and executed the written Settlement Agreement with Vickaryous,** which provided for a payment of $25,000 and that it would not affect Vickaryous's employment with any charter school:

> 8. Matters Settled: This Agreement settles any and all claims and matters that the parties or any of them had related to the Lawsuit, whatsoever from the beginning of time with no party having any further duties or obligations whatsoever related to the Lawsuit to the other parties after the complete performance of this Settlement Agreement. Vickaryous will not be reinstated as part of the terms and condition as part of this Settlement. Moreover, nothing herein or in the General Release shall release or otherwise affect PAMELA VICKARYOUS' employment with any charter school under a charter granted by THE SCHOOL BOARD OF COLLIER COUNTY.



492.   On July 29, 2020, Lewis and Durst's Citizens Concerned for MCA

Facebook Page posted:



**Citizens Concerned for MCA**
July 29, 2020 · 🌐

I can't imagine that Jana Greer is used to hearing people agree with her, but it probably wasn't in the manner she was anticipating when Jen Mitchell agreed that she too was tired of dealing with the MCA issues.

No one was sure what Jana was trying to accomplish by marching up there and accusing Mr Fox and Mr Fishbane of lying and then attacking the CCPS Board, but it certainly wasn't going to help MCA by her being a jerk. Reminding everyone about the attempt by David Bolduc to slip his sweetheart insurance deal past taxpayers didn't make her case any stronger. Someone should have offered her a little of the advice she attempts to sell to others on making friends and influencing others.

It was clear from the tone of every member of the CCPS Board that they are all tired of Kelly Lichter and her shenanigans. They were clear on what the issues were and they were clear in their intent..."Fix it or we'll terminate your charter and allow the administrative judge decide."

I thinks it's also clear that the leadership group at MCA is incapable of adhering to even the most simple rules.....so the outcome here seems inevitable at this point.

These people have caused irreparable damage to the school choice initiative throughout the State of Florida.....AND have thrown away an opportunity for a great educational option for children in this area.

Good Work Criminals!!!

493.    On August 6, 2020, Fishbane sent a letter to MCA which, among other items, placed MCA on "Probationary Warning Status" through March 1, 2021 and specifically requested twenty (20) action items and documents, some of which are not contemplated within the MSA, the Charter Agreement, or *Florida Statutes*.

494.    On August 15, 2020, Lewis and Durst's Citizens Concerned for MCA
Facebook Page posted:



495.    On August 19, 2020, Yormak filed Motion to Reinstate Moore in his
lawsuit against MCA. This Motion was based on numerous false statements and
evidence fabricated by the conspirators, also incorporating nearly verbatim statements
from Fishbane's letters and reports posted on Lewis and Durst's website and Facebook
page, as well as Vickaryous' fraudulent March 23, 2020 Meeting Minutes:

> *Afterwards, the Board voted 4-0 to approve the contract with
> Captivated Health. (See Ex. 6 - Defendant's March 23, 2020
> Meeting Minutes). No board member asked about Mr. Bolduc's
> relationship with Captivated Health. (Id.). Nor was any formal
> disclosure made to the Board that Mr. Bolduc had been working
> for at least five months with MCA staff to get the contract for his
> company. (Id.). Mr. Bolduc never sought to recuse himself. (Id.).
> Just two days after the vote - March 25, 2020 - Captivated Health
> released the following to the media: Managing Captivated Health's
> Tampa-based team will be David Bolduc, who will serve as
> Director for the Southeast Region. David has deep experience in
> underwriting (American International Group), risk analysis and
> captive management (Strategic Risk Solutions) and reinsurance.*

*David holds a Bachelor of Arts in Business Economics from Brown University. He also holds an Associate in Risk Management (ARM), Associate in Reinsurance (ARe) and is a Chartered Financial Analyst (CFA). David also brings first-hand experience with educational institutions, having served as a member of the Gulfview Middle School Advisory Committee, and Board Member of Mason Classical Academy. Accordingly, not only was Mr. Bolduc publicly disclosed to be Captivated Health's Director for the Southeast Region, Captivated Health's press release explicitly noted that he is a Board Member of the Defendant. Mr. Bolduc hid this from the Defendant's Board and never disclosed it prior to the Board's vote approving the Captivated Health contract. (See Ex. 6 - Defendant's March 23, 2020 Meeting Minutes). Additionally, Mr. Bolduc still failed to disclose to the Board his now publicly announced relationship with Captivated Health, despite there being a March 26, 2020 Board Meeting that he attended and notwithstanding the fact that a community member broached the subject during that public meeting. (See Ex. 8 - Defendant's March 26, 2020 Meeting Minutes; Ex. 9 - Moore's March 27, 2020 Whistleblower Letter). Moore Disclosed What Were Actual Violations of Florida Law. The Charter Agreement between the Defendant and CCPS incorporated Florida ethics statutes pertinent to public officials. F.S. § 1002.33(26)(a) and (b) provide the following:*

*(26) STANDARDS OF CONDUCT AND FINANCIAL DISCLOSURE.-*

*(a)     A member of a governing board of a charter school, including a charter school operated by a private entity, is subject to ss. 112.313(2), (3), (7), and (12)      and 112.3143(3).*

*(b)     A member of a governing board of a charter school operated by a municipality or other public entity is subject to s. 112.3145, which relates to the disclosure of financial interests.*

*In this context, F.S. §112.313(3) provides in pertinent part the following:*

*(3) DOING BUSINESS WITH ONE'S AGENCY.-No employee of an agency acting in his or her official capacity as a purchasing agent, or public officer acting in his or her official capacity, shall either directly or indirectly purchase, rent, or lease any realty, goods, or services for his or her own agency from any business entity of which the officer or employee or the officer's or*

*employee's spouse or child is an officer, partner, director, or proprietor or in which such officer or employee or the officer's or employee's spouse or child, or any combination of them, has a material interest. Nor shall a public officer or employee, acting in a private capacity, rent, lease, or sell any realty, goods, or services to the officer's or employee's own agency, if he or she is a state officer or employee, or to any political subdivision or any agency thereof, if he or she is serving as an officer or employee of that political subdivision.*

*And F.S. § 112.313(7) provides in pertinent part:*

*(7) CONFLICTING EMPLOYMENT OR CONTRACTUAL RELATIONSHIP*

*(a) No public officer or employee of an agency shall have or hold any employment or contractual relationship with any business entity or any agency which is subject to the regulation of, or is doing business with, an agency of which he or she is an officer or employee, excluding those organizations and their officers who, when acting in their official capacity, enter into or negotiate a collective bargaining contract with the state or any municipality, county, or other political subdivision of the state; nor shall an officer or employee of an agency have or hold any*

*employment or contractual relationship that will create a continuing or frequently recurring conflict between his or her private interests and the performance of his or her public duties or that would impede the full and faithful discharge of his or her public duties.*

*Finally, F.S. § 112.3143, which pertains to voting conflicts, provides in pertinent part the following:*

*3)(a) No county, municipal, or other local public officer shall vote in an official capacity upon any measure which would inure to his or her special private gain or loss; which he or she knows would inure to the special private gain or loss of any principal by whom he or she is retained or to the parent organization or subsidiary*

*of a corporate principal by which he or she is retained, other than an agency as defined in s. 112.312(2); or which he or she knows would inure to the special private gain or loss of a relative or business associate of the public officer. Such public officer shall, prior to the vote being taken, publicly state to the assembly the*

*nature of the officer's interest in the matter from which he or she is abstaining from voting and, within 15 days after the vote occurs, disclose the nature of his or her interest as a public record in a memorandum filed with the person responsible for recording the minutes of the meeting, who shall incorporate the memorandum in the minutes.*

*It is undisputed that on March 23, 2020, the Defendant conducted a board meeting to approve a contract with a company named Captivated Health.*

*Nevertheless, the Board heard a lengthy presentation from a Captivated Health representative. No board member asked about Mr. Bolduc's relationship to Captivated Health. Nor was any formal disclosure made to the board that Mr. Bolduc had been working for months with the Defendant's staff to get the contract for his company. Mr. Bolduc never sought to recuse himself.*

*On March 25, 2020, Captivated Health issued its press release to the media. Accordingly, not only is Mr. Bolduc Captivated Health's Director for the Southeast Region, it is expressly noted that he is a Board Member of the Defendant. Mr. Bolduc hid this from the Defendant's Board when he moved to approve and voted on approval of the Captivated Health contract. Without much doubt, Mr. Bolduc's actions were a violation of F.S. § 1002.33(26), § 112.313(3) and (7), and § 112.3143(3)(9)."*

496. On September 3, 2020, a Final Order was entered in Vickaryous's FDOE Administrative Complaint case (Case No. 178-2606), approving the Settlement Agreement reached with Corcoran.

497. On September 8, 2020, Lewis and Durst's Citizens Concerned for MCA Facebook Page posted:



**Citizens Concerned for MCA**
September 8, 2020 · 🌐

New month.....New MCA law firm!!!

Yep....they're hiring another one. The plan by the board to destroy the school rather than give up their stranglehold continues. Nick Lichter promised that this is what they would do if anyone tried to remove Kelly from her throne and I guess they're following through with his threats.

Understand, they don't care about you...they don't care about your children...they ONLY care about MONEY and their perceived POWER.

You want to know the biggest enemy to School Choice is in the entire nation??? The Board of Mason Classical Academy!!!!

If it really is this easy for these uneducated self-destructive criminals to get a stranglehold on a taxpayer funded school like MCA, imagine what damage could be done by intelligent criminals.

I think it is pretty safe to say that the Board of MCA will have re-allocated more than a million dollars meant for educational programs for your children to multiple law firms in the State of Florida in 2019 and 2020.

WHY?  GREED - PRIDE - WRATH - ENVY - LUST

Wow!!!- Five of the Seven Deadly Sins.  No surprise there.

It's already hard enough to convince nay-sayers that School Choice is a great educational option, but these fools have done nothing but validate the argument of the anti-school choice movement.

...apleslogcabin #RealRICO #LichterCrimeFamily

498.    On September 17, 2020, Lewis and Durst used their Citizens Concerned

for MCA Facebook Page to promote Naples Classical Academy:



499.    On September 26, 2020, a fraudulent application for unemployment

benefits was submitted in Bolduc's name with the Massachusetts Department of

Unemployment Assistance, claiming that Bolduc worked for Captivated Health

(Borislow Insurance Agency) between July 1, 2019 and June 30,2020.  This fraudulent

claim appears to have been submitted by or at the direction of Yormak because it

occurred shortly after Yormak served a Notice of Non-Party Production and proposed

subpoena for documents directed to Captivated Health for Bolduc's records.

500.    On October 13, 2020, Lewis and Durst's Citizens Concerned for MCA

Facebook Page also posted:



**Citizens Concerned for MCA**
October 13, 2020 · 🌐

Oh Jana. You are a wonderful little disciple of Kelly
Mason Lichter. She directs you follow. She directed you
to expel her enemies from the MCA clothing exchange
page....you followed. She directed you to do public
records requests for the Hostile Page....you followed.
She directed you to file a complaint with the Florida Bar
against Fox and Fishbane...you followed. (It was quite an
illiterate filing and I imagine the Bar employees laughed
at you as they explained why you were confused about
how the Bar works....but we'll post those documents
later).....She ordered you to create a Friends of Kelly
Facebook group.....you followed.....She ordered you to
have an invite only meeting....you followed. You are
such a wonderful follower.....we are very impressed with
your willingness to expose yourself in order to protect
your mean-girl friend Kelly. We hope you shoulder your
share of the blame when this school is closed down
because of these criminals! Did you get your
application in to NCA yet? We're so happy to see that
Hillsdale is bringing a real classical education back to
Naples. It's been missing from Naples for too long!
Cheers!

501.    On October 15, 2020, Lewis and Durst used the Citizens Concerned for

MCA Facebook Page to defend their co-conspirators, Baird, E. Donalds, Mathias, and

Hillsdale:



**Citizens Concerned for MCA**
October 18, 2020 · 🌐

If there is any doubt that the MCA Board is engaging in unethical and criminal activities.....you only have to look at the money they are dumping into the Joe Baird lawsuit.  They are already aware that they will get ZERO money from Mr Baird.

If that is the case, then why do they continue to sue?

Well, that's simple.  They continue to try and dig up information to use against Erika Donalds and Matt Mathias.

How do we know?  They are sending their attorneys to Michigan next month to spend three days in a deposition of the Hillsdale College leadership.  This will cost tens of thousands of dollars.  What possible reason could they have to question Hillsdale about Joe Baird? NONE!

Joe Baird has no real connection to Hillsdale.....but MCA continues to spend the money ear-marked for teacher raises, money set aside for children's educational materials, money meant for a fence, money that could have been used to put hot water in the second floor bathrooms, money that should have been spent on the school.

Hundreds of thousands of dollars for what has been proven to be a Board of criminals and idiots!

A 'principal/executive director' with mental issues, a vice principal who tried to steal thousands in unearned salary from the school and an uneducated girlfriend of the principal/executive director who is in charge of directing real professionally trained teachers in how to be a teacher!

Guess what criminals.....THEY are coming for you!!!!

502.   On October 24, 2020, Baird emailed Lewis regarding "Eviction Coming" and attached a statement from MCA's landlord while telling Lewis "**don't post to your Weebly site just yet**":





503.   As noted above, E. Donalds had already been working to try to turn MCA's landlord against it.

504.   On October 26, 2020, Lewis and Durst posted the materials Baird provided to their Citizens Concerned for MCA Facebook Page:



505.    On October 26, 2020, MCA filed a lawsuit against the CCSB for declaratory and injunctive relief based on CCSB's assertions that MCA violated the MSA and the CCSB's placement of MCA on "Probationary Warning Status." [Collier County Circuit Court **Case No. 20-CA-003427**]

506.    On November 3, 2020, Lewis and Durst's Citizens Concerned for MCA Facebook Page posted:

**Citizens Concerned for MCA**
November 3, 2020 ·

Fraud? Abuse? Threats? Rage? - Sounds like a recurring theme.

If you are trying to make money opening and running charter schools in the State of Florida with your business partners David Hull & Gena Smith, what would you do if they were accused of such heinous crimes?

If you are Kelly Mason Lichter, you deflect the accusations by attacking others and accusing them of trying to close the school. That's her strategy folks....thats been her strategy all along and now that she will NEVER find work in education ever again, she is bitter and is lashing out at everyone that she believes destroyed her chances.

What roll do Laura Miller and David Bolduc play in this conspiracy? It doesn't make sense that they continue to support Kelly when she is obviously under fire (and under investigation). Could it be possible that they were going to be compensated in some way too?

It's obvious that she tried to compensate Whitehead, Hull and Smith by illegally funneling money to them in the form of advance payments of their salary.

Was Bolduc's attempt to sneak through an insurance deal and line his pockets with a big commission Kelly's attempt to pay him off?

If so, what was Laura Miller Mlinarich promised? She's committed as many crimes as any of them, so its reasonable to say that she's likely being 'compensated' some way.

507.   On November 3, 2020, Durst commented on a Facebook post:



**Christopher Durst**
I wonder how the Hillsdale College depositions went today? Word on the street is that the Hillsdale people were confused as the entire deposition was questions about Erika Donalds and nothing about Joe Baird. #ErikaOwnsKelly

508.   On December 7, 2020, Hillsdale College sued Lichter for allegedly tortiously interfering with its business relationships with charter school affiliates [Collier County Circuit Court Case No. **20-CA-3892**].   A copy of Hillsdale's

December 9, 2020 Complaint is attached hereto as **Exhibit E**.  This retaliatory lawsuit is also based on Lichter's protected activities and was brought in violation of section 768.295, *Florida Statutes*.

509.   ***Two days later***, on December 9, 2020—in a clear demonstration of collusion with the FDOE and Defendants—FDOE filed an Ethics Complaint against Bolduc that was based entirely on Vickaryous's false ethics complaint (filed 8 months prior) [**Case No. 20-235**], a copy of which is attached hereto as **Exhibit F.**

510.   On January 5, 2021, Fox acting at Fishbane's direction filed an Answer and Counterclaim/Crossclaim on behalf of the CCSB in Collier County Circuit Court Case No. 20-CA-003427, a copy of which is attached hereto as **Exhibit G**, that added Lichter and Bolduc as cross-defendants and asserted claims against them individually seeking their removal as MCA Governing Board Members:

WHEREFORE the School Board respectfully requests that this Court enter judgment in its favor and declare that:

1.  MCA is a "public school" in Collier County, Florida;

2.  The School Board has the constitutional delegated responsibilities to "supervise, operate and control" MCA;

3.  The School Board is not limited to merely granting or terminating MCA's charter under its constitutional duties;

19

4.  The School Board has broad powers, considerable latitude, and wide discretion short of termination to require MCA to honor its charter and follow Florida Law;

5.  The School Board may enforce MCA's charter and the Florida Statutes in a court of law;

6.  The School Board may enforce the Settlement Agreement in a court of law;

7.  MCA must abide by the terms of the Settlement Agreement;

8.  MCA must fully and faithfully carry out the corrective actions the School Board has required of it as outlined in the "IR" and the four official letters sent to MCA;

9.  Multiple actions taken by LICHTER and BOLDUC were ultra vires;

10. Multiple actions taken by LICHTER must rotate off and leave the MCA Board;

11. BOLDUC must rotate off and leave the MCA Board; and

12. and, such other relief as is just and proper.

511.    Fishbane directed this filing—which was also brought in violation of section 768.295, Florida Statutes—even though the CCSB never voted to approve or authorized filing these claims against MCA, Lichter, and Bolduc and Fishbane has no authority to file them.

512.    On April 30, 2021, Vickaryous again perjured herself:

```
2      Q.     Okay.  Do you recall a board meeting
3   scheduled for March 26th, 2020?
4      A.     Yes, I do.
5      Q.     Were you present at that meeting?
6      A.     Yes, I was.
7      Q.     And what happened at the meeting?
8      A.     A community member informed the board of a
9   conflict of interest with David Bolduc now being -- it
10  was announced the day before that he was employed with
11  Captivated Health.
12     Q.     Was this known to you previously?
13     A.     I had no idea.
```

513.    On October 29, 2021, Mathias sued Lichter, her husband, Joseph
Whitehead, and Jana Greer for defamation [Collier County Circuit Court Case No.
**21-CA-002572**].  A copy of Mathias's Complaint is attached hereto as **Exhibit H**.
Among other things, Mathias based this lawsuit—also brought in violation of section
768.295, *Florida Statutes*—on a December 3, 2019 criminal complaint Lichter filed over
what she believed to be an illegal audio recording.

514.    On February 25, 2022, E. Donalds and Rep. Donalds continued to
promote Optima, speaking at CPAC about the importance of the "battle for schools."
During an activist training session about school choice, Rep. Donalds discussed his
preference for a "market system" for schools and E. Donalds discussed her efforts to
introduce "competition to the government system" for schools.

515.    On March 22, 2022, the Florida Commission on Ethics found there was

**no probable cause** for Vickaryous's Complaint falsely accusing Bolduc of violating

section 112.313, *Florida Statutes*, in connection with the Captivated Health situation:



516.    On August 19, 2022, Plaintiffs filed the above-captioned lawsuit.

517.    On August 22, 2022, in Vickaryous's whistleblower lawsuit against

Plaintiffs [Case No. 2:21-cv-00903-JLB-NPM], U.S. Magistrate Judge Mizell entered

a Report and Recommendation [Doc. 49] denying Vickaryous's Motion for

Temporary Reinstatement and finding (among other things) that Vickaryous acted in

bad faith and made knowingly false statements:

reinstatement pursuant to section 112.3187(9)(f), … an aggrieved party must show that he or she … did not make the disclosure in bad faith or for a wrongful purpose….”). Here, Vickaryous failed to sustained her burden and show that her purported whistleblower complaints were not made in bad faith. Rather, because Vickaryous's disclosures are rife with material omissions and falsehoods, they were neither objectively nor subjectively reasonable and therefore made in bad faith.

For example, Vickaryous's whistleblower complaints allege that Bolduc was a director of Captivated Health in October 2019. (*E.g.*, Doc. 14-23, p. 2). But Vickaryous knew better. She witnessed him working for KOVA Insurance at the time, and she was present during the April 14, 2020 board meeting during which Bolduc's becoming a director of Captivated Health in March 2020 was explored in considerable detail. (Doc. 14-20; Doc. 31-30, pp. 6-7, 12; Doc. 14-29, pp. 44-47). It was also knowingly false for Vickaryous to assert that MCA had made a deal with Captivated Health and that she was delaying its implementation. (Doc. 14-23, p. 2; Doc. 14-20; Doc. 33-1, pp. 63-65). There never was a deal. Vickaryous admitted that

Vickaryous also made misleading statements. She suggested Moore's notice alleged an illegality. (*E.g.*, Doc. 14-22, p. 3). It didn't—it notified the board of a need to determine whether Moore had violated MCA's policies. (Doc. 14-17). Vickaryous also misleadingly asserted that only Lichter's friends could attend a March 19, 2020 board meeting via the web, but in fact, the board meeting was public and community members could attend in person. (Doc. 14-23, p. 4; Doc. 31-30, pp. 21-24). And her purported complaints omitted all the material information from the April 14 board meeting minutes recounted above.

> Finally, Vickaryous's complaints about public records handling (Doc. 14-23, p. 4) also appear to be made in bad faith. Vickaryous admitted that sometime after April 6, Hull met with Steer, and Steer was directed to add Moore to have access to the Google vault. (Doc. 31-30, p. 51). And on April 9, Vickaryous told Hull that MCA was handling public records requests properly and no corrective action was needed. (Doc. 34-11, p. 2). Moreover, Vickaryous apparently attempted to permanently delete critical files from MCA's records and to wipe and lock her laptops before returning them. (Doc. 34-40).
>
> In sum, MCA should not be ordered to temporarily reinstate Vickaryous because her purported whistleblower complaints were made in bad faith.

518.    Yormak knew when he assisted Vickaryous in preparing her bad faith complaints against Plaintiffs and filing her retaliatory whistleblower lawsuit and Motion for Reinstatement that they were objectively baseless and fraudulent.

519.    On August 23, 2022, the night of Florida's primary election, Rep. Donalds aggressively confronted Lichter at a watch party hosted at *Seed To Table* in Naples. During this encounter, Rep. Donalds and Larry Wilcoxson ("Wilcoxson") cornered Lichter while Rep. Donalds forcefully demanded that Lichter dismiss this lawsuit and told Lichter that he would "crush" her if she did not.

520.    Despite a checkered past that includes arrests for child molestation and aggravated assault with a deadly weapon and accusations of exposing himself to a female school custodian, Wilcoxson works for Rep. Donalds as a "Senior Advisor."

521.    On September 7, 2022, Rep. Donalds, E. Donalds, and Wilcoxson attended a Collier County Republican Executive Committee ("CCREC") event at

which the CCREC was scheduled to approve funding for Lichter and other school board candidates endorsed by the CCREC.  To attend this event, Rep. Donalds cancelled a Ft. Myers Beach Town Hall and E. Donalds skipped a Naples Classical Academy Board meeting.  Rep. Donalds also directed his agent, Wilcoxson, to attend the September 7, 2022 CCREC meeting.

522.    At the September 7, 2022 CCREC meeting, Rep. Donalds made a presentation specifically attacking Lichter for filing this lawsuit while simultaneously asking the CCREC not to continue endorsing or to approve funding for Lichter's school board campaign.  Shortly thereafter, as Lichter's husband asked that she be given time to speak to defend herself, Rep. Donalds' Senior Advisor, Wilcoxson, launched himself across the venue towards Lichter and her husband in an extremely aggressive manner and had to be physically restrained by a law enforcement officer and other attendees at the event.

523.    Consistent with Rep. Donalds' August 23, 2022 threat to "crush" Lichter for filing this lawsuit, he facilitated donations from numerous individuals, entities, and PACs affiliated with Rep. Donalds and E. Donalds, who flooded Lichter's school board opponent's campaign with donations; including Southwest Florida Jobs Alliance, Parents for Accountability in Education and Just the Facts PAC, as well as Quality Charter School Solutions, LLC and Arza Consulting Group.[33]

---

[33] On September 24, 2022, Arza Consulting Group held a Meet & Greet for Lichter's opponent.

524. Southwest Florida Jobs Alliance, Parents for Accountability in Education and Just the Facts PAC are all chaired by Terry Miller with Noreen Fenner listed as their treasurer. Noreen Fenner was also the treasurer of Byron Donalds' "Friend of Byron Donalds" PAC.

525. Parents for Accountability in Education received significant contributions from Eric Robinson's accounting firm, Robinson Roberts & Associates, on September 28, 2022 and October 17, 2022. Upon information and belief, Robinson or his firm have loaned money to fund Optima's operations.

526. The donations orchestrated by Rep. Donalds coincided with expenditures to for ads attacking Lichter over this lawsuit:







Tomorrow is Election Day and you have a choice.

Do you want Kelly Lichter who has been investigated for academic and financial mismanagement and Sunshine Law violations on our School Board making decisions that could benefit her own personal self interest? Do you want someone like Lawsuit Lichter that is so obsessed with filing lawsuits that she is suing conservative Hillsdale

527.    On September 26, 2022, E. Donalds made a presentation for CCREC members at Optima's offices, during which she published numerous false and defamatory statements about Plaintiffs and re-published prior false and defamatory statements made by others, including the following:

   a.   MCA was abusing children and specific examples of the abuse were documented in the FDOE complaint filed by Baird and in the Fishbane Report;

   b.   Jon Fishbane is the CCPS attorney and completed two investigative reports about MCA, documenting specific allegations of abuse of children in the school;

   c.   MCA routinely counseled out students with behavior issues, special needs, or academic challenges;

   d.   MCA's principal, David Hull, targeted the Donalds' children after Rep. Donalds voted against Hull's contract;

   e.   MCA's landlord offered to gift the school building to MCA when he passes away, but one of the criteria is that they had to remain a Hillsdale school;

   f.   Plaintiffs scapegoated Vickaryous;

   g.   When MCA severed their relationship with Hillsdale they didn't give Hillsdale's intellectual property back…they not only kept using it, but they also actually tried to sell it to other people;

h. One of the main reasons that Hillsdale got involved is because their own alumni, who were hired by the school, came as a group back to Hillsdale and said you can't let them hire anymore Hillsdale alumni because they're being abused there;

i. Plaintiffs stole Hillsdale's intellectual property

j. Plaintiffs put a black eye on the entire charter school sector and the classical brand;

k. MCA unlawfully expelled students;

l. Baird's daughter was abused;

m. Plaintiffs filed an IRS complaint about Optima Foundation;

n. Multiple students were told they could not come back to MCA;

o. MCA is the number one school in Collier County because it is picking which kids to test;

p. MCA illegally counsels out IEP students;

q. Bolduc worked for a company that was selling insurance to the school, which was a conflict of interest.

528. Also on September 26, 2022, U.S. District Judge Badalamenti entered an Order adopting the August 22, 2022 Report and Recommendation in the Vickaryous whistleblower lawsuit against Plaintiffs [Doc. 53 **Case No. 2:21-cv-903-JLB-NPM**], which (among other things) found that "t*he Magistrate Judge did not err in finding that Ms. Vickaryous acted in bad faith or for a wrongful purpose and that her complaints were not protected because they contained inaccurate and misleading information*" and that "*Ms.*

*Vickaryous only acted after she believed her own employment was in jeopardy and crafted a*
*misleading narrative, given that most of her allegations are severely undermined or directly*
*contradicted by the record evidence predating her disclosures.*"

529.   The retaliatory lawsuits and claims filed by Vickaryous and Yormak,

Hillsdale, Mathias, and Fishbane, as identified in paragraphs 440, 478, 480, 508, 510,

and 513, above, remain pending and are being actively litigated.

## V.   DEFENDANTS'
## PATTERN OF CRIMINAL MISCONDUCT

530. Defendants conducted, engaged in, and/or participated in criminal

activity consisting of the following acts, which had the same or similar intents, results,

accomplices, victims, and/or methods of commission, and were not isolated incidents:

A.   Defendants, Hillsdale, Arnn, E. Donalds, Rep. Donalds, Optima Foundation, and OptimaEd, engaged in "racketeering" activity under 18 U.S.C. § 1961(1)(A) by committing numerous acts or threats punishable by imprisonment for more than one year under Florida law, in violation of § 836.05, *Florida Statutes*, as alleged in subparagraph H, below;

B.   Defendants, Vickaryous, Yormak, and Fishbane, engaged in "racketeering" activity under 18 U.S.C. § 1961(1)(A) by committing numerous acts or threats punishable by imprisonment for more than one year under Florida law, in violation of § 838.022, *Florida Statutes*, as alleged in subparagraph L, below;

C.   Defendant, Rep. Donalds, engaged in "racketeering" activity under 18 U.S.C. § 1961(1)(A) by committing numerous acts or threats punishable by imprisonment for more than one year under Florida law, in violation of § 838.021, *Florida Statutes,* as alleged in subparagraph K, below;

D.    As alleged in paragraphs 337, 338, 340, 355, 358, 359, 361, 363, 374, 391, 402, 429, 430, 434, 437, 440, 450, 456, 472, 474, 477, and 478, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, engaged in "racketeering" activity under 18 U.S.C. § 1961(1)(B) by violating 18 U.S.C. §1343 by, having devised or intending to devise a scheme or artifice to defraud, or to obtain money or property by means of fraud or fraudulent pretenses, representations, or promises, transmitting or causing to be transmitted by means of wire in interstate commerce writings for the purpose of executing a scheme or artifice to defraud, through material misrepresentations or omissions of material facts;

E.    As alleged in paragraphs 410 and 411, Defendant, Vickaryous, committed numerous violations of § 815.04, *Fla. Stat.*, by (1) rendering data or supporting documentation residing or existing internal or external to a computer, computer system, computer network, or electronic device unavailable; (2) destroying data or supporting documentation that resided or existed internal or external to a computer, computer system, computer network, or electronic device; and/or (3) taking confidential data, programs, or supporting documentation that resided or existed internal or external to a computer, computer system, computer network, or electronic device;

F.    As alleged in paragraphs 387, 394, 405, 409, 410, 411, and 427, Defendant, Vickaryous, committed numerous violations of §815.06, *Fla. Stat.*, by (1) accessing or causing to be accessed a computer, computer system, computer network, or electronic device with knowledge that such access was unauthorized or the manner of use exceeded authorization; (2) destroying, taking, injuring, or damaging equipment or supplies used or intended to be used in a computer, computer system, computer network, or electronic device; (3) destroying, injuring, or damaging any computer, computer system, computer network, or electronic device; and/or (4) engaging in surveillance of an individual by accessing any inherent feature or component of a computer, computer system, computer network, or electronic device, including accessing the data or

information of a computer, computer system, computer network, or electronic device that is stored by a third party;

G.  As alleged in paragraphs 346, 347, 391, 429, 437-439, 442, 444, 447, 448, 456, 457, 460-466, 472-476, 481, and 497, Defendants, Lewis and Durst, committed multiple violations of §817.569, *Fla. Stat.*, by (1) using public records or information obtainable only through public records to facilitate or further the commission of a crime; and/or (2) providing false information that becomes part of a public record to facilitate or further the commission of a crime; including the violation of §877.13, as alleged in subparagraph M, below;

H.  As alleged in paragraphs 289, 402, 450, 477, and 519-526, Defendants, Hillsdale, Arnn, E. Donalds, Rep. Donalds, and Durst, committed multiple violations of § 836.05, *Fla. Stat.*, by verbally or by a written or printed communication, maliciously threatening to accuse another of any crime or offense, or by such communication maliciously threatening an injury to the person, property or reputation of another, or maliciously threatening to expose another to disgrace, with intent thereby to extort a pecuniary advantage, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will;

I.  As alleged in paragraphs 468 and 512, Defendants, Vickaryous and Yormak (by virtue of  §§ 777.011 and 777.04, *Fla. Stat.*), committed violations of §837.02, *Fla. Stat.*, by making false statements not believed to be true under oath in an official proceeding concerning material matters;

J.  As alleged in paragraphs 358, 361, 374, 391, 429-432, 434, and 474, Defendant, Fishbane, committed violations of §837.06, *Fla. Stat.*, by knowingly making false statements in writing with the intent to mislead a public servant in the performance of his or her official duty;

K.  As alleged in paragraphs 519-526, Defendant, Rep. Donalds, engaged in violations of §838.021, *Fla. Stat.*, by threatening to harm a public servant, his or her immediate family, or any other person with whose welfare the public

servant is interested with the intent to:(a) influence the performance of any act or omission that the person believes to be, or that the public servant represents as being, within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty, and/or (b) cause or induce the public servant to use or exert, or procure the use or exertion of, any influence upon or with any other public servant regarding any act or omission that the person believes to be, or that the public servant represents as being, within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty;

L.    As alleged in paragraphs 391, 429-431, 434, 437, 456, 474, 482, 483, and 489, Defendants, Vickaryous, Yormak, and Fishbane, engaged in violations of §838.022, *Fla. Stat.*, by knowingly and intentionally obtaining a benefit for any person or causing unlawful harm to another, by falsifying, or causing another person to falsify, any official record or official document; or concealing, covering up, destroying, mutilating, or altering any official record or official document, except as authorized by law or contract, or causing another person to perform such an act;

M.    As alleged in paragraphs 336-528, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, committed violations of §877.13, *Fla. Stat.*, by (1) knowingly disrupting or interfering with the lawful administration or functions of an educational institution or activity on school board property in this state; (2) knowingly advising, counseling, or instructing a school employee to disrupt any school or school board function, activity on school board property, or classroom; and/or (3) conspiring to engage in any school campus or school function disruption which interferes with the educational processes or with the orderly conduct of a school campus, school, or school board function or activity on school board property;

N.    As alleged in paragraphs 480, 508, 510, and 513, Defendants, Arnn, Hillsdale, Fishbane, Mathias, Vickaryous, and Yormak, engaged in violations of §877.01,

*Fla. Stat.*, by soliciting, receiving or accepting or agreeing to receive or accept, or conspiring to receive or accept, any valuable thing whatsoever, or any promise, contract, or agreement whatsoever, with the intent and purpose of stirring up strife and litigation; or with the intent or purpose of seeking out, influencing, assisting, or advising others to bring suit, or seek professional legal services, counsel, or advice;

O.    As alleged in paragraphs 346, 347, 391, 429, 437-439, 442, 444, 447, 448, 456, 457, 460-466, 472-476, 481, 497, and 519-526, Defendants, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Durst, and Lewis, committed multiple violations of §784,048, *Fla. Stat.*, by engaging in a course of conduct directed at a specific person that causes substantial emotional distress and serves no legitimate purpose and/or engaging in a course of conduct to communicate or cause to be communicated words, images, or language by or through electronic means directed at or pertaining that causes substantial emotional distress and serves no legitimate purposes;

P.    As alleged in paragraphs 189-196, Defendants, Baird, E. Donalds, and Rep. Donalds, violated of § 836.09, *Florida Statutes*, by stating, delivering, or transmitting by any means whatever, to the editor, publisher or reporter of any newspaper or periodical for publication therein false and libelous statements concerning Plaintiffs, then and their known to be false or libelous, and thereby securing publication of the same;

Q.    As alleged in paragraphs 519-526, Defendant, Rep. Donalds, violated 18 U.S.C. § 241 by conspiring to injure, oppress, threaten, or intimidate Lichter in the free exercise or enjoyment of any her rights or privileges secured by the Constitution, or because of her having so exercised the same.

531.    With respect to the crimes alleged in Paragraph 530, all Defendants either committed or aided, abetted, counseled, hired, or otherwise procured the commissions

of such crimes, and are therefore principals in the first degree under § 777.011, *Florida Statutes*.

532.    Alternatively, any Defendants wo did not commit such crimes as principals in the first degree under § 777.011, *Florida Statutes*. either solicited another to commit the crimes alleged in paragraph 530, and in the course of such solicitation commanded, encouraged, hired, or requested another person to engage in specific conduct which would constitute such crimes or an attempt to commit such crimes, thereby constituting criminal solicitation in violation of § 777.04(2), *Florida Statutes*; or they agreed, conspired, combined or confederated with others to commit the crimes identified in paragraph 530, thereby committing criminal conspiracy in violation of § 777.04(3), *Florida Statutes*.

## PLAINTIFFS' FUNDAMENTAL
## RIGHTS, PRIVILEGES & LIBERTIES

533.    Plaintiffs each have and hold clearly established fundamental rights, privileges, and liberties protected by the United States Constitution, including:

a.    Freedom of speech, assembly, and association, and to petition the government for the redress of grievances under the First Amendment;

b.    Equal protection and due process under the Fourteenth Amendment

c.    Freedom from unreasonable searches and seizures under the Fourth Amendment; and

d.    Liberty, including the right to protect their reputations.

534.    Plaintiffs' First Amendment rights, including the rights to speak on matters of public concern, petition for redress of grievances, assemble and associate, influencing governmental action, and access to the courts are among the most precious of the liberties safeguarded by the Bill of Rights and high in the hierarchy of First Amendment values.

535.    Plaintiffs' clearly established First Amendment rights protect their right to associate and assemble with each other as part of MCA and to advocate for MCA and its members.

536.    Plaintiffs also have and hold the fundamental right to protect their reputations from unjustified invasion and wrongful hurt, which "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty."[34]  Society prizes the dignity of every person and has "has a pervasive and strong interest in preventing and redressing attacks upon reputation."[35]

537.    Plaintiffs' rights to protect their reputations are fundamental and protected by the Constitution because they are "deeply rooted in our history and tradition" and essential to our Nation's "scheme of ordered liberty."  *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2246 (2022).

---

[34] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 and 92-93 (1966)); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974); *Holter v. HLCY T.V., Inc.*, 366 So.2d 445, 451 (Fla. 2d DCA 1978);
[35] *Milkovich*, 497 U.S. at 22 (*citing Rosenblatt*, 383 U.S. at 86); *Seropian v. Forman*, 652 So.2d 490, 493 (Fla. 4th DCA 1995); *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 238 (1933); *Pullum v. Johnson*, 647 So.2d 254, 256 (Fla. 1st DCA 1994).

538.    Moreover, the defamatory statements at issue herein involve accusations of criminal and financial misconduct that amount to violations of § 1002.33(8), *Florida Statutes*, which would be grounds to terminate MCA's Charter, and §§ 112.313 and 112.3143, *Florida Statutes*, which would be grounds to prohibit Lichter and Bolduc from serving as charter school governing board members in the future.

539.    MCA, as the operator of a charter school, and Lichter and Bolduc, as members of a charter school's Governing Board, have duties and obligations to uphold the U.S. Constitution and laws of the United States, and therefore occupy an office, trust, or place of confidence under 42 U.S.C. § 1985; and therefore  also have corresponding federal rights to be free from interference with the performance of their duties.[36]

540.    MCA also has a legally protected interest in its Charter, Charter Agreement, and right to operate a "high-performing" charter school, as well as its students and prospective students.

541.    Plaintiffs also have and hold the right to be free from retaliation for exercising all of their foregoing fundamental rights, privileges, and liberties.

542.    Plaintiffs' protected rights, privileges, and liberties identified in paragraphs 533-541, above, outweigh any alleged interests Defendants may claim to have had in violating, limiting or restricting Plaintiffs' rights.

---

[36] *Brewer v. Hoxie School Dist. No. 46 of Lawrence Cty. Ark.*, 238 F.2d 91, 99-101 (8th Cir. 1956); *Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338, 1340-1343 (W.D. Mo. 1992); *Anderson v. Orleans Parish School Bd.*, 340 F.Supp.2d 716, 718-719 (E.D. La. 2004).

543.   Defendants tacitly or explicitly agreed to participate in a common scheme and unlawful ongoing conspiracy, in furtherance of which they recommended, agreed to, and participated in violating Plaintiffs' civil rights, privileges, and liberties identified in paragraphs 533-541, above, and caused significant harm as a result.

544.   Defendant Fishbane is not immune from liability because his actions upon which the causes of action alleged below are based were not committed within the lawful scope of his position as General Counsel for the CCSD, he was not acting within the scope of his discretionary authority, and he knew or reasonably should have known that his actions would violate Plaintiffs' federal rights.[37]

545.   Defendants E. Donalds and Rep. Donalds are not immune from liability because any actions they took while they were state actors and upon which the causes of action alleged below are based were not committed within the lawful scope of their government positions, they were not acting within the scope of their discretionary authority in such positions, and they knew or reasonably should have known that their actions would violate Plaintiffs' federal rights.

546.   Defendants violated Plaintiffs Constitutional and federally protected rights while acting under color of state law, including as willful participants in joint action with the State or its agents, including without limitation the FDOE, CCSB, and Corcoran.[38]

---

[37] *Gaines v. Wardynski*, 871 F.3d 1203, 1206 (11th Cir. 2017).
[38] *Dennis v. Sparks*, 449 U.S. 24, 28-29 (1980).

## COUNT I
### [42 U.S.C. §1983—Violation Of MCA's Civil Rights]

547.   MCA re-alleges paragraphs 1 through 546, as if fully set forth herein.

548.   This is an action under 42 U.S.C. §1983 by MCA against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for violating and depriving MCA of its fundamental rights, privileges, and liberty acting under color of state law, which is based on the actions of Defendants set forth in paragraphs 336-529, above.

549.   As alleged in paragraphs 533-541, MCA has and holds protected rights, privileges, and liberties under the U.S. Constitution and Federal law.

550.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, violated MCA's protected rights, privileges, and liberties by engaging in the conduct identified in paragraphs 336-529, above, which:

   a.   Defamed[39] MCA while engaged in unauthorized, unlawful, and unjustifiable actions intended to terminate MCA's Charter and Charter Agreement and interfere with MCA's operations;

   b.   Defamed MCA while engaged in unauthorized, unlawful, and unjustifiable actions seeking to force the removal of MCA's Governing Board members and interfere with MCA's operations;

---

[39] The defamation directed at MCA is more fully set forth in Counts XV and XVIII, below.

    c.      Defamed MCA while engaged in unauthorized, unlawful, and unjustifiable actions to prevent MCA from exercising its rights to freedom of assembly and association;

    d.      Unlawfully searching MCA's computer systems and data without a warrant;

    e.      Unlawfully damaging MCA's property, including its computer systems and data, without probable cause or due process; and

    f.      Unlawfully depriving MCA of its protected rights, privileges, and liberties without due process of law.

551.   At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

552.   Defendants' adversely impacted MCA's protected rights, privileges, and liberties, and their actions described paragraph 550, above triggered state action, caused the state to impose burdens on MCA or alter its status or rights, and/or caused the state to seek to remove or significantly alter a liberty or property interest of MCA.

553.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to violate MCA's protected rights, privileges and liberties, and each of them engaged in overt acts in furtherance of their conspiracy that directly injured MCA and deprived it of having and exercising its protected rights, privileges, and immunities.

554.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful ongoing conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

555.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, MCA suffered and is entitled to recover damages, including damages for economic harm and harm to its reputation, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

556.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, MCA suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources that could have been expended on the school and its students, and other valuable efforts to protect and defend against Defendants' unlawful misconduct and conspiracy; all of which MCA is entitled to recover under the wrongful act doctrine.

557.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages MCA suffered, MCA has also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating MCA's fundamental rights, privileges and liberties.

558.    Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to MCA if the Defendants' unlawful conduct persists

559.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

560.    Based upon the facts alleged herein and to be established at trial, MCA has the clear legal right to the entry of an injunction prohibiting Defendants from violating MCA's rights, privileges, and liberties.

561.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm MCA.  Accordingly, Defendants' actions are not privileged and they entitle MCA to recover punitive damages.

**WHEREFORE,** Plaintiff, MCA, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established at trial;

B.    Special damages under the wrongful act doctrine in appropriate amounts to be established at trial;

C.    Punitive Damages in appropriate amounts to be established at trial;

D.    A declaration that Defendants' acts violate 42 U.S.C. §1983;

  E. Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1983;

  F. Reasonable attorneys' fees and costs associated with this action; and

  G. Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT II
### [42 U.S.C. §1983—Retaliation Against MCA]

562. MCA re-alleges paragraphs 1 through 546 as if fully set forth herein.

563. This is an action under 42 U.S.C. §1983 by MCA against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for retaliating against MCA for exercising its fundamental rights, privileges, and liberties while acting under color of state law.

564. As alleged in paragraphs 533-541, MCA has and holds fundamental rights, privileges, and liberty under the U.S. Constitution and federal law.

565. MCA exercised its protected rights, privileges, and liberties by:

  a. Operating Mason Classical Academy;

  b. Assembling and associating, including with its Governing Board Members;

  c. Refusing to terminate its Governing Board Members;

  d. Speaking about matters of public concern associated with MCA and the actions taken by Defendants to try to terminate MCA's Charter and Charter Agreement and force the removal of MCA's Governing Board members;

  e. Filing a Complaint with FDOE against CCSD's investigation, as set forth in Exhibit D;

f.    Filing a lawsuit against CCSB to contest its placement of MCA on "Probationary Warning Status" [Collier County Circuit Court Case No 20-CA-3427]; and

g.    Discharging and performing the duties of MCA's office.

566.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, took adverse action and retaliated against MCA for exercising its protected rights, privileges, and liberties by:

a.    Unlawfully trying and conspiring to terminate MCA's Charter and Charter Agreement;

b.    Unlawfully trying and conspiring to force the removal of MCA's Governing Board;

c.    Committing and conspiring to commit crimes against MCA intended to terminate its Charter and Charter Agreement and to force the removal of its Governing Board;

d.    Unlawfully searching MCA's computer systems without a warrant;

e.    Unlawfully damaging and destroying MCA's computer systems and data without probable cause or due process;

f.    Defaming[40] MCA;

g.    Filing meritless lawsuits, complaints, and claims against MCA and its Governing Board Members, including those set forth in paragraphs 440, 478, 480, 508, 510, and 513, and in Exhibits E, F G, and H; and

h.    Filing false and baseless complaints against MCA, including those set forth in Exhibit F.

---

[40] The defamation directed at MCA is more fully set forth in Counts XV and XVIII, below.

567.    Defendants singled out MCA for discriminatory treatment on an
irrational and wholly arbitrary basis and were motivated by spite and without any
legitimate objective.

568.    Defendants' retaliatory actions adversely affected MCA's protected
activities.

569.    Defendants' retaliatory actions against MCA were causally connected to
MCA's protected activities.

570.    Defendants' acts amounted to a threat, coercion, or intimidation through
intimating that punishment, sanctions, or adverse regulatory action would
immediately follow.

571.    Defendants' retaliatory actions would likely deter a person of ordinary
firmness from exercising the fundamental rights, privileges, and liberties MCA
exercised.

572.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep.
Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst,
Lewis, Vickaryous, and Yormak, and Yormak, acted under color of state law and/or
were jointly engaged or acted in conspiracy with state officials.

573.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds,
Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and
Yormak, unlawfully deprived MCA of its protected rights, privileges, and liberties
without due process of law in violation of the Fourteenth Amendment to the United
States Constitution.

574.  Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to retaliate against MCA and each of them engaged in overt acts in furtherance of their conspiracy that directly injured MCA and deprived it of having and exercising its protected rights, privileges, and immunities.

575.  Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful ongoing conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

576.  As a direct and proximate result of Defendants' unlawful conduct and conspiracy, MCA suffered and is entitled to recover damages, including damages for economic harm and harm to its reputation, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

577.  As a direct and proximate result of Defendants' unlawful conduct and conspiracy, MCA suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources that could have been expended on the school and its students, and other valuable efforts to protect and defend against Defendants' unlawful misconduct and conspiracy; all of which MCA is entitled to recover under the wrongful act doctrine.

578.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages MCA suffered, MCA has also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating MCA's fundamental rights, privileges and liberties.

579.    Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to MCA if the Defendants' unlawful conduct persists

580.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

581.    Based upon the facts alleged herein and to be established at trial, MCA has the clear legal right to the entry of an injunction prohibiting Defendants from violating MCA's rights, privileges, and liberties.

582.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm MCA.  Accordingly, Defendants' actions are not privileged and they entitle MCA to recover punitive damages.

**WHEREFORE,** Plaintiff, MCA, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established at trial;

B.    Special damages in appropriate amounts to be established at trial;

C.    Punitive damages in appropriate amounts to be established at trial

D.    A declaration that Defendants' acts violate 42 U.S.C. §1983;

E.    Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1983;

F.    Mandatory injunctive relief requiring Defendants to dismiss their retaliatory claims and lawsuits filed against MCA;

G.    Reasonable attorneys' fees and costs associated with this action; and

H.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT III
## [42 U.S.C. §1983—Violation Of Lichter's Civil Rights]

583.    Lichter re-alleges paragraphs 1 through 546 as if fully set forth herein.

584.    This is an action under 42 U.S.C. §1983 by Lichter against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for violating and depriving her of her fundamental rights, privileges, and liberty acting under color of state law.

585.    As alleged in paragraphs 533-541, Lichter has and holds protected rights, privileges, and liberties under the U.S. Constitution and Federal law.

586.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, violated Lichter's protected rights, privileges, and liberties by engaging in the conduct identified in paragraphs 336-529, above, which:

a.  Defamed[41] Lichter while engaged in unauthorized, unlawful, and unjustifiable actions seeking to force her removal from MCA's Governing Board and interfere with her right to perform her duties;

b.  Defamed Lichter while engaged in unauthorized, unlawful, and unjustifiable actions seeking to prevent her from exercising her rights to freedom of assembly and association;

c.  Unlawfully searched Lichter's emails without a warrant; and

d.  Unlawfully deprived Lichter of her protected rights, privileges, and liberties without due process of law.

587.  At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

588.  Defendants' adversely impacted Lichter's protected rights, privileges, and liberties, and their actions described in paragraph 586, above, triggered state action, caused the state to impose burdens on Lichter or alter her status or rights, and/or caused the state to seek to remove or significantly alter a liberty or property interest of Lichter.

589.  Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to violate Lichter's protected rights,

---

[41] The defamation directed at Lichter is more fully set forth in Counts XVI and XIX, below.

privileges and liberties, and each of them engaged in overt acts in furtherance of their conspiracy that directly injured Lichter and deprived her of having and exercising her protected rights, privileges, and immunities.

590.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful ongoing conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

591.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Lichter suffered and is entitled to recover damages, including damages for economic harm, harm to her reputation, emotional distress, mental anguish, humiliation, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

592.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Lichter suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful misconduct and conspiracy; all of which Lichter is entitled to recover under the wrongful act doctrine.

593.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages Lichter suffered, Lichter has also suffered and will continue to suffer irreparable harm for which there

is no adequate remedy at law if Defendants are not enjoined from violating Lichter's
fundamental rights, privileges and liberties.

594.    Defendants' unlawful conduct and conspiracy is ongoing and likely to
continue and cause additional harm and injuries to Lichter if the Defendants' unlawful
conduct persists

595.    The public interest, most notably the interests of the students and staff of
MCA and their parents, would be served by the entry of an injunction prohibiting
Defendants' unlawful conduct and conspiracy.

596.    Based upon the facts alleged herein and to be established at trial, Lichter
has the clear legal right to the entry of an injunction prohibiting Defendants from
violating Lichter's rights, privileges, and liberties.

597.    Defendants' actions were unjustified, willful, intentional, malicious, and
conducted in bad faith and with the intent to harm Lichter.  Accordingly, Defendants'
actions are not privileged and they entitle Lichter to recover punitive damages.

**WHEREFORE,** Plaintiff, Lichter, demands judgment against Defendants,
Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation,
OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established
at trial;

B.    Special damages under the wrongful act doctrine in appropriate
amounts to be established at trial;

C.    Punitive Damages in appropriate amounts to be established at
trial;

D.    A declaration that Defendants' acts violate 42 U.S.C. §1983;

E.    Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1983;

F.    Reasonable attorneys' fees and costs associated with this action; and

G.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT IV
### [42 U.S.C. §1983—Retaliation Against Lichter]

598.    Lichter re-alleges paragraphs 1 through 546 as if fully set forth herein.

599.    This is an action under 42 U.S.C. §1983 by Lichter against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for retaliating against Lichter for exercising her fundamental rights, privileges, and liberties while acting under color of state law.

600.    As alleged in paragraphs 533-541, Lichter has and holds fundamental rights, privileges, and liberty under the U.S. Constitution and federal law.

601.    Lichter exercised her protected rights, privileges, and liberties by:

a.    Assembling and associating with others on MCA's Governing Board;

b.    Refusing to resign as an MCA Governing Board Member;

c.    Speaking about matters of public concern associated with MCA and the actions taken by Defendants to try to terminate MCA's Charter and Charter Agreement and force the removal of MCA's Governing Board members;

d.    Filing a Complaint with FDOE against CCSB, as set forth in Exhibit D;

      e.      Approving the filing a lawsuit against CCSB to contest its placement of MCA on "Probationary Warning Status" [Collier County Circuit Court Case No 20-CA-3427]; and

      f.      Discharging and performing the duties of her office.

602.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, took adverse action and retaliated against Lichter for exercising her protected rights, privileges, and liberties by:

      a.      Unlawfully trying and conspiring to force her removal as an MCA Governing Board Member;

      b.      Engaging in and conspiring to engage in crimes against Lichter intended to force her removal as a member of MCA's Governing Board;

      c.      Unlawfully searching her emails without a warrant;

      d.      Defaming[42] Lichter; and

      e.      Filing meritless lawsuits and claims against Lichter, including those set forth in Exhibits E, G, and H and paragraph 480, 508, 510, and 513.

603.   Defendants singled out Lichter for discriminatory treatment on an irrational and wholly arbitrary basis and were motivated by spite and without any legitimate objective.

604.   Defendants' retaliatory actions adversely affected Lichter's protected activities.

---

[42] The defamation directed at Lichter is more fully set forth in Counts XVI and XIX, below.

605.    Defendants' retaliatory actions against Lichter were causally connected to her protected activities.

606.    Defendants' acts amounted to a threat, coercion, or intimidation through intimating that punishment, sanctions, or adverse regulatory action would immediately follow.

607.    Defendants' retaliatory actions would likely deter a person of ordinary firmness from exercising the fundamental rights, privileges, and liberties Lichter exercised.

608.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

609.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, unlawfully deprived Lichter of her protected rights, privileges, and liberties without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

610.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to retaliate against Lichter, and each of them engaged in overt acts in furtherance of their conspiracy that directly injured

Lichter and deprived her of having and exercising her protected rights, privileges, and immunities.

611.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful ongoing conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

612.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Lichter suffered and is entitled to recover damages, including damages for economic harm and harm to her reputation, emotional distress, mental anguish, humiliation, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

613.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Lichter suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful retaliation and conspiracy; all of which Lichter is entitled to recover under the wrongful act doctrine.

614.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages Lichter suffered, she has also suffered and will continue to suffer irreparable harm for which there is no

adequate remedy at law if Defendants are not enjoined from violating Lichter's fundamental rights, privileges and liberties.

615.   Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to Lichter if the Defendants' unlawful conduct persists

616.   The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

617.   Based upon the facts alleged herein and to be established at trial, Lichter has the clear legal right to the entry of an injunction prohibiting Defendants from violating her rights, privileges, and liberties.

618.   Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Lichter.  Accordingly, Defendants' actions are not privileged and they entitle Lichter to recover punitive damages.

**WHEREFORE,** Plaintiff, Lichter, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established at trial;

B.    Special damages in appropriate amounts to be established at trial;

C.    Punitive damages in appropriate amounts to be established at trial

D.    A declaration that Defendants' acts violate 42 U.S.C. §1983;

E.     Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1983;

F.     Mandatory injunctive relief requiring Defendants to dismiss their retaliatory claims and lawsuits filed against Lichter;

G.     Reasonable attorneys' fees and costs associated with this action; and

H.     Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT V
### [42 U.S.C. §1983—Violation Of Bolduc's Civil Rights]

619.    Bolduc re-alleges paragraphs 1 through 546 as if fully set forth herein.

620.    This is an action under 42 U.S.C. §1983 by Bolduc against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for violating and depriving him of his fundamental rights, privileges, and liberty while acting under color of state law.

621.    As alleged in paragraphs 533-541, Bolduc has and holds protected rights, privileges, and liberties under the U.S. Constitution and Federal law.

622.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, violated Bolduc's protected rights, privileges, and liberties by engaging in the conduct identified in paragraphs 336-529, above, which:

a.    Defamed[43] Bolduc while engaged in unauthorized, unlawful, and unjustifiable actions seeking to force his removal from MCA's Governing Board;

b.    Defamed Bolduc while engaged in unauthorized, unlawful, and unjustifiable actions seeking to prevent him from exercising his rights to freedom of assembly and association;

c.    Searched Bolduc's emails without a warrant; and

d.    Unlawfully deprived Bolduc of his protected rights, privileges, and liberties without probable cause and due process of law.

623.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

624.    Defendants adversely impacted Bolduc's protected rights, privileges, and liberties, and their actions described in paragraph 622, above, triggered state action, caused the state to impose burdens on Bolduc or alter his status or rights, and/or caused the state to seek to remove or significantly alter a liberty or property interest of Bolduc.

625.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to violate Bolduc's protected rights, privileges and liberties, and each of them engaged in overt acts in furtherance of their

---

[43] The defamation directed at Bolduc is more fully set forth in Counts XVII and XX, below.

conspiracy that directly injured Bolduc and deprived him of having and exercising his protected rights, privileges, and immunities.

626.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their ongoing unlawful conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

627.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Bolduc suffered and is entitled to recover damages, including damages for economic harm, harm to his reputation, emotional distress, mental anguish, humiliation, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

628.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Bolduc suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful misconduct and conspiracy; all of which Bolduc is entitled to recover under the wrongful act doctrine.

629.   As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages Bolduc suffered, Bolduc has also suffered and will continue to suffer irreparable harm for which there

is no adequate remedy at law if Defendants are not enjoined from violating his fundamental rights, privileges and liberties.

630.   Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to Bolduc if the Defendants' unlawful conduct persists.

631.   The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

632.   Based upon the facts alleged herein and to be established at trial, Bolduc has the clear legal right to the entry of an injunction prohibiting Defendants from violating Bolduc's rights, privileges, and liberties.

633.   Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Bolduc.  Accordingly, Defendants' actions are not privileged and they entitle Bolduc to recover punitive damages.

**WHEREFORE,** Plaintiff, Bolduc, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.   Compensatory damages in appropriate amounts to be established at trial;

B.   Special damages under the wrongful act doctrine in appropriate amounts to be established at trial;

C.   Punitive Damages in appropriate amounts to be established at trial;

D.    A declaration that Defendants' acts violate 42 U.S.C. §1983;

E.    Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1983;

F.    Reasonable attorneys' fees and costs associated with this action; and

G.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## <u>COUNT VI</u>
### [42 U.S.C. §1983—Retaliation Against Bolduc]

634.    Bolduc re-alleges paragraphs 1 through 546 as if fully set forth herein.

635.    This is an action under 42 U.S.C. §1983 by Bolduc against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for retaliating against Bolduc for exercising his fundamental rights, privileges, and liberties while acting under color of state law.

636.    As alleged in paragraphs 533-541, Bolduc has and holds fundamental rights, privileges, and liberty under the U.S. Constitution and federal law.

637.    Bolduc exercised his protected rights, privileges, and liberties by:

a.    Assembling and associating with others on MCA's Governing Board;

b.    Refusing to resign as an MCA Governing Board Member;

c.    Speaking about matters of public concern associated with MCA and the actions taken by Defendants to try to terminate MCA's Charter and Charter Agreement and force the removal of MCA's Governing Board members;

d.    Speaking in defense of MCA at public CCSB Board Meetings;

e.   Approving the filing a lawsuit against CCSB to contest its placement of MCA on "Probationary Warning Status" [Collier County Circuit Court Case No 20-CA-3427]; and

f.   Discharging and performing the duties of his office.

638.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, took adverse action and retaliated against Bolduc for exercising his protected rights, privileges, and liberties by:

a.   Unlawfully trying and conspiring to force his removal as an MCA Governing Board Member;

b.   Engaging in and conspiring to engage in crimes against Bolduc intended to force his removal as a member of MCA's Governing Board;

c.   Unlawfully searching his emails without a warrant;

d.   Defaming[44] Bolduc; and

e.   Filing meritless lawsuits, complaints, and claims against Bolduc, including those set forth in Exhibits F and G and paragraphs 440, 478, 480, 510, and 513.

639.   Defendants singled out Bolduc for discriminatory treatment on an irrational and wholly arbitrary basis and were motivated by spite and without any legitimate objective.

640.   Defendants' retaliatory actions adversely affected Bolduc's protected activities.

---

[44] The defamation directed at Bolduc is more fully set forth in Counts XVII and XX, below.

641.    Defendants' retaliatory actions against Bolduc were causally connected to his protected activities.

642.    Defendants' retaliatory acts amounted to a threat, coercion, or intimidation through intimating that punishment, sanctions, or adverse regulatory action would immediately follow.

643.    Defendants' retaliatory actions would likely deter a person of ordinary firmness from exercising the fundamental rights, privileges, and liberties Bolduc exercised.

644.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

645.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, unlawfully deprived Bolduc of his protected rights, privileges, and liberties without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

646.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to retaliate against Bolduc and each of them engaged in overt acts in furtherance of their conspiracy that directly injured

Bolduc and deprived him of having and exercising his protected rights, privileges, and immunities.

647.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful ongoing conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

648.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Bolduc suffered and is entitled to recover damages, including damages for economic harm and harm to his reputation, emotional distress, mental anguish, humiliation, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

649.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Bolduc suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful retaliation and conspiracy; all of which Bolduc is entitled to recover under the wrongful act doctrine.

650.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages Bolduc suffered, he has also suffered and will continue to suffer irreparable harm for which there is no

adequate remedy at law if Defendants are not enjoined from violating his fundamental rights, privileges and liberties.

651.    Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to Bolduc if the Defendants' unlawful conduct persists

652.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

653.    Based upon the facts alleged herein and to be established at trial, Bolduc has the clear legal right to the entry of an injunction prohibiting Defendants from violating his rights, privileges, and liberties.

654.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Bolduc.  Accordingly, Defendants' actions are not privileged and they entitle Bolduc to recover punitive damages.

**WHEREFORE,** Plaintiff, Bolduc, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established at trial;

B.    Special damages in appropriate amounts to be established at trial;

C.    Punitive damages in appropriate amounts to be established at trial

D.    A declaration that Defendants' acts violate 42 U.S.C. §1983;

E.     Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1983;

F.     Mandatory injunctive relief requiring Defendants to dismiss their retaliatory claims and lawsuits filed against Bolduc;

G.     Reasonable attorneys' fees and costs associated with this action; and

H.     Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT VII
## [VIOLATION OF 42 U.S.C. §1985—MCA vs. Defendants]

655.    MCA re-alleges paragraphs 1 through 546 as if fully set forth herein.

656.    This is an action under 42 U.S.C. §1985 by MCA against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for conspiracy to interfere with MCA's civil rights.

657.    As alleged in paragraphs 533-541, MCA has a legally protected interest in its Charter and its right to operate a charter school.  MCA also possesses rights of equal protection and due process under the Fourteenth Amendment.  In its operation of a charter school, MCA has duties and obligations to uphold the U.S. Constitution and laws of the United States, and therefore occupies an office, trust, or place of confidence under the United States

658.    MCA has a corresponding federal right to be free from interference with the performance of its duties.

266

659.    Defendants unlawfully conspired to prevent, by intimidation or threat, MCA from discharging the duties of its office, to injure MCA in its person or property on account of the lawful discharge of the duties of its office or while engaged in the lawful discharge thereof, and unlawfully conspired to injure MCA's property so as to interrupt, hinder, or impede it in the discharge of its official duties.

660.    Defendants' conspiracy alleged herein violates 42 U.S.C. §1985(1).

661.    Defendants' actions and conspiracy adversely affected MCA's protected rights.

662.    Defendants' acts amounted to a threat, coercion, or intimidation through intimating that punishment, sanctions, or adverse regulatory action would immediately follow.

663.    Defendants' actions would likely deter a person of ordinary firmness from exercising the fundamental rights, privileges, and liberties MCA exercised.

664.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

665.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, unlawfully conspired to interfere with MCA's protected rights, privileges, and liberties without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

666.    As alleged above, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to interfere with and prevent, injure, interrupt, hinder, or impede MCA's rights, privileges and liberties, and each of them engaged in overt acts in furtherance of their conspiracy that directly injured MCA.

667.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

668.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, MCA suffered and is entitled to recover damages, including damages for economic harm and harm to its reputation, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

669.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, MCA suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful conspiracy; all of which MCA is entitled to recover under the wrongful act doctrine.

670.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages MCA suffered, it has also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating its fundamental rights, privileges and liberties.

671.    Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to MCA if the Defendants' unlawful conduct persists

672.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

673.    Based upon the facts alleged herein and to be established at trial, MCA has the clear legal right to the entry of an injunction prohibiting Defendants from violating its rights, privileges, and liberties.

674.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm MCA.  Accordingly, Defendants' actions are not privileged and they entitle MCA to recover punitive damages.

**WHEREFORE,** Plaintiff, MCA, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

    A.    Compensatory damages in appropriate amounts to be established at trial;

B.    Special damages in appropriate amounts to be established at trial

C.    Punitive damages in appropriate amounts to be established at trial

D.    A declaration that Defendants' acts violate 42 U.S.C. §1985(1);

E.    Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1985(1);

F.    Reasonable attorneys' fees and costs associated with this action; and

G.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT VIII
### [VIOLATION OF 42 U.S.C. §1985—Lichter vs. Defendants]

675.    Lichter re-alleges paragraphs 1 through 546 as if fully set forth herein.

676.    This is an action under 42 U.S.C. §1985 by Lichter against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for conspiracy to interfere with her civil rights.

677.    As alleged in paragraphs 533-541, Lichter has a legally protected interest in her position as an MCA Governing Board member and possesses rights of equal protection and due process under the Fourteenth Amendment.    As an MCA Governing Board Member, Lichter has duties and obligations to uphold the U.S. Constitution and laws of the United States, and therefore occupies an office, trust, or place of confidence under the United States

678.    Lichter has a corresponding federal right to be free from interference with the performance of her duties.

679.    Defendants unlawfully conspired to prevent, by intimidation or threat, Lichter from discharging the duties of her office, to injure Lichter in her person or property on account of the lawful discharge of the duties of her office or while engaged in the lawful discharge thereof, and unlawfully conspired to injure Lichter's property so as to interrupt, hinder, or impede her in the discharge of her official duties.

680.    Defendants' conspiracy alleged herein violates 42 U.S.C. §1985(1).

681.    Defendants' actions and conspiracy adversely affected Lichter's protected rights.

682.    Defendants' acts amounted to a threat, coercion, or intimidation through intimating that punishment, sanctions, or adverse regulatory action would immediately follow.

683.    Defendants' actions would likely deter a person of ordinary firmness from exercising the fundamental rights, privileges, and liberties Lichter exercised.

684.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

685.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, unlawfully conspired to interfere with Lichter's protected rights, privileges, and liberties without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

686.    As alleged above, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to interfere with and prevent, injure, interrupt, hinder, or impede Lichter's protected rights, privileges and liberties, and each of them engaged in overt acts in furtherance of their conspiracy that directly injured Lichter.

687.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

688.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Lichter suffered and is entitled to recover damages, including damages for economic harm and harm to her reputation, emotional distress, mental anguish, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

689.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Lichter suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful conspiracy; all of which Lichter is entitled to recover under the wrongful act doctrine.

690.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages Lichter suffered, she has also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating her fundamental rights, privileges and liberties.

691.    Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to Lichter if the Defendants' unlawful conduct persists

692.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

693.    Based upon the facts alleged herein and to be established at trial, Lichter has the clear legal right to the entry of an injunction prohibiting Defendants from violating her rights, privileges, and liberties.

694.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Lichter.  Accordingly, Defendants' actions are not privileged and they entitle Lichter to recover punitive damages.

**WHEREFORE,** Plaintiff, Lichter, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established
at trial;

B.     Special damages in appropriate amounts to be established at trial;

C.     Punitive damages in appropriate amounts to be established at trial;

D.     A declaration that Defendants' acts violate 42 U.S.C. §1985(1);

E.     Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1985(1);

F.     Reasonable attorneys' fees and costs associated with this action; and

G.     Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT IX
### [VIOLATION OF 42 U.S.C. §1985—Bolduc vs. Defendants]

695.   Plaintiffs re-alleges paragraphs 1 through 546 as if fully set forth herein.

696.   This is an action under 42 U.S.C. §1985 by Bolduc against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for conspiracy to interfere with his civil rights.

697.   As alleged in paragraphs 533-541, Bolduc has a legally protected interest in his position as an MCA Governing Board member and possesses rights of equal protection and due process under the Fourteenth Amendment.  As an MCA Governing Board Member, Bolduc has duties and obligations to uphold the U.S. Constitution and laws of the United States, and therefore occupies an office, trust, or place of confidence under the United States

698.   Bolduc has a corresponding federal right to be free from interference with the performance of his duties.

274

699.    Defendants unlawfully conspired to prevent, by intimidation or threat, Bolduc from discharging the duties of his office, to injure Bolduc in his person or property on account of the lawful discharge of the duties of his office or while engaged in the lawful discharge thereof, and unlawfully conspired to injure Bolduc's property so as to interrupt, hinder, or impede him in the discharge of his official duties.

700.    Defendants' conspiracy alleged herein violates 42 U.S.C. §1985(1).

701.    Defendants' actions and conspiracy adversely affected Bolduc's protected rights.

702.    Defendants' acts amounted to a threat, coercion, or intimidation through intimating that punishment, sanctions, or adverse regulatory action would immediately follow.

703.    Defendants' actions would likely deter a person of ordinary firmness from exercising the fundamental rights, privileges, and liberties Bolduc exercised.

704.    At all times material, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, and Yormak, acted under color of state law and/or were jointly engaged or acted in conspiracy with state officials.

705.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, unlawfully conspired to interfere with Bolduc's protected rights, privileges, and liberties without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

706.    As alleged above, Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired with each other and others to interfere with and prevent, injure, interrupt, hinder, or impede Bolduc's protected rights, privileges and liberties, and each of them engaged in overt acts in furtherance of their conspiracy that directly injured Bolduc.

707.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are jointly and severally liable for all harms flowing from their unlawful conspiracy, including the acts of each conspirator and all acts committed in furtherance of the conspiracy, regardless of whether such acts were specifically approved or known to the other conspirators.

708.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Bolduc suffered and is entitled to recover damages, including damages for economic harm and harm to his reputation, emotional distress, mental anguish, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

709.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, Bolduc suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful conspiracy; all of which Bolduc is entitled to recover under the wrongful act doctrine.

710.    As a direct and proximate result of Defendants' unlawful conduct and conspiracy, and in addition to the quantifiable monetary damages Bolduc suffered, he has also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating his fundamental rights, privileges and liberties.

711.    Defendants' unlawful conduct and conspiracy is ongoing and likely to continue and cause additional harm and injuries to Bolduc if the Defendants' unlawful conduct persists

712.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Defendants' unlawful conduct and conspiracy.

713.    Based upon the facts alleged herein and to be established at trial, Bolduc has the clear legal right to the entry of an injunction prohibiting Defendants from violating his rights, privileges, and liberties.

714.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Bolduc.  Accordingly, Defendants' actions are not privileged and they entitle Bolduc to recover punitive damages.

**WHEREFORE,** Plaintiff, Bolduc, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory damages in appropriate amounts to be established at trial;

B.     Special damages in appropriate amounts to be established at trial;

C.     Punitive damages in appropriate amounts to be established at trial;

D.     A declaration that Defendants' acts violate 42 U.S.C. §1985(1);

E.     Injunctive relief prohibiting Defendants from violating 42 U.S.C. §1985(1);

F.     Reasonable attorneys' fees and costs associated with this action; and

G.     Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT X
## [VIOLATION OF 42 U.S.C. §1986]

715.   Plaintiffs re-alleges paragraphs 1 through 546 as if fully set forth herein.

716.   This is an action under 42 U.S.C. §1986 by MCA, Lichter, and Bolduc against Defendant, Fishbane, for neglecting to prevent the violations of and conspiracy to interfere with Plaintiffs' civil rights set forth in Counts I-IX, above.

717.   Defendants entered into a conspiracy to violate 42 U.S.C. §1985.

718.   42 U.S.C. §1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action…

719.   Fishbane had knowledge that wrongs conspired to be done against Plaintiffs in violation of 42 U.S.C. §1985 were about to be committed and had the power to prevent or aid in preventing the commission of those wrongs.

720.   Despite that knowledge, Fishbane neglected and/or refused to prevent or aid in preventing the wrongs from being committed.

721.   As a direct and proximate result of Fishbane's misconduct, Plaintiffs suffered and are entitled to recover damages, including damages for economic harm and harm to their reputation, emotional distress, mental anguish, and loss of enjoyment of life, all of which are continuing in nature and will continue into the future, in amounts to be proven at trial.

722.   As a direct and proximate result of Fishbane's misconduct, Plaintiffs suffered and incurred significant damages, including costs, attorneys' fees, expenses, time, energy and resources, and other valuable efforts to protect and defend against Defendants' unlawful conspiracy; all of which Plaintiffs are entitled to recover under the wrongful act doctrine.

723.   As a direct and proximate result of Fishbane's misconduct, and in addition to the quantifiable monetary damages Plaintiffs suffered, they have also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Fishbane is not enjoined from violating 42 U.S.C. § 1986.

724.   Fishbane's conduct is ongoing and likely to continue and cause additional harm and injuries to Plaintiffs if Fishbane's misconduct persists

725.    The public interest, most notably the interests of the students and staff of MCA and their parents, would be served by the entry of an injunction prohibiting Fishbane's misconduct.

726.    Based upon the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of an injunction prohibiting Fishbane from violating 42 U.S.C. § 1986.

727.    Fishbane's actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Plaintiffs.    Accordingly, Defendants' actions are not privileged and they entitle Plaintiffs to recover punitive damages.

**WHEREFORE,** Plaintiffs, MCA, Lichter, and Bolduc, demand judgment against Defendant, Fishbane, awarding:

A.    Compensatory damages in appropriate amounts to be established at trial;

B.    Special damages in appropriate amounts to be established at trial;

C.    Punitive damages in appropriate amounts to be established at trial;

D.    A declaration that Fishbane's acts and failures to act violate 42 U.S.C. §1986;

E.    Injunctive relief prohibiting Fishbane from violating 42 U.S.C. §1986;

F.    Reasonable attorneys' fees and costs associated with this action; and

G.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XI
### [RICO—18 U.S.C. § 1964]

728.  Plaintiffs realleges paragraphs 1 through 532 as if fully set forth herein.

729.  This is an action by Plaintiffs against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, under 18 U.S.C. § 1964.

730.  Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are employed by or associated with an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct and functioned as a continuing unit (the "Optima Enterprise").

731.  The Optima Enterprise and its activities affected interstate commerce.

732.  Each of the Defendants conducted or participated in, directly or indirectly, the conduct of the Optima Enterprise's affairs by engaging in a pattern of racketeering activity consisting of the acts described in paragraphs 530-532, above, at least two of which had the same or similar intents, results, accomplices, victims, and/or methods of commission, and were not isolated incidents.

733.  The pattern of racketeering activity described in paragraphs 530-532, above, occurred over an extended period of time and is also ongoing in nature and likely to extend into the future.

734.  The pattern of racketeering activity described in paragraphs 530-532, above, was committed in furtherance of the affairs of the Optima Enterprise.

735.   Defendants were able to commit the acts comprising the pattern of racketeering activity described in paragraphs 530-532, above, because of their positions in or associations with the Optima Enterprise or involvement in or control over the affairs of the Optima Enterprise.

736.   Defendants each had the specific intent to either personally engage in at least two incidents of racketeering activity or specifically intended to otherwise participate in the affairs of the Optima Enterprise with knowledge and intent that other members of the Optima Enterprise would engage in at least two incidents of racketeering activity.

737.   As a direct and proximate result of Defendants' racketeering activities, Plaintiffs suffered injury to their business and property and are entitled to recover treble damages.

738.   As a direct and proximate result of Defendants racketeering activities, and in addition to the quantifiable monetary damages Plaintiffs suffered, Plaintiffs have also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined.

739.   Defendants' unlawful conduct is ongoing and likely to continue, and continued injuries will result if the Defendants' unlawful conduct persists

740.   The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful conduct.

741.    Based upon the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of a permanent injunction prohibiting Defendants from violating 18 U.S.C. 1962(a)-(c).

742.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Plaintiffs.    Accordingly, Defendants' actions are not privileged.

**WHEREFORE,** Plaintiffs, MCA, Lichter, and Bolduc, demand judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Treble damages in appropriate amounts to be established at trial;

B.    Injunctive relief prohibiting Defendants from engaging in violations of 18 U.S.C. § 1962;

C.    Attorneys' Fees and Costs associated with this action; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XII
## [RICO CONSPIRACY—18 U.S.C. § 1964]

743.    Plaintiffs realleges paragraphs 1 through 532 as if fully set forth herein.

744.    This is an action under 18 U.S.C. § 1964 by Plaintiffs against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for a conspiracy to violate 18 U.S.C. § 1962 (C).

745. Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are employed by or associated with an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct and functioned as a continuing unit (the "Optima Enterprise").

746. The Optima Enterprise and its activities affected interstate commerce.

747. Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired to conduct or participate in, directly or indirectly, the conduct of the Optima Enterprise by engaging in a pattern of racketeering activity consisting of the acts described in paragraphs 530-532, above, at least two of which had the same or similar intents, results, accomplices, victims, and/or methods of commission, and were not isolated incidents.

748. The pattern of racketeering activity described in paragraphs 530-532, above, occurred over an extended period of time and is also ongoing in nature and likely to extend into the future.

749. The pattern of racketeering activity described in paragraphs 530-532, above, was committed in furtherance of the affairs of the Optima Enterprise.

750. As a direct and proximate result of Defendants' pattern of racketeering activity described in paragraphs 530-532 and conspiracy, Plaintiffs suffered injury to their business and property and are entitled to recover treble damages.

751.  As a direct and proximate result of Defendants' pattern of racketeering activity described in paragraphs 530-532 and conspiracy, and in addition to the quantifiable monetary damages Plaintiffs suffered, Plaintiffs have also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined.

752.  Defendants' unlawful conduct is ongoing and likely to continue, and continued injuries will result if the Defendants' unlawful conduct persists

753.  The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful conduct.

754.  Based upon the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of a permanent injunction prohibiting Defendants from violating 18 U.S.C. 1962(D).

755.  Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Plaintiffs.   Accordingly, Defendants' actions are not privileged.

**WHEREFORE,** Plaintiffs, MCA, Lichter, and Bolduc, demand judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Treble damages in appropriate amounts to be established at trial;

B.    Injunctive relief prohibiting Defendants from engaging in violations of 18 U.S.C. § 1962(D);

C.    Attorneys' Fees and Costs associated with this action; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XIII
## [CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT]

756.   Plaintiffs realleges paragraphs 1 through 532 as if fully set forth herein.

757.   This is an action by Plaintiffs against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, under § 772.104, *Florida Statutes*.

758.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are employed by or associated with an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct and functioned as a continuing unit (the "Optima Enterprise")..

759.   Each of the Defendants conducted or participated in, directly or indirectly, the conduct of the Optima Enterprise through a pattern of criminal activity consisting of acts described in paragraphs 530-532, above, at least two of which had the same or similar intents, results, accomplices, victims, and/or methods of commission, and were not isolated incidents:

760.   The pattern of criminal activity described in paragraphs 530-532, above, occurred over an extended period of time and is also ongoing in nature and likely to extend into the future.

761.    The pattern of criminal activity described in paragraphs 530-532, above, was committed in furtherance of the affairs of the Optima Enterprise.

762.    Defendants were able to commit the acts comprising the pattern of criminal activity described in paragraphs 530-532, above, because of their positions in or associations with the Optima Enterprise or involvement in or control over the affairs of the Optima Enterprise.

763.    Defendants each had the specific intent to either personally engage in at least two incidents of criminal activity or specifically intended to otherwise participate in the affairs of the Optima Enterprise with knowledge and intent that other members of the Optima Enterprise would engage in at least two incidents of criminal activity.

764.    As a direct and proximate result of Defendants' criminal activities, Plaintiffs suffered injury to their business and property and are entitled to recover treble damages.

765.    As a direct and proximate result of Defendants actions, and in addition to the quantifiable monetary damages Plaintiff suffered, Plaintiffs have also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating section 772.103, *Florida Statutes*.

766.    Defendants' unlawful conduct is ongoing and likely to continue, and continued injuries will result if the Defendants' unlawful conduct persists.

767.    The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful conduct.

768.    Based upon the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of a permanent injunction prohibiting Defendants from violating section 772.103, *Florida Statutes*.

769.    Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Plaintiffs.    Accordingly, Defendants' actions are not privileged.

**WHEREFORE,** Plaintiffs, MCA, Lichter, and Bolduc,  Kelly Lichter, demand judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Treble damages in appropriate amounts to be established at trial;

B.    Injunctive relief prohibiting Defendants from violating § 772.103, *Fla. Stat.*;

C.    Attorneys' Fees and Costs associated with this action; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XIV
## [CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT--CONSPIRACY]

770.    Plaintiffs realleges paragraphs 1 through 532 as if fully set forth herein.

771.    This is an action under § 772.104, *Florida Statutes*, by Plaintiffs against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, for a conspiracy to violate  § 772.103(3), *Florida Statutes*.

772.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, are employed by or associated with an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct and functioned as a continuing unit (the "Optima Enterprise").

773.   Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, conspired or endeavored to conduct or participate in, directly or indirectly, the conduct of the Optima Enterprise by engaging in a pattern of criminal activity consisting of acts described in paragraphs 530-532, at least two of which had the same or similar intents, results, accomplices, victims, and/or methods of commission, and were not isolated incidents:

774.   The pattern of criminal activity described in paragraphs 530-532, above, occurred over an extended period of time and is also ongoing in nature and likely to extend into the future.

775.   The pattern of criminal activity described in paragraphs 530-532, above, was committed in furtherance of the affairs of the Optima Enterprise.

776.   As a direct and proximate result of Defendants' criminal activity described in paragraphs 530-532 and conspiracy, Plaintiffs suffered injury to their business and property and are entitled to recover treble damages.

777.   As a direct and proximate result of Defendants criminal activity described in paragraphs 530-532 and conspiracy,, and in addition to the quantifiable

monetary damages Plaintiff suffered, Plaintiffs have also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from violating section 772.103, *Florida Statutes*.

778.   Defendants' unlawful conduct is ongoing and likely to continue, and continued injuries will result if the Defendants' unlawful conduct persists.

779.   The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful conduct.

780.   Based upon the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of a permanent injunction prohibiting Defendants from violating section 772.103, *Florida Statutes*.

781.   Defendants' actions were unjustified, willful, intentional, malicious, and conducted in bad faith and with the intent to harm Plaintiffs.   Accordingly, Defendants' actions are not privileged.

**WHEREFORE,** Plaintiffs, MCA, Lichter, and Bolduc,  Kelly Lichter, demand judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.   Treble damages in appropriate amounts to be established at trial;

B.   Injunctive relief prohibiting Defendants from violating § 772.103, *Fla. Stat.*;

C.   Attorneys' Fees and Costs associated with this action; and

D.   Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XV
### [DEFAMATION—MCA vs Defendants]

748. Plaintiff realleges paragraphs 1 through 546 as if fully set forth herein

749. Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, published, caused to be published, and/or directed or encouraged others to publish, false and defamatory statements alleged in paragraphs 429, 434, 439, 445, 447, 456, 465, 483, 487, 492, 497, and 504,which did expose and had the tendency to expose MCA to hatred, contempt, ridicule and disgrace.

750. Defendants' false and defamatory statements are of and concerning MCA and reasonably understood to be about MCA.

751. The Defendants' defamatory statements about MCA are false.

752. Defendants published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

753. The Defendants' false and defamatory statements are defamatory *per se* because they charged that MCA committed crimes and tended to injure MCA in its trade, business or profession.

754. In light of MCA's standing in the community, the nature of the statements, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as MCA, Defendants directly and proximately caused MCA to suffer significant damages, including substantial reputational harm

which is ongoing in nature and will be suffered in the future.  MCA is also entitled to recover damages for the costs associated with repairing its reputation and/or correcting the defamatory statements.

755.   Re-publication of the Defendants' defamatory statements in other publications, online, and through social media, caused MCA to suffer additional damages; all of which were foreseeable.

756.   The Defendants acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm MCA, or in blatant disregard of the substantial likelihood of causing MCA harm.

757.   As a direct and proximate result of Defendants' tortious conduct, MCA is entitled to compensatory and special damages in amounts to be proven at trial.

758.   As a direct and proximate result of the Defendants' tortious conduct, and in addition to the quantifiable monetary damages MCA suffered, MCA has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

759.   Based upon the facts alleged herein, MCA has the clear legal right to the entry of an injunction prohibiting Defendants from publishing and republishing the defamatory statements.

760.   The public interest would be served by the entry of an injunction prohibiting Defendants' tortious conduct.

761.    Based upon the facts alleged herein and to be established at trial, MCA has the clear legal right to the entry of a permanent injunction prohibiting Defendants from publishing and republishing the defamatory statements.

762.    Defendants' actions were willful, intentional, malicious, and conducted in bad faith and with the intent to harm MCA.  Accordingly, Defendants' actions were not privileged and they entitle MCA to recover punitive damages.

**WHEREFORE,** Plaintiff, Mason Classical Academy, Inc., demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory and special damages in appropriate amounts to be established at trial;

B.    Punitive Damages;

C.    Injunctive relief prohibiting Defendants from publishing and republishing the defamatory statements; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XVI
### [DEFAMATION—Lichter vs Defendants]

763.    Plaintiff realleges paragraphs 1 through 546 as if fully set forth herein.

764.    Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak published, caused to be published, and/or directed or encouraged others to publish false and defamatory statements alleged in paragraphs 439, 443, 445, 447, 456,

462, 465, 481, 483, 487, 492, 497, 500, and 506,which did expose and had the tendency to expose Lichter to hatred, contempt, ridicule and disgrace.

765.    Defendants' false and defamatory statements are of and concerning Lichter and reasonably understood to be about Lichter.

766.    The Defendants' defamatory statements about Lichter are false.

767.    Defendants published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

768.    The Defendants' false and defamatory statements are defamatory *per se* because they charged that Lichter committed crimes and tended to injure Lichter in her trade, business or profession.

769.    In light of Lichter's standing in the community, the nature of the statements, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Lichter, the Defendants directly and proximately caused her to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Lichter is also entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statements.

770.    Lichter also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Defendants' false and defamatory statements.

771.   Re-publication of the Defendants' defamatory statements in other publications, online, and through social media, caused Lichter to suffer additional damages; all of which were foreseeable.

772.   The Defendants acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Lichter, or in blatant disregard of the substantial likelihood of causing Lichter harm.

773.   As a direct and proximate result of Defendants' tortious conduct, Lichter is entitled to compensatory and special damages in amounts to be proven at trial.

774.   As a direct and proximate result of the Defendants' tortious conduct, and in addition to the quantifiable monetary damages Lichter suffered, she has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

775.   Based upon the facts alleged herein, Lichter has the clear legal right to the entry of an injunction prohibiting Defendants from publishing and republishing the defamatory statements.

776.   The public interest would be served by the entry of an injunction prohibiting Defendants' tortious conduct.

777.   Based upon the facts alleged herein and to be established at trial, Lichter has the clear legal right to the entry of a permanent injunction prohibiting Defendants from publishing and republishing the defamatory statements.

778.   Defendants' actions were willful, intentional, malicious, and conducted in bad faith and with the intent to harm Lichter.  Accordingly, Defendants' actions were not privileged and they entitle her to recover punitive damages.

**WHEREFORE,** Plaintiff, Kelly Lichter, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.  Compensatory and special damages in appropriate amounts to be established at trial;

B.  Punitive damages in appropriate amounts to be established at trial;

C.  Injunctive relief prohibiting Defendants from publishing and republishing the defamatory statements; and

D.  Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XVII
### [DEFAMATION—Bolduc vs. Defendants]

779.  Plaintiff realleges paragraphs 1 through 546 as if fully set forth herein.

780.  Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, published, caused to be published, and/or directed or encouraged others to publish false and defamatory statements alleged in paragraphs 429, 434, 439, 442,443, 445, 447, 456, 473, 483, 489, 497, and 506,which did expose and had the tendency to expose Bolduc to hatred, contempt, ridicule and disgrace.

781.  Defendants' false and defamatory statements are of and concerning Bolduc and reasonably understood to be about Bolduc.

782.  The Defendants' defamatory statements about Bolduc are false.

783.   Defendants published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

784.   The Defendants' false and defamatory statements are defamatory *per se* because they charged that Bolduc committed crimes and tended to injure him in his trade, business or profession.

785.   In light of Bolduc's standing in the community, the nature of the statements, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Bolduc, the Defendants directly and proximately caused him to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Bolduc is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements.

786.   Bolduc also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Defendants' false and defamatory statements.

787.   Re-publication of the Defendants' defamatory statements in other publications, online, and through social media, caused Bolduc to suffer additional damages; all of which were foreseeable.

788.   The Defendants acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Bolduc, or in blatant disregard of the substantial likelihood of causing him harm.

789.    As a direct and proximate result of Defendants' tortious conduct, Bolduc is entitled to compensatory and special damages in amounts to be proven at trial.

790.    As a direct and proximate result of the Defendants' tortious conduct, and in addition to the quantifiable monetary damages Bolduc suffered, he has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

791.    Based upon the facts alleged herein, Bolduc has the clear legal right to the entry of an injunction prohibiting Defendants from publishing and republishing the defamatory statements.

792.    The public interest would be served by the entry of an injunction prohibiting Defendants' tortious conduct.

793.    Based upon the facts alleged herein and to be established at trial, Bolduc has the clear legal right to the entry of a permanent injunction prohibiting Defendants from publishing and republishing the defamatory statements.

794.    Defendants' actions were willful, intentional, malicious, and conducted in bad faith and with the intent to harm Bolduc.  Accordingly, Defendants' actions were not privileged and they entitle him to recover punitive damages.

**WHEREFORE,** Plaintiff, David Bolduc, demands judgment against Defendants, Arnn, Hillsdale, Fishbane, Rep. Donalds, E. Donalds, Optima Foundation, OptimaEd, Mathias, Phoenix, Durst, Lewis, Vickaryous, and Yormak, awarding:

A.    Compensatory and special damages in appropriate amounts to be established at trial;

B.    Punitive damages in appropriate amounts to be established at trial;

C.    Injunctive relief prohibiting Defendants from publishing and republishing the defamatory statements; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XVIII
**[DEFAMATION—MCA vs E. Donalds, Optima Foundation, and OptimaEd]**

795.    Plaintiff realleges paragraphs 1 through 546 as if fully set forth herein

796.    Defendants, E. Donalds, Optima Foundation, and OptimaEd, , published, caused to be published, and/or directed or encouraged others to publish false and defamatory statements alleged in paragraph 527,which did expose and had the tendency to expose MCA to hatred, contempt, ridicule and disgrace.

797.    Defendants' false and defamatory statements are of and concerning MCA and reasonably understood to be about MCA.

798.    The Defendants' defamatory statements about MCA are false.

799.    Defendants published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

800.    The Defendants' false and defamatory statements are defamatory *per se* because they charged that MCA committed crimes and tended to injure MCA in its trade, business or profession.

801.    In light of MCA's standing in the community, the nature of the statements, the extent to which the statements were circulated, and the tendency of the

statements to injure someone such as MCA, Defendants directly and proximately caused MCA to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future. MCA is also entitled to recover damages for the costs associated with repairing its reputation and/or correcting the defamatory statements.

802. Re-publication of the Defendants' defamatory statements in other publications, online, and through social media, caused MCA to suffer additional damages; all of which were foreseeable.

803. The Defendants acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm MCA, or in blatant disregard of the substantial likelihood of causing MCA harm.

804. As a direct and proximate result of Defendants' tortious conduct, MCA is entitled to compensatory and special damages in amounts to be proven at trial.

805. As a direct and proximate result of the Defendants' tortious conduct, and in addition to the quantifiable monetary damages MCA suffered, MCA has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

806. Based upon the facts alleged herein, MCA has the clear legal right to the entry of an injunction prohibiting Defendants from publishing and republishing the defamatory statements.

807. The public interest would be served by the entry of an injunction prohibiting Defendants' tortious conduct.

808.    Based upon the facts alleged herein and to be established at trial, MCA has the clear legal right to the entry of a permanent injunction prohibiting Defendants from publishing and republishing the defamatory statements.

809.    Defendants' actions were willful, intentional, malicious, and conducted in bad faith and with the intent to harm MCA.  Accordingly, Defendants' actions were not privileged and they entitle MCA to recover punitive damages.

**WHEREFORE,** Plaintiff, Mason Classical Academy, Inc., demands judgment against Defendants, E. Donalds, Optima Foundation, and OptimaEd, , awarding:

E.    Compensatory and special damages in appropriate amounts to be established at trial;

F.    Punitive Damages;

G.    Injunctive relief prohibiting Defendants from publishing and republishing the defamatory statements; and

H.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XIX
### [DEFAMATION—Lichter vs E. Donalds, Optima Foundation, and OptimaEd]

810.    Plaintiff realleges paragraphs 1 through 546 as if fully set forth herein.

811.    Defendants, E. Donalds, Optima Foundation, and OptimaEd, published, caused to be published, and/or directed or encouraged others to publish false and defamatory statements alleged in paragraphs526-527, which did expose and had the tendency to expose Lichter to hatred, contempt, ridicule and disgrace.

812.    Defendants' false and defamatory statements are of and concerning Lichter and reasonably understood to be about Lichter.

813.    The Defendants' defamatory statements about Lichter are false.

814.    Defendants published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

815.    The Defendants' false and defamatory statements are defamatory *per se* because they charged that Lichter committed crimes and tended to injure Lichter in her trade, business or profession.

816.    In light of Lichter's standing in the community, the nature of the statements, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Lichter, the Defendants directly and proximately caused her to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Lichter is also entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statements.

817.    Lichter also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Defendants' false and defamatory statements.

818.    Re-publication of the Defendants' defamatory statements in other publications, online, and through social media, caused Lichter to suffer additional damages; all of which were foreseeable.

819.    The Defendants acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Lichter, or in blatant disregard of the substantial likelihood of causing Lichter harm.

820.    As a direct and proximate result of Defendants' tortious conduct, Lichter is entitled to compensatory and special damages in amounts to be proven at trial.

821.    As a direct and proximate result of the Defendants' tortious conduct, and in addition to the quantifiable monetary damages Lichter suffered, she has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

822.    Based upon the facts alleged herein, Lichter has the clear legal right to the entry of an injunction prohibiting Defendants from publishing and republishing the defamatory statements.

823.    The public interest would be served by the entry of an injunction prohibiting Defendants' tortious conduct.

824.    Based upon the facts alleged herein and to be established at trial, Lichter has the clear legal right to the entry of a permanent injunction prohibiting Defendants from publishing and republishing the defamatory statements.

825.    Defendants' actions were willful, intentional, malicious, and conducted in bad faith and with the intent to harm Lichter.  Accordingly, Defendants' actions were not privileged and they entitle her to recover punitive damages.

**WHEREFORE,** Plaintiff, Kelly Lichter, demands judgment against Defendants, E. Donalds, Optima Foundation, and OptimaEd, awarding:

A.    Compensatory and special damages in appropriate amounts to be established at trial;

B.    Punitive damages in appropriate amounts to be established at trial;

C.    Injunctive relief prohibiting Defendants from publishing and republishing the defamatory statements; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## COUNT XX
### [DEFAMATION—Bolduc vs. E. Donalds, Optima Foundation, and OptimaEd]

826.    Plaintiff realleges paragraphs 1 through 546 as if fully set forth herein.

827.    Defendants, E. Donalds, Optima Foundation, and OptimaEd, , published, caused to be published, and/or directed or encouraged others to publish false and defamatory statements alleged in paragraph 527,which did expose and had the tendency to expose Bolduc  to hatred, contempt, ridicule and disgrace.

828.    Defendants' false and defamatory statements are of and concerning Bolduc and reasonably understood to be about Bolduc.

829.    The Defendants' defamatory statements about Bolduc are false.

830.    Defendants published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

831.    The Defendants' false and defamatory statements are defamatory *per se* because they charged that Bolduc committed crimes and tended to injure him in his trade, business or profession.

832.    In light of Bolduc's standing in the community, the nature of the statements, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Bolduc, the Defendants directly and proximately caused him to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Bolduc is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements.

833.    Bolduc also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Defendants' false and defamatory statements.

834.    Re-publication of the Defendants' defamatory statements in other publications, online, and through social media, caused Bolduc to suffer additional damages; all of which were foreseeable.

835.    The Defendants acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Bolduc, or in blatant disregard of the substantial likelihood of causing him harm.

836.    As a direct and proximate result of Defendants' tortious conduct, Bolduc is entitled to compensatory and special damages in amounts to be proven at trial.

837.    As a direct and proximate result of the Defendants' tortious conduct, and in addition to the quantifiable monetary damages Bolduc suffered, he has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

838.   Based upon the facts alleged herein, Bolduc has the clear legal right to the entry of an injunction prohibiting Defendants from publishing and republishing the defamatory statements.

839.   The public interest would be served by the entry of an injunction prohibiting Defendants' tortious conduct.

840.   Based upon the facts alleged herein and to be established at trial, Bolduc has the clear legal right to the entry of a permanent injunction prohibiting Defendants from publishing and republishing the defamatory statements.

841.   Defendants' actions were willful, intentional, malicious, and conducted in bad faith and with the intent to harm Bolduc.  Accordingly, Defendants' actions were not privileged and they entitle him to recover punitive damages.

**WHEREFORE,** Plaintiff, David Bolduc, demands judgment against Defendants, E. Donalds, Optima Foundation, and OptimaEd, awarding:

A.    Compensatory and special damages in appropriate amounts to be established at trial;

B.    Punitive damages in appropriate amounts to be established at trial;

C.    Injunctive relief prohibiting Defendants from publishing and republishing the defamatory statements; and

D.    Such other and further relief as the Court deems just and appropriate to protect plaintiff's rights and interests.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  November 30, 2022.

*/s/ Shane B. Vogt*
Shane B. Vogt - FBN 257620
LEAD COUNSEL
E-mail:  svogt@tcb-law.com
David A. Hayes - FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 30, 2022, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Shane B. Vogt*
Attorney

307